# EXHIBIT 4

1

1

2     SURROGATES' COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK

3     ------------------------------------------X
      In the Matter of An Application for Probate

4
      In the Estate of

5
                                              FILE NO:

6              JULIA TASCHEREAU,              1042/98

7
                              Deceased.

8     ------------------------------------------X
                          31 Chambers Street - Room 509

9                         New York, New York 10007
                          October 16, 2007

10

    **B E F O R E:**

11
                    **THE HONORABLE RENEE R. ROTH,**

12                                        **Surrogate**

13  **A P P E A R A N C E S:**

14          ELIZABETH COMBIER
             Petitioner Pro Se

15           315 East 65th Street
             New York, New York 10021

16

17

18          KENNETH T. WASSERMAN, ESQ.
             Attorney for Objectant

19           350 Fifth Avenue - Suite 4810
             New York, New York 10118

20

21

22          PETER S. SCHRAM, ESQ.
             Attorney for The Public Administrator

23           350 Broadway
             New York, New York 10013

24

25

26

1

2          THE COURT:  Julia Taschereau.

3     Good morning.

4          MS. COMBIER:  Good morning, your Honor.

5          MR. WASSERMAN:  Good morning, Judge.

6     Kenneth Wasserman, for the objectant.

7          THE COURT:  Yes.

8          MS. COMBIER:  Elizabeth Combier, for the

9     proponent -- as the proponent.

10         MR. SCHRAM:  Peter Schram, for the

11    public administrator.

12         THE COURT:  The first motion is yours,

13    Mr. Wasserman.

14         MR. WASSERMAN:  Yes, Judge, it is.

15         The objectant's motion is to dismiss the

16    probate petition for failure to obey a

17    discovery order of June 12th, 2007.

18         The order required the petitioner's

19    attendance at an examination before trial which

20    had been called for in the stipulation that her

21    attorney at the time signed.  The order

22    cautioned the petitioner of her risk in not

23    attending the examination, and specifically

24    mentioned the potential of dismissal of the

25    petition on the date scheduled for the

26    examination.  However, the petitioner did not

appear.

   She argues in her papers that the Court
has no jurisdiction --

   THE COURT:  I am aware of that.

   MR. WASSERMAN:  She has a history of
noncompliance with court orders, both in this
court and in the related Supreme Court action,
so I respectfully request that the petition
should be dismissed.

   THE COURT:  Why haven't you appeared for
deposition, pursuant to my order?

   MS. COMBIER:  Your Honor, you said in
your order of July 24th, 2006 that you have no
jurisdiction over the case <u>Danger versus</u>
<u>Combier</u>.  The case <u>Danger versus Combier</u> does
not exist.  Mr. Wasserman is being paid by
Karla Moskowitz to pursue a case that does not
exist.

   THE COURT:  You are talking about Judge
Moskowitz?

   MS. COMBIER:  According to the 19th
Precinct -- and I have submitted to your court
a taped conversation of the 19th Precinct
telling me that Karla Moskowitz has asked him
to pursue the case.  But on my papers, which I

4

have submitted to this court, your Honor, the
case law and the facts of that case, it doesn't
exist.  There is no case.

        And you said yourself, your Honor, that
you have no jurisdiction over that case.  It
doesn't exist.  My sister signed a notarized
statement --

        THE COURT:  Ms. Combier, you are
misreading and mischaracterizing my decision.

        Now, I am going to tell you for the last
time you are required to obey this court's
orders.  If you do not appear for a deposition
within two weeks, I am going to dismiss your
petition for probate.

        Now, give me a date on which, within the
next two weeks, you are available to be
deposed.

        MS. COMBIER:  Your Honor --

        THE COURT:  Pardon me?

        MS. COMBIER:  Could I -- okay, I just
wanted to ask you:  Upon what jurisdiction are
you --

        THE COURT:  No, no, no, no, no.  That's
not how it works here.  Please.

        You have two weeks to appear for a

5

```
 1
 2    deposition.  What date is convenient for you
 3    within the next two weeks?
 4            MS. COMBIER:  Today is the...?
 5            THE COURT:  Today is the 16th of
 6    October.
 7            MS. COMBIER:  Is the 26th a day that is
 8    -- is that a weekend?
 9            THE COURT:  Counsel, are you available
10    on the 26th?
11            MR. WASSERMAN:  It is a Friday.
12            Yes, Judge.
13            THE COURT:  In this courthouse.  Arrange
14    for a stenographer here.
15            You are to appear in this courthouse in
16    this courtroom.
17            MS. COMBIER:  Okay, your Honor.
18            I requested that he give me discovery of
19    any of the claims that he has had.  May I ask
20    for that, please, your Honor?
21            THE COURT:  Please, you do the
22    deposition and we'll see where we go
23    thereafter.  You first have to obey this
24    court's orders before you can ask for anything
25    else.
26            MS. COMBIER:  Okay, may I have that
```

1

2  order in writing, your Honor, so that I can

3  appeal it?

4      THE COURT:  You have a stenographer

5  here.  If you order the transcript, you have

6  it.

7      MS. COMBIER:  I would like a separate

8  order, your Honor, so that I could appeal it.

9      THE COURT:  Did you hear me clearly?

10     If you are not here by the 26th for a

11 deposition, then I am dismissing the probate

12 petition.

13     Now, with respect to your application,

14 your motion for a jury trial, we will hold that

15 in abeyance until we see whether there is a

16 need for a jury trial or any trial whatsoever.

17     MS. COMBIER:  I believe, your Honor, it

18 is my right to have a trial on the writ.

19     THE COURT:  You have heard what I said.

20 It is held in abeyance until you are deposed,

21 otherwise there is no probate proceeding

22 because I am going to dismiss your application.

23     MS. COMBIER:  On what grounds, your

24 Honor?

25     THE COURT:  Thank you.  Have a good day.

26     MR. SCHRAM:  Your Honor, can we have a

```
 1
 2        time on the 26th?
 3              THE COURT:  Yes, of course.  You are
 4        absolutely right.
 5              MR. WASSERMAN:  Ten o'clock in the
 6        morning?
 7              THE COURT:  Let's do it at 11, please.
 8        I have a calendar here.
 9              MR. WASSERMAN:  Yes.
10              THE COURT:  11 o'clock in the courtroom.
11        Thank you.
12                    ****************
13   CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE
     TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES IN
14   THIS CASE.
15
16
17
18        -------------------------
19              ERIC ALLEN, RPR
              SENIOR COURT REPORTER
20
21
22
23
24
25
26
```

# EXHIBIT 5

A - 45



## ELIZABETH COMBIER

v

## FRED ANDERSON, CHARLES AMSTEIN, J. RICHARD FREY, THE SESSION, THE TRUSTEES, THE DEACONS OF MADISON AVENUE PRESBYTERIAN CHURCH, Individually and collectively in office on or about March 31, 1998, and thereafter, with the exception of SESSION MEMBER ERIC SELCH, and THE PRESBYTERY OF NEW YORK CITY

### INDEX # 115354/99

### VERDICT SHEET

### MARCH 2004

**FIVE OUT OF SIX JURORS MUST AGREE AS TO EACH QUESTION. IT IS NOT NECESSARY FOR THE SAME FIVE JURORS TO AGREE ON EACH QUESTION, HOWEVER, FIVE OUT OF SIX MUST AGREE IN ORDER TO REACH A CONCLUSION. PLEASE SIGN YOUR NAME AFTER EACH QUESTION IF YOU AGREE.**

1.  Did the defendants wrongfully interfere with plaintiff's right to possession of her mother's ashes?

                Yes __✓__           No _____ .

1. _Ian Miller_                    4. _Hyun-Soo Park_

2. _Jaime Marquit_            5. _Madeline Goud_

3. _Abby Schlectman_     6. _____

If your answer to Question 1 is "Yes", then proceed to the next question. If your answer to Question 1 is "No", then **STOP** and report your verdict to the court.

A-46

2. Was defendants' interference with plaintiff's right to possession of the ashes justified under the circumstances?

Yes _____     No _✓_

1. _Ian Miller_         4. _Hyan-Joo Park_

2. _Jaime Marguit_      5. _Madeline Goudi_

3. _Adah Schkectman_    6. _____

If your answer to Question 2 is "Yes", then **STOP** and report your verdict to the Court. If your answer to Question 2 is "No", then proceed to the next question.

3. State the amount awarded to plaintiff for the emotional distress and mental suffering attributable to defendants' wrongful interference with her right to possession of her mother's ashes. If your answer is "None," then please state so.

Emotional distress $ _____

1. _____        4. _____

2. _____        5. _____

3. _____        6. _____

**REPORT YOUR VERDICT TO THE COURT**

-2-

# EXHIBIT 6

# **LenoxHill** Hospital

100 East 77th Street
New York, NY 10075-1850
www.lenoxhillhospital.org

Kenneth Wasserman
350 Fifth Avenue
Suite 4810
New York, NY 10118

Re: Home Care Records    Julia Taschereau

Dear Mr. Wasserman:

We have done an extensive search for the home care records of the above patient and were unable to locate them. These records are no longer available because they have passed the required retention period of 7 years and have been destroyed.

Also in this packet, you will find certified copies of the Emergency Room records that weren't included in the original packet.

Please feel free to contact me at 212-434-2433 if I can be of further assistance.

Sincerely,

Francine Fields, MHA, RHIA
Director, Health Information Management

Cc: Edward Dondes, atty
        Gordon & Silber, P.C.

# **LenoxHill** Hospital

100 East 77th Street
New York, NY 10075-1850
www.lenoxhillhospital.org

September 16, 2009

**Patient Name:**  Taschereau, Julia
**Medical Record #**   1243521---ER visits of 7/26/97 & 7/19/93

To Whom It May Concern:

This is to certify that the attached copy for the above-named individual are copies of the hospital record.  This record was made in the regular course of business at Lenox Hill Hospital, and it is the regular course at Lenox Hill Hospital to make such records. Entries on the records are made at the time of the occurrence or event or within a reasonable time thereafter.

Sincerely,

*Francine Fields*

Francine Fields
Director, Health Information Management

# EXHIBIT 7

SURROGATE'S COURT : NEW YORK COUNTY
------------------------------------------X

Probate Proceeding, Will of

    JULIA ELIZABETH TASCHEREAU,

                Deceased.

------------------------------------------X    File No. 1042/98
JULIA DANGER,

        Plaintiff,

    -v-

ELIZABETH COMBIER,

        Defendant.
------------------------------------------X

R O T H ,   S .

    The motions pending in the estate of Elizabeth Taschereau
arise in two separate litigations, namely a probate contest and a
dispute over the proceeds of a trust established by decedent's
father.  The relevant background of these applications is as
follows.

    Testatrix died on March 16, 1998, at the age of 84, survived
by her twin daughters, Elizabeth Combier and Julia Danger.  The
day after decedent's death, Elizabeth filed a petition for
probate of an instrument, dated November 21, 1997, under which
she inherits the entire estate and is nominated executrix.  The
instrument was drafted, without fee, by an attorney associated
with a friend of Elizabeth.  The lawyer took his first
instructions concerning decedent's testamentary wishes from
Elizabeth, who was present during the execution ceremony.  It is

noted that decedent had executed a penultimate instrument some
eight years earlier in which she had left her estate equally to
her two daughters.

*where is it? never signed*

Preliminary letters were issued to Elizabeth on April 13,
1998. Following motion practice and the settlement of certain
issues concerning SCPA 1404 examinations, Julia filed objections
alleging lack of due execution, lack of testamentary capacity and
fraud and undue influence on the part of Elizabeth and the
draftsman.

*no, only papers without verification no petition*

At about the same time that the twins were engaged in the
above motion practice, Julia sued Elizabeth (individually) in
Supreme Court (New York County) with respect to a trust under the
will of their maternal grandfather for the income (and
discretionary principal) benefit of decedent with remainder, upon
her death, equally to the twins (the "Trust Proceeding"). The
complaint, sounding in conversion and fraud and seeking damages
of at least $500,000, alleges, among other things, that Elizabeth
unduly influenced decedent to ask the trustee (Bankers Trust
Company) for distributions that were ultimately used to pay
Elizabeth's personal expenses. The complaint also alleges that
Elizabeth communicated directly with Bankers Trust Company,
purportedly on her mother's behalf, and, by misrepresenting her
mother's financial circumstances, induced additional
distributions that were also used for Elizabeth's benefit. Julia

*unverified fraud; not Trust*

2

alleges that such distributions in effect improperly diminished her share of the trust remainder. It is noted that final distribution of the trust remainder was made several months after the action was commenced, both Julia and Elizabeth signing receipts and releases that discharged Bankers Trust Company from any further responsibility as trustee. After a flurry of motions, the Trust Proceeding was transferred to this court (Combier v Danger, Sup Ct, New York County, Dec. 17, 1999, Index No. 606259/98).

More motion practice followed on the heels of such transfer. After several conferences with the court, the parties entered into a stipulation narrowing the issues raised in their motions to the following: 1) whether the probate proceeding and the Trust Proceeding should be consolidated, 2) whether the draftsman of the propounded instrument should be compelled to give additional testimony, 3) whether Julia and, or her attorney should be sanctioned, and 4) whether Julia should be precluded from seeking any further discovery from Elizabeth in the probate and trust proceedings.

Prior to determination of these issues, however, Elizabeth discharged her attorney (her fourth), claiming, among other things, that he had committed malpractice and verbally and physically abused her. Nevertheless, she refused to sign the papers needed to permit him to withdraw formally. Her refusal to

3

do so appears to have been prompted by the lawyer's assertion of
retaining and charging liens as security for approximately
$22,000 in legal fees that she had incurred from September 2003
through January 2005 in the proceedings here as well as a second
unrelated action in Supreme Court (New York County) in which he
had represented her in her individual capacity.  In such action,
Elizabeth had sued, among others, a church and two of its
clergymen for, <u>inter alia</u>, defamation and intentional infliction
of emotional distress allegedly caused by the church's brief
delay in returning decedent's ashes.  Most of such claims were
dismissed on summary judgment.  The trial of the remaining claims
ended in a mistrial; a second trial resulted in a verdict for the
defendants.  The denial of Elizabeth's motion to set aside the
verdict was affirmed (<u>Combier v Anderson</u>, 26 AD3d 269, <u>rearg</u>
<u>denied</u> 2006 NY Slip Op 71015).

After months of trying to resolve the impasse on his fee
dispute, the attorney, in July 2005, moved for leave to withdraw
from the proceedings in this court.  On the return date of his
motion, Elizabeth appeared pro se, but did not file responsive
papers or cross-move for relief related to the fee dispute.
Accordingly, for good cause shown, the attorney was allowed to
withdraw and the matter was stayed for 30 days to allow Elizabeth
to retain a new attorney (her fifth) (<u>Matter of Taschereau</u>, NYLJ,
Aug. 18, 2005, at 24, col 3).

4

The next day Elizabeth filed a motion (pro se) seeking, among other things, an order compelling her former attorney to arbitrate their fee dispute and directing him to turn over her files. She also appealed the order permitting counsel to withdraw (even though she had discharged him) and then sought a stay of all proceedings in this court pending decision on the appeal and the return of her files. The attorney then cross-moved to have his fee fixed by this court, to which Elizabeth responded by filing a document entitled "Notice of Intention to Arbitrate" in which she again demanded arbitration of the fee dispute.

It is noted parenthetically that during this period of motion practice certain statements by Elizabeth in a conference with the court gave cause for concern that she had distributed estate assets to herself and had thus, among other things, violated her basic fiduciary duty to be impartial. In order to address such concerns, the court sua sponte directed Elizabeth to account (Matter of Taschereau, NYLJ, Nov. 8, 2005, at 28, col 3). Instead of doing so, however, she submitted a lengthy letter stating purported "reasons" for not accounting, none of which constituted a basis for failing to obey the court's order.

In the wake of Elizabeth's failure to account, as well as her admissions concerning her distributions to herself, Julia petitioned for revocation of her sister's preliminary letters.

5

Pending a hearing on Elizabeth's fitness to serve, the court
suspended her preliminary letters (Matter of Taschereau, NYLJ,
May 18, 2006, at 30, col 5) based upon her failure to account as
ordered, which is a statutory ground for such suspension (SCPA
719[1]). Elizabeth thereafter filed "objections" in the
revocation proceeding, to which she appended a purported
accounting. It is noted that such "accounting" was highly
questionable in substance as well as in form, since it contained
numerous inconsistencies with the New York Estate Tax Return (ET-
90) that Elizabeth had earlier filed with the court (see 22 NYCRR
207.20) and reported certain facially improbable administration
expenses. After the nominated successor fiduciary failed to
qualify, letters of temporary administration issued to the Public
Administrator on June 21, 2006.

With this background, we would immediately turn to the
merits of the pending motions, but for a threshold issue, i.e.,
whether this court has jurisdiction over the Trust Proceeding in
which Julia seeks damages from Elizabeth for the wrongful
diminution of Julia's share of the trust remainder.

Although the jurisdiction of the Surrogate's Court
encompasses all matters that relate to the affairs of a decedent
(see Matter of Piccione, 57 NY2d 278; NY Const, art VI,
§ 12[d]), the relief sought in the complaint, as framed (and as
viewed in a light most favorable to Julia), can affect neither

6

decedent's estate nor the now terminated testamentary trust
established by the sisters' grandfather, since such relief would
be obtained only against Elizabeth individually.  Moreover, even
if Julia's pleading could be viewed as seeking damages from
Elizabeth on decedent's behalf, the court still would not have
subject matter jurisdiction.  Only a fiduciary of decedent's
estate has standing to seek such relief, and Julia never
requested limited letters for this purpose (SCPA 702).
Similarly, to the extent that Julia's complaint could be read to
seek damages on behalf of the trustee, her claims would also fail
since she has no standing to make a claim on behalf of the
trustee and, in any event, as noted above, she released the
trustee from liability in connection with its acts as fiduciary.
Accordingly, the action is one between living parties and is
therefore not within this court's jurisdiction.  The action is
therefore returned to the Supreme Court (New York County).

The motions now pending can therefore be determined by this
court only in relation to the other proceeding at issue here,
i.e., the contested probate proceeding.  They are considered
seriatim below.

## Julia's Motion to Consolidate the Probate and Trust Proceedings

The return of the Trust Proceeding to Supreme Court (New
York County) obviously renders the motion for consolidation moot.

7

It is therefore denied.

Elizabeth's Pro Se Motion for a Stay

To the extent that Elizabeth's papers can be understood, she offers two grounds for the stay: first, her pending appeal of this court's order granting her former attorney's application to withdraw (Matter of Taschereau, NYLJ, Aug. 18, 2005, at 24, col 3, supra), and second, the unavailability of her files as a result of such attorney's assertion of a retaining lien.

The pendency of her appeal does not warrant a stay. As noted above, the order from which Elizabeth appeals merely granted her former attorney's application to withdraw after she discharged him. The court at the same time directed that the matter be stayed 30 days to give Elizabeth the opportunity to obtain new counsel. Having discharged him, Elizabeth does not seek to have her former attorney continue to represent her. Instead, she uses her appeal as a vehicle to challenge incidental matters that were not before this court in connection with the withdrawal application, including the validity of her former attorney's retaining lien. In other words, she does not need to prevent enforcement of the order authorizing the withdrawal of the attorney she discharged (CPLR 5519[c]).

Nor does the fact of a retaining lien on her files make a stay of the probate proceeding imperative. As discussed more

8

fully immediately below, there is a mechanism by which Elizabeth may obtain access to her probate files without subverting the protection to which the lawyer is entitled in relation to his claim for fees.

<u>Motions on The Fee Dispute</u>

We turn next to Elizabeth's motion to compel her former attorney to arbitrate their fee dispute and to turn over her files, and the lawyer's cross-motion for a determination of his legal fees. It is noted initially that, in connection with such cross-motions, neither party submitted the arbitration agreement at issue. Accordingly, in a telephone conference call, a member of the court's staff requested that Elizabeth and her former counsel each submit a copy of such agreement to the court as well as documentation of any notice given Elizabeth of her right to arbitrate.

As directed, Elizabeth's former attorney provided the court with both the retainer agreement containing the parties' arbitration agreement and copies of the correspondence he had sent to Elizabeth concerning her right to arbitrate. Elizabeth, on the other hand, did not provide the court with any documents even though it was she who sought to compel her former attorney to arbitrate. Instead, she sent a letter to the court which, among other things, demanded that she be provided with 1) a written order directing her to furnish such documents and 2) the

9

case law supporting the issuance of such order.

It is further noted that, as part of her requested relief, Elizabeth seeks an order compelling arbitration of her fee dispute and the return of her files in connection with her action in Supreme Court against the church. However, this court does not have jurisdiction over any issues relating to that action (Matter of Piccione, 57 NY2d 278, supra). Accordingly, we address Elizabeth's applications only as they relate to Surrogate's Court matters.

Elizabeth has not challenged the authenticity of the retainer agreement containing the arbitration provision in question or the other documents submitted by her former attorney. The retainer agreement refers to the resolution of any fee dispute, at the election of the client, by arbitration within the New York State Attorney-Client Fee Dispute Resolution System (22 NYCRR 137). It does not, however, include certain language required to make the client's right to arbitrate unconditional (22 NYCRR 137.2[b]).

The New York State Fee Dispute Resolution Program is intended to provide for the "informal and expeditious resolution of fee disputes between attorneys and clients through arbitration and mediation" (22 NYCRR 137.0). Such arbitration is not available, however, where there are claims involving professional malpractice or misconduct (22 NYCRR 137.1[b]). Nor is it

10

available, in the absence of advance consent to arbitrate, when an attorney has complied with the notice procedures set forth in section 137.6(a)(1) and the client has failed to commence an arbitration proceeding within 30 days of receipt of such notice (22 NYCRR 137.6[b]).

In this case, Elizabeth has repeatedly expressed her intent to pursue a legal malpractice claim against her former counsel in connection with the fee dispute. Moreover, the record establishes that she was given the notice required pursuant to section 137.6(a) and did not, for whatever reason, timely commence an arbitration proceeding. Under these circumstances, Elizabeth's application to compel arbitration of her fee dispute is denied.

Notwithstanding Elizabeth's contention to the contrary, this court has jurisdiction to determine the parties' fee dispute as it pertains to Surrogate's Court matters as well as any related claims for malpractice (see Matter of Warsaski, 190 Misc 2d 553, affd __ AD2d __, 2006 NY Slip Op 05290). However, counsel's cross-motion for determination of his fee was not brought by petition as required (SCPA 2110) and it therefore must be dismissed without prejudice to its re-submission in proper form.

As for that portion of Elizabeth's motion seeking the return of her files, it is well settled that an attorney who is discharged without cause has a retaining lien on all of the

11

client's papers and property in his possession as security for unpaid fees (see Goldman v Rafel Estates, Inc., 269 AD 647). Elizabeth claims, however, that counsel was discharged for cause -- a claim which if established would bar him from receiving a fee and invalidate his lien (see Campagnola v Mulholland, Minion & Roe, 76 NY2d 38).

Under ordinary circumstances, the court would proceed to hold a hearing on the issue of whether the discharge was for cause (see Genton v Arpeggio Restaurant, Inc., 232 AD2d 274). However, holding such a hearing prior to trial of the probate contest could prejudice Elizabeth because she would almost certainly be required to waive the attorney-client privilege in order to establish that her discharge of counsel was for cause (see e.g. Schulte Roth & Zabel LLP v Chammah, 251 AD2d 132). To avoid compromising Elizabeth's position in the probate contest and to give her access to her files so that the probate contest is not held hostage to her fee dispute, Elizabeth is directed to post a bond in the amount of $7,567, the portion of her former counsel's asserted fee that he claims is related to Surrogate's Court matters (see e.g. Matter of Science Development Corp., 159 AD2d 343). Counsel is directed to turn over the relevant files within seven days of his receipt of notice and proof that such bond has been posted.

12

<u>Julia's Motion to Compel the Further Testimony of the Draftsman</u>

Julia seeks an order compelling the draftsman of the propounded instrument to testify to communications with respect to which he has claimed attorney-client privilege. Elizabeth, however, asserts that, after her mother's death, she sought legal advice from the draftsman about a variety of matters including her mother's estate and that those conversations are privileged. Julia invokes Elizabeth's deposition testimony that she did not consider the draftsman to be her attorney as proof that no attorney-client relationship existed between Elizabeth and the draftsman after decedent's death. At the same time, however, in attempting to show that Elizabeth and the draftsman were in league with one another when the propounded instrument was drafted, Julia insists that the draftsman was Elizabeth's "personal attorney" after decedent's death. Julia offers no explanation for the seeming contradiction.

It is observed that the draftsman answered all questions about the preparation and execution of the propounded instrument, including the substance of his conversations with Elizabeth regarding such issues (CPLR 4503[b]). It was only when Julia's counsel questioned him concerning his communications with Elizabeth after decedent's death that he invoked the privilege on the ground that she had at that point, in confidence, requested his advice.

13

Confidential communications between an attorney and a client during the course of a professional relationship are privileged and cannot be disclosed without the consent of the client (CPLR 4503[a]; see e.g Spectrum Systems Intl. Corp. v Chemical Bank, 78 NY2d 371). The attorney-client relationship need not be formalized by a retainer agreement or payment of a fee as long as the attorney offered legal advice or assistance (see Brandman v Cross & Brown Co. of Florida, Inc., 125 Misc 2d 185). The party asserting the privilege, however, bears the burden of establishing that it attaches to a particular communication (Spectrum, 78 NY2d 371, supra).

Elizabeth has met her burden in this connection. Contrary to Julia's assertion, Elizabeth's deposition testimony to the effect that she did not consider the draftsman her attorney is not dispositive. Instead, viewed in context, her statements appear to relate only to the period before decedent's death. Moreover, when viewed as a whole, Elizabeth's testimony as well as the draftsman's establishes that the draftsman, although never formally retained by Elizabeth, consulted with her and acted on her behalf in connection with her mother's estate. It is of particular note that the draftsman spoke with Julia's counsel regarding estate matters at least twice on Elizabeth's behalf. Based upon the foregoing, it is concluded that an attorney-client relationship existed between Elizabeth and the draftsman.

14

Julia's motion to compel him to testify concerning his communications with Elizabeth after decedent died is therefore denied.

## Elizabeth's Motions for Sanctions/Preclusion of Further Discovery

The technical deficiencies of Elizabeth's submissions aside, the record provides no basis upon which to sanction Julia and, or her counsel for frivolous "discovery and motion practice." Indeed, the result of the allegedly frivolous motions was that Elizabeth ultimately provided additional discovery to her sister. Elizabeth also has not demonstrated that a protective order barring Julia from seeking any further discovery from her is warranted. In this regard, it is observed that Elizabeth's papers fail to establish a single outstanding discovery request by Julia. The motion is therefore denied.

The Trust Proceeding having been returned to Supreme Court and all pending motions in the probate contest having been determined, the court directs that any further discovery in the probate proceeding shall be completed within 60 days of the date of this decision.

The Clerk of the Court is directed to mail a copy of this decision, which constitutes the order of the court, to Kenneth E. Brown, Elizabeth Combier, Jonathan Landsman (Elizabeth's former

15

counsel), and Kenneth T. Wasserman (counsel for Julia).


_____
S U R R O G A T E

Dated: July 19, 2006

16

# EXHIBIT 8

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3     ------------------------------------X
                                         :
4     COMBIER,                           :    09-CV-05314
                                         :
5                        Plaintiff,      :
              v.                         :
6                                        :    500 Pearl Street
      THE STATE OF NEW YORK, et al.,     :    New York, New York
7                                        :
                         Defendants.  :    October 28, 2009
8     ------------------------------------X

9
                TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10               BEFORE THE HONORABLE FRANK MAAS
                   UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:         ELIZABETH COMBIER
                                 Pro Se
14                               315 East 65th Street
                                 New York, New York  10065
15
      For The State of New York: MONICA ANNE CONNELL, ESQ.
16                               RON EDEN, LEGAL INTERN
                                 New York State Office of the
17                                  Attorney General
                                 120 Broadway, 24th Floor
18                               New York, New York  10271

19    For Ethel Griffin and      JEFFERY H. SHEETZ, ESQ.
        Peter Schram:            Greenfield, Stein & Senior, LLP
20                               600 Third Avenue - 11th Floor
                                 New York, New York  10016
21
      For Guide One Insurance    CARL J. SCHAERF, ESQ.
22      and Dr. Fred Anderson:   Schnader, Harrison, Segal &
                                    Lewis
23                               140 Broadway, Suite 3100
                                 New York, New York  10005
24
                                 (Appearances continue on next page.)
25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

```
                                                                      2
 1

 2

 3     APPEARANCES CONTINUED:

 4

 5     For Kenneth Wasserman:        KENNETH WASSERMAN, ESQ.
                                     Kenneth T. Wasserman,
 6                                     Attorney at Law
                                     350 Fifth Avenue - Suite 4810
 7                                   New York, New York  10018

 8     For Eli Uncyk and Jeff        JEFFERY KOFSKY, ESQ.
          Kofsky:                    Uncyk, Borenkind & Nadler, LLP
 9                                   555 Fifth Avenue - 18th Floor
                                     New York, New York  10017
10

11     Pro Se Defendant:            FRANCESCA SABADIE

12

13     Court Transcriber:           RUTH ANN HAGER
                                     TypeWrite Word Processing Service
14                                   211 N. Milton Road
                                     Saratoga Springs, New York  12866
15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              THE CLERK:  This is a conference in the matter of
 2  Combier v. The State of New York.
 3              State your name for the record, please.
 4              MS. COMBIER:  Elizabeth Combier, pro se.
 5              THE COURT:  Good morning.
 6              MS. CONNELL:  Good morning, Your Honor.  Monica
 7  Connell of the New York State Attorney's General's Office for
 8  the state defendants.
 9              MR. SHEETZ:  Good morning, Your Honor.  Jeffrey
10  Sheetz, Greenfield, Stein & Senior for Ethel Griffin, the
11  public administrator, and Peter Schram for counsel.
12              THE COURT:  Good morning.
13              MR. SCHAERF:  Carl Schaerf, Schnader, Harrison,
14  Segal & Lewis on behalf of Guide One Insurance and Dr. Fred
15  Anderson.
16              THE COURT:  Good morning.
17              MR. WASSERMAN:  Kenneth Wasserman for Kenneth
18  Wasserman.
19              MR. KOFSKY:  Jeffrey Kofsky of Uncyk, Borenkind &
20  Nadler for Eli Uncyk and for me.
21              MR. EDEN:  Ron Eden [Ph.], the Office of the
22  Attorney General.
23              MS. CONNELL:  Mr. Eden is an intern in my office,
24  Your Honor, or -- excuse me, a recent --
25              THE COURT:  Okay.  Thank you.
```

4

1       MS. CONNELL:  Yeah.  Thank you.

2       THE COURT:  Anyone else who is representing a party?

3  Okay.  I've read the amended complaint and I think I've seen

4  most of the letters.  I guess one question I have is, Ms.

5  Combier, is there anybody who you contend was served but

6  hasn't yet appeared who should have by now?

7       MS. COMBIER:  Yes, Your Honor.

8       THE COURT:  Who's that?

9       MS. COMBIER:  Theodore Prudon.  And as I said in my

10 papers --

11      THE COURT:  Just that one person?

12      MS. COMBIER:  Theodore Prudon and -- I'm sorry,

13 Ms. Cotton --

14      MS. CONNELL:  Yeah.  Ms. Connell.

15      MS. COMBIER:  Ms. Connell.

16      MS. CONNELL:  Yes.

17      MS. COMBIER:  Could I have a copy of the complaint?

18 I ran out of the house today and I didn't bring it with me.  I

19 just wanted to have a copy.  I'm sorry.

20      MS. CONNELL:  No, that's fine.  Don't apologize.

21 It's fine.

22      MS. COMBIER:  And, Your Honor, I'm confused because

23 looking at the docket sheet I have not seen notices of

24 appearance for Barbara Levitan.

25      THE COURT:  Well, that's what I'm asking you.  Are

5

1   there people who you contend --

2          MS. COMBIER:  Yes.

3          THE COURT:  -- were served --

4          MS. COMBIER:  Yes.

5          THE COURT:  -- who have not appeared and I gather

6   you're telling me Mr. Prudon is one such person.

7          MS. COMBIER:  Lawrence Mark, Barbara Levitan.

8          MS. CONNELL:  Your Honor, if I may just address the

9   issue of the State defendants because I think that's what

10  Ms. Combier is going to speak to now.

11         THE COURT:  Oh, okay.  Are these people who have not

12  yet requested representation but who have been served?

13         MS. CONNELL:  No, Judge.  I wrote a letter to the

14  Court, I believe it was in August, saying we needed to resolve

15  that issue.  I think my next letter was --

16         THE COURT:  Wait.  When you say "the Court,"

17  distinguish -- I assume it's Judge --

18         MS. CONNELL:  Judge Holwell.  I apologize.

19         THE COURT:  Okay.

20         MS. CONNELL:  But in my October 13th letter to Your

21  Honor I mentioned that we would represent or were representing

22  all of the State defendants named in the complaint.  Ms.

23  Combier has objected that I didn't file a not -- an amended

24  notice of appearance saying I was appearing for the people

25  added in the amended complaint.  In order to resolve this I

6

1  have filed yesterday a notice of appearance on behalf of all

2  state defendants.  I mailed it to Ms. Combier.  On the record

3  I'd like to hand her a copy now.  Every state employee, state

4  agency, state entity suit I'm representing as per my previous

5  letters to the Court.

6          THE COURT:  Okay.  And I haven't gone through, you

7  know, none of these names ring a bell like Prudon but is there

8  anybody who you were about to tell me hasn't appeared who's

9  not a so-called state defendant?

10          MS. CONNELL:  Mr. Prudon is not, so that --

11          THE COURT:  Oh, okay.

12          MS. CONNELL:  -- that's one that's --

13          MS. COMBIER:  Mr. Prudon is not and Lawrence Mark is

14  not.

15          THE COURT:  Okay.

16          MS. COMBIER:  And, Your Honor, I faithfully served

17  the summons and complaint on all the defendants in the caption

18  and I filed the certificate and it was scanned by this court

19  because I did complete my responsibility to do that, Your

20  Honor.

21          THE COURT:  I know there was one --

22          MS. COMBIER:  In a timely fashion.

23          THE COURT:  -- very long looked like affidavit of

24  service with a lot of names on it.

25          MS. COMBIER:  I did do that, Your Honor.

7

1          THE COURT:  I'm aware of that.

2          MS. COMBIER:  So everybody has been served.  And

3    thank you, Ms. Connell.  A question I did have and --

4          THE COURT:  Well, let's --

5          MS. COMBIER:  -- I'm not --

6          THE COURT:  Wait, wait.  Let's just stick with this

7    issue.

8          MS. COMBIER:  Okay.

9          THE COURT:  Is there anybody else beyond the State

10   defendants and Prudon and Mark and the --

11         MS. COMBIER:  Well --

12         THE COURT:  And the state defendants I guess now and

13   notice of appearance has been filed.

14         MS. COMBIER:  Julia Danger submitted to me a notice

15   of appearance letter.

16         THE COURT:  Okay.

17         MS. COMBIER:  But she --

18         THE COURT:  Oh, that's your sister.

19         MS. COMBIER:  She did not file it, so I don't know

20   how serious she is about that and I don't know what is going

21   on with that because she has not been in contact with me at

22   all, but I have sent her everything that I have written or

23   filed in the Court but she has not been in touch with me.

24         THE COURT:  She sent --

25         MS. COMBIER:  No, she handed to me --

8

1          THE COURT:  No, no.  Let me -- please, let me finish

2    my sentence.

3          MS. COMBIER:  Oh, okay.  I'm sorry.

4          THE COURT:  She sent either Judge Holwell or me, I

5    believe, a letter that said she could not make it to the

6    conference because she's in France.  I don't see where it is

7    in the pile of paper now but -- oh, wait.  Let's see here.

8    Yes.  I got a letter dated October 26th saying in part, "I am

9    presently in Paris."  And skipping a little, "I intend to file

10   a motion to dismiss and I have sent a letter indicating this

11   to Judge Holwell along with the affirmation of service."  And

12   I assume that's an acknowledgment of service but I haven't

13   seen that.  In any event, she clearly is aware of the

14   litigation.

15         MS. COMBIER:  Your Honor, doesn't she have to send

16   that to me as well or --

17         THE COURT:  Well, what I'm going to do is docket her

18   letter and we will send you a copy.

19         MS. COMBIER:  But I also noticed on the docket sheet

20   because I do have PACER that Mr. Eli Uncyk and Mr. Jeff Kofsky

21   tried to submit an electronic letter to this court.  I was not

22   receiving a copy of it nor did I know about it until I looked

23   at the docket sheet.  So I'm just wondering, Your Honor, as

24   I'm not on PACER, I don't get any electronic stuff, according

25   to the Pro Se Office aren't the parties supposed to copy me on

9

1  their documentation?

2       THE COURT:  Anything -- just so it's clear to

3  counsel and anybody who's here pro se, because this is a pro

4  se case merely docketing something -- and I'm thinking more so

5  in the future of motion papers rather than letters -- has to

6  be sent by mail typically to a pro se plaintiff, although I

7  noticed that some people communicated with you by email.  Is

8  that acceptable to you also?

9       MS. COMBIER:  Well, that's a problem, Your Honor.

10 It is because I am on email and I do have PACER, but to

11 randomly see on the docket sheet that I'm not getting things

12 like the letter from my sister, Mr. Wasserman also filed a

13 notice of appearance.

14      THE COURT:  Well, Ms. Danger didn't attempt to

15 docket something on CM/ECF so there would have been nothing.

16 She didn't send it to you apparently but she's a pro se and we

17 treat pro ses with some liberality in this court.

18      MS. COMBIER:  But could -- is there some way that

19 the Court could inform her that I need to be sent what she

20 sends the Court or is that not acceptable to the Court or --

21      THE COURT:  Well, that's -- that's --

22      MS. COMBIER:  I mean, because I would like to get

23 copied on what she sends the Court.

24      THE COURT:  Yeah.  The order that will come out of

25 today's conference will indicate that no materials are to be

10

1  sent to me unless copies are furnished to you by mail.  Okay?

2          MS. COMBIER:  Okay.  And Mr. Wasserman --

3          MR. WASSERMAN:  Your Honor --

4          MS. COMBIER:  -- did make a notice of appearance by

5  electronic filing and the Pro Se Office told me to tell the

6  Court that I needed a copy of your notice of appearance, which

7  I never received.

8          MR. WASSERMAN:  With respect to Julia Danger,

9  although I do not represent her in this action I have

10 represented her in the past and I have a copy of a letter from

11 her dated August 21st to Judge Holwell with a copy indicated

12 at the bottom sent by email to Elizabeth Combier at

13 Betsy@parentadvocates.org --

14         THE COURT:  Okay.

15         MR. WASSERMAN:  -- so --

16         MS. COMBIER:  I never got that from --

17         THE COURT:  Well, yeah.

18         MR. KOFSKY:  In addition, Your Honor, we -- our

19 firm --

20         THE COURT:  Tell us who you are.

21         MR. KOFSKY:  I'm Jeff Kofsky, Uncyk, Borenkind &

22 Nadler.  The letter we mailed to Judge Holwell with respect to

23 motion to dismiss was also mailed to Ms. Combier by regular

24 mail, by Certified Mail return receipt requested and was

25 signed for on Ms. Combier's behalf.

11

1      THE COURT:  Okay.

2      MS. COMBIER:  The October 10th letter?  The October

3  10 -- I was referring to the October 10th electronic

4  communication --

5      THE COURT:  Well, I -- look.  I've indicated that

6  all letters going forward are to be -- all communications are

7  to be provided to you by mail.

8      MS. COMBIER:  Thank you.  Thank you, Your Honor.

9      THE COURT:  So let's move forward rather than

10  backward.  I or Judge Holwell have received numerous letters

11  requesting a premotion conference describing the theory of the

12  various motions.  At least one of the letters talks about Rule

13  8(a) which requires that there be a plain and simple statement

14  of the claim and this is a complaint which is 40 or so pages

15  long and seems to combine a number of different wrongs in a

16  way that may not be a plain and simple statement.  But I

17  gather this is the amended complaint is the one you want the

18  defendant's motions to address.  Is that correct?

19      MS. COMBIER:  Your Honor, if you require a statement

20  I can make one and I've -- I've kind of composed it already to

21  make it easier for this court.  I mean, I don't know what you

22  mean by "statement," but if my complaint is too long --

23      THE COURT:  Well, what I'm suggesting to you is some

24  of the people have said -- and I'm not sure that I disagree

25  with them -- is that your complaint is a little confusing.

12

1   You're a pro se and part of what the Court has to do is try

2   and work its way through that, but there seemed to be

3   allegations involving the church, there seemed to be

4   allegations involving Surrogate's Court.  I have not studied

5   your complaint but just taking those two as examples I'm not

6   quite sure how, if at all, the church and Surrogate's Court

7   interrelate.

8              MS. COMBIER:  Um-hum.  Well, Your Honor, if you

9   would like and you give me a date I will have a statement sent

10  to all of the defendants --

11             THE COURT:  Well, you know what?

12             MS. COMBIER:  -- and yourself.

13             THE COURT:  I don't want to add to the complexity.

14  I guess really what I'm asking is do you have any wish to

15  further amend your complaint or is this the complaint you want

16  counsel to address?

17             MS. COMBIER:  Well, I did ask you if I could make a

18  second amended complaint for two reasons actually, Your Honor.

19  First of all, one has been cured now and that was the

20  situation with Monica Connell.  She did tell me that she

21  wasn't going to make a notice of appearance and I thought that

22  I -- if I made a second amended complaint that could cure that

23  particular item of not making a notice of appearance for any

24  of the defendants, the state defendants.  So that's been cured

25  now.

13

1    My -- so I have actually three reasons.  The second

2 reason is on reflection of the case going forward with speed

3 and with accuracy I was going to withdraw the name of Theodore

4 Prudon even though I do feel that there is a definite case

5 behind him that I could make.  I would willingly write a

6 second amended complaint and remove him from the complaint.

7    And thirdly, Your Honor, in my original complaint

8 there is a very necessary party named Jonathan Landsman cited

9 in my first complaint.  When I filed my amended complaint and

10 it was stamped and everything and I went away I saw that his

11 name had been omitted from the caption and yet he remains -- I

12 believe it's paragraph 39 of the amended complaint -- and I

13 would like to put him back in because he is a major player in

14 this matter that I have documentation behind.  So that was

15 another reason why I wanted to, you know, write an amended

16 complaint and serve him.  And, of course, I've read the

17 Federal Rules of Civil Procedure quite often and as carefully

18 as I possibly can as a kind of reporter person, so --

19    THE COURT:  Who is Mr. Landsman?  I --

20    MS. COMBIER:  Mr. Landsman, he was my attorney

21 during the years that the Surrogate Court pursued a case that

22 was frivolous and had no basis and he asked the Court to have

23 me pay him for pursuing the frivolous lawsuit.  And then the

24 Court ordered me to pay him $7,000.00 -- almost $8,000.00 and

25 I couldn't do that, so he has all of my papers.  I have copies

14

1  of everything he has but he has kept my papers in his office
2  and he physically --
3       THE COURT:  He was served with the original
4  complaint?
5       MS. COMBIER:  Yes -- oh, no.  Excuse me, Your Honor.
6  In the original complaint was just Webber, Santa Marina [Ph.],
7  Mr. Wasserman, and Julia Danger.  So, no, he was not served.
8  And when I noticed that he wasn't in the caption I had already
9  served all the parties so I was going to address issues with
10 him separately.  But upon reflection once again, Your Honor, I
11 would -- if this court would allow me to write a second
12 amended complaint I would like to, as I said earlier, remove
13 Theodore Prudon and put Mr. Landsman back in because there is
14 a paragraph about him in the list of defendants already but
15 he's not in the caption.  And I understand Federal Rules of
16 Civil Procedure if I want to change the caption in any way,
17 which I would like to, I have to write another amended
18 complaint and serve him, so --
19      THE COURT:  Well, if you wish to serve a second
20 amended complaint I'll permit you to do that so that we don't
21 have a moving target and so that the motions are addressed to
22 your pleading you want me and Judge Holwell to consider.  How
23 quickly -- you said you were interested in expedition.  How
24 quickly can you serve your second amended complaint?
25      MS. COMBIER:  Could I say two weeks?

15

1            THE COURT:  Sure.  We're at the 28th.  This

2   calendar.  I'll make it November -- well, I'll give you until

3   the end of that week, Friday, the 13th of November.

4            MS. COMBIER:  Okay, Your Honor.  Thank you.

5            THE COURT:  So by that date you will serve all of

6   the defendants with the second amended complaint and --

7            MS. COMBIER:  And Mr. Landsman.

8            THE COURT:  -- file a copy with the Court.

9            MS. COMBIER:  Absolutely.  May I ask, do I get -- do

10  I go to the Pro Se Office and get an additional summons and

11  complaint?  They'll give it to me when I file it.

12            THE COURT:  For the additional defend --

13            MS. COMBIER:  For the additional defendant.

14            THE COURT:  I believe that's the case.

15            MS. COMBIER:  Okay.  I'll check with them.  Thank

16  you.

17            THE COURT:  Okay.  I -- one of the reasons why I had

18  everybody come in today is because I wanted to make sure that

19  all the motions to dismiss are on the same schedule and what I

20  propose is December 11th.  Is there anybody who could not file

21  their motion by December 11th assuming that on or shortly

22  after November 13th they get their -- the second amended

23  complaint?  Okay.  So I'll pick that date.  I will say January

24  15th for opposition papers.  Ms. Combier?  Okay?

25            MS. COMBIER:  Your Honor.

16

1          THE COURT:  Yeah.

2          MS. COMBIER:  There might be a possibility that I

3    will be going away the week of Christmas and New Year's.

4    Could I possibly have another week?

5          THE COURT:  I'll make it January 22nd.

6          MS. COMBIER:  Okay.  Thank you.

7          THE COURT:  And February 5th for any reply papers.

8    I'm going to impose a -- unless, Ms. Connell, you tell me you

9    need more -- a 25-page limit on any memorandum in support of

10   the motions to dismiss.

11         MS. CONNELL:  Judge, I'll try to do it in 25 and if

12   I need more I may --

13         THE COURT:  Well, I was going to carve out you as an

14   exception.  Say, 25 -- suppose I say 35 for you?

15         MS. CONNELL:  That'd be great, Your Honor.  I can do

16   it in 35.

17         THE COURT:  Okay.

18         MS. CONNELL:  Thank you.

19         THE COURT:  And obviously, Ms. Combier, you'll have

20   35 pages as a limit for your opposition memorandum and reply

21   papers.  I'm going to limit everybody to ten pages; that's

22   double-spaced.

23         MR. SHEETZ:  Your Honor, on behalf of Ms. Griffin

24   and Mr. Schram, I just request that we might have an

25   additional week.  I may be a trial in January and I'd just

17

1    like to have a little more time for the reply, say perhaps to

2    the 12th.

3           THE COURT:  Well, there's a lot of maybes between

4    now and January so --

5           MR. SHEETZ:  No, I understand that.

6           THE COURT:  So why don't I say if that becomes an

7    issue let me know --

8           MR. SHEETZ:  Okay.  Great.

9           THE COURT:  -- at the appropriate time?

10           MR. SHEETZ:  Thank you.

11           THE COURT:  Is there anything else anybody wants to

12    bring up today?

13           MS. COMBIER:  Yes, Your Honor.

14           THE COURT:  Yes.

15           MS. COMBIER:  The issue that I brought up previously

16    of Monica Connell representing all the State actors in this

17    matter, I feel that she should not be allowed to do that

18    because all of the State actors they involve a clerk of the

19    first department, they involve an attorney at the first

20    department, as well as the judges, and the former Attorney

21    General and the former Surrogate's Court judge who is now

22    working at McLaughlin & Stern.  And I feel that this is a

23    conflict that --

24           THE COURT:  Why?

25           MS. COMBIER:  -- is not resolved representing --

18

1          THE COURT:  Why is it a conflict?

2          MS. COMBIER:  Well, the former Surrogate's Court

3    judge acting in concert with the State of New York and being

4    defended as such due to the actions that they have taken --

5    and I can explain if you want further -- is, I believe,

6    contrary to the public interests.  And I -- my dad was the

7    Assistant Attorney General for the State of New York, so I'm a

8    great loyal member of the State of New York, a taxpayer.  And

9    the interests of the State of New York --

10          THE COURT:  Well, if they're working against the

11    public interests but they're working in unison against the

12    public interest, then I don't see the basis for a conflict

13    motion.

14          MS. COMBIER:  Well, if the current Attorney General,

15    who I don't believe knows the reasons for my citing Elliot

16    Spitzer, Judge Renee Roth, even though I have made certain

17    visits like to the FBI, the DA over the period of the last 11

18    years, I don't believe that Andrew Cuomo would necessarily be

19    conflicted.  I mean, that's not established yet that Andrew

20    Cuomo is contrary to the public interests at this point which

21    my case does show as definitely there are actions that have

22    been taken that are, I'm saying and I allege, against the

23    public interests.  I am not --

24          THE COURT:  Okay.  But that's not, as far as I'm

25    concerned, a basis for requiring recusal or disqualification,

19

1  I guess I should say, of Ms. Connell's so that application is

2  denied.  Anything else from anyone?  Yes.

3          MALE VOICE:  Your Honor, another party has joined us

4  you may wish heard to --

5          THE COURT:  Oh, okay.  Yes.  Thank you for pointing

6  that out.

7          MS. SABADIE:  I'm sorry, Your Honor.

8          THE COURT:  That's okay.

9          MS. SABADIE:  I guess the subway [inaudible].  Yeah.

10  I'm Francesca Sabadie and I'm one of the defendants on the

11  second amended complaint.

12          THE COURT:  The amended complaint.

13          MS. SABADIE:  Yeah, the amended complaint.  Sorry.

14          THE COURT:  We don't yet have a second amended.

15          MS. SABADIE:  We don't have a second one.  Sorry.

16          THE COURT:  And you heard the schedule and you have

17  no --

18          MS. SABADIE:  That's -- yeah, and it's a 35-page

19  limit for everybody but that's just --

20          THE COURT:  No, no.

21          MS. SABADIE:  But that's just for Monica I

22  [inaudible] --

23          THE COURT:  It's just for Ms. Connell because she

24  has the lion's share of the defendants.  Everybody else has a

25  25-page.

20

1          MS. SABADIE:  And that's just on the memo of law,

2   then?

3          THE COURT:  Correct.  But presumably -- well, to the

4   extent that parties -- let me start over.  I don't want to

5   convert these motions into motions for summary judgment.  I

6   recognize that the facts are complicated and the law is that,

7   for example, documents that are referred to in the complaint

8   may be considered as part of the motion to dismiss and I'm

9   certainly willing to do that.  But I don't want to get into

10  extraneous facts that require consideration of this as a

11  motion for summary judgment.

12         MS. SABADIE:  Thank you.

13         THE COURT:  Okay.  Thank you all.

14         MS. CONNELL:  Thank you, Your Honor.

15         MALE VOICE:  Thank you, Your Honor.

16                    *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

21

1        I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5        _____

6                    Ruth Ann Hager

7    Dated:   January 29, 2010

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 9**

FORBES
July 24 2000

Sept. 30, 1999. It stuck by its core business, betting incorrectly that buying 20 small distributors in two years would keep it afloat. After filing for Chapter 11 in April, CHS proposed selling off its European subsidiaries and becoming a Web-based emporium of hardware and infrastructure products. But in May it dropped the plan; CHS will liquidate this summer. As for MicroAge, which lost $160 million on 12-month trailing revenues of $6.1 billion, it is gasping for new life selling networking equipment and servers online.

Radical reinvention may be the only cure. The survivors have vastly expanded their range of products and services. Ingram Micro (sales: $29 billion) is now using a fee-based system to assemble, ship and, when necessary, hold

*MicroAge is gasping for life selling servers and network equipment.*

inventory for PC makers, and is getting into e-commerce fulfillment in a big way. Tech Data ($17 billion) wholesales 75,000 different products, from Cisco routers to Palm devices.

Still, diversification is no guarantee of survival. Merisel (which lost $54 million on 12-month trailing revenues of $5.4 billion) looks vulnerable. Facing a falloff in business, Merisel consolidated U.S. and Canadian operations, eliminating 400 positions. A new unit—selling and servicing resellers of Sun Microsystem products—now accounts for one-third of the company's revenues this year, up from 20% in 1999. But that rate may not continue, since Merisel recently lost a few key customers it declines to name. Its shares can be had for 91 cents.

There's a whiff of mortality about Dallas-based CompuCom, too. While it's moving to a more service-based model, a disproportionate amount of its $3 billion in revenues still comes from PC products. Its stock is down 80% in the past year to $1.50. **F**

# White Shoes, Black Shirts

**SCANDALS: U.S. prosecutors say White & Case and KPMG helped hide dirty doings at MGM and Crédit Lyonnais.**

BY DAVID McCLINTICK

A SCATHING 215-PAGE REport from the U.S. Department of Justice sets out how one of the world's leading law firms, Wall Street's White & Case, together with the equally renowned global accounting firm KPMG, played a role in helping to conceal fraud, forgery and other crimes allegedly committed by Crédit Lyonnais, the once grand, now decimated Paris bank (FORBES, Dec. 13, 1999).

The highly unusual private report, marked "Distribution Limited," was prepared by two Justice Department prosecutors in Los Angeles for French authorities conducting their own investigation of the bank. While the report does not say that White & Case or KPMG themselves committed criminal acts, its embarrassingly detailed contents could well attract the attention of bar associations and accounting regulatory groups.

Richard Holwell, a senior White & Case partner, vigorously rejected the report's characterizations of his firm's actions, and firmly denied any wrongdoing. A spokesman for KPMG said the firm hadn't yet seen the report and thus couldn't comment.

The report focuses on the two firms' roles in the 1990 acquisition of MGM/UA by Giancarlo Parretti and Florio Fiorini, two Italian businessmen now under house arrest in Italy awaiting extradition to Los Angeles to face U.S. criminal charges. As is now known, Parretti and Fiorini bribed officials of Crédit Lyonnais to get more than $2 billion with which to buy a number of properties, including MGM, from which



The man who started it all: Giancarlo Parretti

they subsequently looted millions of dollars.

According to the new Justice Department report, KPMG and White & Case both played roles in several pivotal transactions involving the misrepresentation by Parretti and Fiorini of how much debt they owed Credit Lyonnais through one of their companies, Pathé Communications, whose stock was traded on the New York Stock Exchange. Under U.S. law, the amount of money a public company owes is material information that must be disclosed accurately.

Pathé, KPMG's client, had another requirement. Under a prior agreement with the Securities & Exchange Commission, Pathé was prohibited from engaging in "related party transactions"—transactions between Pathé and its executive officers, directors and other individuals and entities associated with the company—without approval of an independent

committee of the board.

Parretti and Fiorini concocted a scheme by which a company called Cinema 5, purportedly controlled by Italian media mogul Silvio Berlusconi, purchased a group of Pathé's movie theaters in England and Holland for $185 million. Pathé purportedly used the money to pay down its debt owed to a Crédit Lyonnais subsidiary. In fact, Cinema 5 was a shell created by Fiorini, with the knowledge of Crédit Lyonnais officials, for the sole purpose of deceiving regulators, including the SEC. The money didn't come from Silvio Berlusconi. The signature of one of Berlusconi's aides was forged on a document to make it appear that it did, when in fact the money came from Crédit Lyonnais. Parretti and Fiorini's overall debt to the bank rose rather than declining.

According to the Justice Department report, a KPMG partner in Amsterdam, Henk Lafebre, was "highly suspicious" that the Cinema 5 transaction was not an arms-length deal. Lafebre expressed his concerns to



**Florio Fiorini's many talents include forgery.**

partners in the Los Angeles office, which bore final responsibility for auditing Pathé.

But the Los Angeles partner in charge of the account, James Weir, did not credit the warnings, or those of Douglas Flint, an audit partner for KPMG in London. Despite the fact that

▶ **Widening Scandal**
Prosecutors have termed the MGM-Crédit Lyonnais affair a global fraud case of "unprecedented complexity."

**Two Crédit Lyonnais bankers pocket bribes from Parretti, an Italian with a long criminal record.**

**Parretti and his partner Fiorini acquire MGM with bribe-oiled Crédit Lyonnais loans.**

**Criminal investigations of Crédit Lyonnais, Parretti and Fiorini gear up in the U.S. and France.**

**Parretti and Fiorini are placed under house arrest in Italy to await extradition to Los Angeles.**

**Federal prosecutors criticize White & Case and KPMG for their roles in key MGM transactions.**

François Gille, a top Crédit Lyonnais official, refused to identify Cinema 5's owners, citing "bank secrecy" concerns. KPMG signed off on the newly named MGM-Pathé's 1990 annual 10-K report to the SEC, a document the Justice Department has since concluded was "materially false and misleading." At about the same time, a newly installed chief financial officer at MGM-Pathé, Thomas Carson, tried to fire KPMG as MGM-Pathé's auditors. But he was overruled by François Gille, who himself had been a partner at a predecessor firm to KPMG Peat Marwick. It was Carson's impression that KPMG's first loyalty was to Crédit Lyonnais, not MGM-Pathé.

Concerned about looting at MGM-Pathé, Crédit Lyonnais launched its own probe, dispatching a team of bankers to its Dutch subsidiary, which had lent most of the money to the Italians. In a briefing to his Paris colleagues, Yves Gouzerh, the bank's chief investigator, burst into tears when describing the frauds he had discovered.

By then it was too late. Fiorini tried to protect himself by going behind Parretti's back to aid Crédit Lyonnais

in its probe. In February 1991, Fiorini wrote a note to a White & Case partner, acknowledging that the Cinema 5 transaction hadn't been at arm's length.

But White & Case did nothing to change the public characterization of the deal. In fact, according to the Justice Department report, the White & Case Paris office later helped Crédit Lyonnais hide relevant documents from Swiss authorities who were investigating the bank, seriously impeding the investigation. Says Holwell: "There's nothing wrong in keeping central control over documents."

As counsel for Crédit Lyonnais, White & Case played a key role in deciding how to report the Cinema 5 transaction to the investing public through SEC documents. But because the firm represented many of the key participants in the Cinema 5 transaction, the Justice Department concluded there were "numerous conflicts of interest which seriously undermined any ability White & Case had" to be thorough, complete and independent.

The firm, for instance, submitted a memorandum to French authorities for transmittal to the SEC which "deliberately ignored substantial [incriminating] evidence of which the bank was aware." Example: White & Case knew of a forgery by Fiorini but did not bring it to the attention of the SEC. "Ultimately," the report says, "the SEC did not take any action ... largely in reliance on representations made by White & Case."

Retorts Holwell: "I don't think anybody can charge that anybody was dishonest with the SEC." To the contention that White & Case had conflicts of interest investigating Cinema 5, Holwell says: "Baloney."

It is not too much to read into the report from Justice the damning implication that, had White & Case and KPMG exercised reasonable diligence, the MGM deal would have collapsed and the legendary studio would never have been looted. **F**

AFFIDAVIT OF SERVICE

This is affirm that I, Pose A. Posr, deposited a true copy of an opposition to motion to dismiss/summary judgment with the U.S. Post Office at 83rd Street & 8th Ave, on 2010.02.16 and mailed such copies to [i] Jonathan Landsmen, 260 Madison Ave, NYC 10016 - Lawrence Mark, 21 Quaker Ridge Road, Croton on the Hudson, NY 10520 - Francesca Sabadie, 1 Walworth Ave., Scarsdale, NY 10583 - Julia Danger, 47 Avenue Mathurin Moreau, Paris, France 75019 - Eli Uncyk, Jeff Kofsky, Uncyk, Borenkind & Nadler, LLP, 555 Fifth Ave., NYC 10017, - Kenneth T. Wasserman, 350 Fifth Ave., Suite 4810, NYC 10018 - Jeffery H. Sheetz, attorneys for Schram, Griffin, Greenfield, Stein, & Senior, LLP, 600 Third Ave., 11th Fl., NYC 10016 - Carl Schaerf, attorneys for Dr. Anderson, Guide One, Presbytery NYC, Schnader, Harrison, Segal, & Lewis, 140 Bway, Suite 3100, NYC 10005, - Monica Connell, attorney for All State Defendants, 120 B'way, 24th Fl, NYC 10271.

Above statement is true & correct under penalty of perjury.

Posr A. Posr
Process Server
62 E 125th St, #3G
NYC 10035

Dated: 2010.02.16