# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————— x

ELIZABETH COMBIER,

                      Plaintiff          DOCKET NO. 09 CIV 5314 (RJH)(FM)

     -against-

THE STATE OF NEW YORK, SUPREME COURT
OF THE STATE OF NEW YORK APPELLATE
DIVISION FIRST DEPARTMENT, HON, JOHN T.
BUCKLEY, in his individual and official capacity, HON.
KARLA MOSKOWITZ, in her individual and official
Capacity, ELIOT SPITZER, in his individual and official
Capacity, ERIC REISS, in his individual and official
Capacity,LAUREN HOLMES, in her individual and official
capacity, DAN RAMOS, in his individual and official
capacity, HON. JONATHAN LIPPMAN,
in his individual and official capacity as the former
Presiding Judge of the New York Supreme Court,
Appellate Division, First Department, HON RENEE
R. ROTH, in her individual and official capacity
as the former Manhattan Surrogate Court Judge,
HON. TROY WEBBER, in her individual and
official capacity, BARBARA LEVITAN, in her
individual and official capacity, MARY SANTAMARINA, Esq.,
in her individual and official capacity, ETHEL GRIFFIN,
in her individual and official capacity, PETER SCHRAM,
in his individual and official capacity, DR. FRED
ANDERSON, in his individual and professional capacity,
KENNETH WASSERMAN, in his official and individual
capacity, FRANCESCA SABADIE, individually,
LAWRENCE MARK, individually, JULIA DANGER,
individually, ELI UNCYK, in his individual and
professional capacity, JEFF KOFSKY, in his individual
and professional capacity, JONATHAN LANDSMAN, in his
individual and professional capacity, DOROTHY HENDERSON
in her individual and professional capacity, GUIDE ONE
INSURANCE COMPANY, PRESBYTERY OF NEW YORK CITY,

                    Defendants

—————————————————————————— x

**SECOND AMENDED
COMPLAINT**

***JURY TRIAL DEMANDED***

**PLAINTIFF ELIZABETH COMBIER**, proceeding Pro Se, as and for her Summons and Second Amended Complaint filed to protect her Constitutional rights against the above-captioned defendants, alleges upon knowledge as to her own facts and upon information and belief as to all other matters:

<u>**PRELIMINARY STATEMENT**</u>

1.This is a civil action seeking injunctive relief, monetary relief, including past and on-going economic loss, compensatory and punitive damages, costs and fees for violations of Constitutionally protected rights brought pursuant to: the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution; 42 U.S.C §1983, § 1985(2), (3); §1986; 28 U.S.C. § 1331, §1343, §1367, §1443; 18 U.S.C. §201, §241, §242, §641; 18 U.S.C. §1341, §1343; 18 U.S.C. §1505, §1512, §1513, and §1515; 18 U.S.C.A.§1951, §1952, and §1957; 18 U.S.C. §1961; SCPA §203, §302 1(a), §303 and §502; Civil Rights Law §§70, 76-a, and 79-h; Article I, § 8, §11 of the New York State Constitution; Judiciary Codes of Conduct, Judiciary Law §487, and other State law claims codified in the New York State Constitution as well as in the New York Civil Practice Law and Rules ("CPLR") as they relate to: procedures mandated by SCPA to assure fairness and equity in the Surrogate Court; prohibition of obstruction of justice, tampering with witnesses and contracts, conversion of property and fraud; support for freedom of speech and assembly; freedom from malice in law, from abuse of process and malicious prosecution, and from the intentional infliction of emotional harm.

2. Specifically, Plaintiff alleges that DEFENDANTS, with flagrant disregard for Plaintiff's Constitutionally protected rights, wantonly, recklessly, maliciously, knowingly

and purposefully, acting *ultra vires* individually under a ministerial cloak and in conspiracy with each other under color of state law, have deprived Plaintiff of her protected rights of freedom of speech, assembly, religion, and enjoyment of liberty and property in order to retaliate against her for exposing the corruption and fraud scheme at Madison Avenue Presbyterian Church ("MAPC"), Plaintiff's church for more than fifty years.

3. Plaintiff alleges that DEFENDANTS set up a conspiracy to deny probate of Plaintiff's mother's Will dated November 1997 - in which Plaintiff is the beneficiary – in order to take control and ultimately ownership of the estate of decedent Julia Taschereau, mother of twin sisters Elizabeth Combier ("Plaintiff") and DANGER.

4. The main theme of the fabricated story placed into the computers of the Courts of New York State was, and continues to be, acted out by Defendant WASSERMAN, who created out of thin air a tale of a long-term battle between the twin sisters in which Plaintiff is characterized as a greedy, controlling person ready and willing to steal all of her mother's money for ownership of her mother's apartment after her mother's death.

5. This tale has no validity, yet DEFENDANTS have "believed" this tale for eleven years, and shut the doors of the Courts of New York State to access by Plaintiff while giving DANGER a free ride inside it's hallowed halls, even though DANGER has lived in Paris France since 1972 and is mentally unstable. Upon information and belief, DANGER is not WASSERMAN's client and is not paying him.

6. None of Plaintiff's causes of action are frivolous, and all are brought to this Court as a case of first impression ( *primae impressionis)* for the violation of numerous Constitutional rights by Defendants, many of whom are under oath to the State of New

3

York to be impartial and honor the rules, and Statutes of the State of New York, yet deliberately chose not to.

7. Plaintiff's invocation of the equitable powers of this Court is just and proper based upon an eleven year pattern, practice, custom and policy of bad faith, harassment, defamation and unlawful use of the New York State Unified Court System by the state and non-state Defendants to further a corrupt scheme against Plaintiff's person and property.

8. This Second Amended Complaint is brought pursuant to an Order of United States District Judge Frank Maas dated October 28, 2009. EXHIBIT 1

## JURISDICTION AND VENUE

9. Jurisdiction of this Court is invoked under: the First, Fifth, Seventh, and Fourteenth Amendment to the United States Constitution; 42 U.S.C §1983, § 1985(2), (3); 18 U.S.C. §1505, §1512, §1513, and §1515; 18 U.S.C.A.§1952 and §1957, §1962, §1963, §1964, and 18 U.S. C. §1964(c) .

10. Formerly known as ancillary and pendant jurisdiction, supplemental jurisdiction under 28 U.S.C. §1367 permits both pendent claim and pendent party jurisdiction. 28 U.S.C. §1367 changed "the pre-existing law in that it makes supplemental jurisdiction mandatory, not discretionary".

28 U.S.C. 1343(3) provides for original jurisdiction of the district court:

To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

28 U.S.C. 1331(a) provides:

4

The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

42 U.S.C. 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

11. Plaintiff alleges that she has a prima facie case under 42 U.S.C. §1983 as the actions

cited herein [a] occurred "under color of law" and [b]  are derivations of Constitutional

rights as well as federal and state statutory rights. Plaintiff also alleges that in this private,

civil RICO action she was injured in my business and property by reason of:

[a] a "person" within the scope of the statute

[b] has utilized a "pattern of racketeering activity" or the proceeds thereof

[c] to infiltrate an interstate "enterprise"

[d] by (i) investing the income derived from the pattern of racketeering activity in the enterprise; (ii) acquiring or maintaining an interest in the enterprise through the pattern of racketeering activity; (iii) conducting the affairs of the enterprise through the pattern of racketeering activity; or (iv) conspiring to commit any of the above acts.

12. Defendants mailed motions, orders, and notes to Plaintiff  with the purpose to defraud

and/or obtain money and property by means of fraudulent misrepresentations; this

constitutes mail fraud under 18 U.S.C.A. §1341, and is part of the alleged RICO scheme

enacted by DEFENDANTS. This Court has jurisdiction to remedy acts of mail fraud.

13. Whoever knowingly uses intimidation, threatens, or corruptly persuades another

person, or attempts to do so, or engages in misleading conduct toward another person,

with intent to influence, delay, or prevent the testimony of any person in an official proceeding, or cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding, as Defendants have attempted to do by threatening Plaintiff with contempt of court if she spoke about what Defendants said in the Surrogate Court hearing April 1, 2009 is acting unlawfully and is tampering with an informant. This Court has jurisdiction over 18 U.S.C. §1512.

14. Pursuant to the civil RICO "injury discovery accrual rule" held by the Second Circuit (Bankers Trust Co. v Rhoades, 859 F.2d 1096, 1102 (1988)), Plaintiff learned of the exact particularities of the civil RICO complained about herein in July, 2006 when she received the order of former Surrogate's Court Judge Renee R. Roth, saying that her mother died "intestate" and the Public Administrator would be henceforth be the administrator of the estate of her mother. Plaintiff went into heart failure and spent three days in Lenox Hill Hospital, with her children crying by her side. EXHIBIT 2.

Plaintiff subsequently learned about the "pattern" exercised by DEFENDANTS in the alleged RICO, briefly described herein and claims injury caused by DEFENDANTS' violation of Sec. 1962. The Supreme Court has set a limitations period of four years for civil RICO claims, and this four year period has not yet been exhausted, thus this RICO claim is timely and this court has jurisdiction.

14. Venue herein is proper under 28 U.S.C. §1391(b) because the causes of action arose in the Southern District of New York, and the events or omissions giving rise to Plaintiff's claims occurred in this District.

15. Defendants have waived any protection or immunity they may have enjoyed under the Eleventh Amendment to the Constitution of the United States of America because they knowingly, maliciously and intentionally inflicted the most emotional, physical, and financial harm possible on Plaintiff without any subject matter jurisdiction over the fabricated tale made up by WASSERMAN or personal jurisdiction over DANGER, and thus they did not have the protected status giving them absolute or quasi-judicial immunity. When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he/she exercises no discretion or individual judgment and acts no longer as a judge but as a "minister" of his/her own prejudices. A judge is liable for injury caused by a ministerial act. To have immunity the judge must be performing a judicial function. State actors have been sued officially and in their individual capacities.

16. The presence of malice and the intention to deprive a person of his/her civil rights is wholly incompatible with the judicial function. When the State is one of the perpetrators and violators as in the instant case, there can be no expectation of just, if any, relief from it. The State cannot cause a federal violation, and then try to prohibit litigants from seeking redress in the federal courts for those same violations. There is no court other than this one that can hear the claims asserted by Plaintiff in the instant complaint.

## THE PARTIES

15. At all times relevant in this Complaint, Plaintiff Pro Se ("Plaintiff") ELIZABETH COMBIER is an advocate and reporter residing in the State of New York. At all times relevant hereto Plaintiff is a consultant/reporter to newspapers, online newsmagazines and international groups, individuals and organizations interested in corruption, fraud,

and illegal actions of public and private individuals and courts. She is also Editor of a website that publishes stories of court corruption, and Editor of blogs that deal with these issues as well as Federal and State Whistleblower Protection. Plaintiff is a part-time consultant/advocate for the United Federation of Teachers in New York City.

17. At all times relevant in this Complaint, Defendant STATE OF NEW YORK (hereinafter "STATE") is a sovereign state of the United States of America. At all times relevant herein, Defendant State was an employer within the meaning of the Constitution of the State of New York and was a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

18. At all times relevant in this Complaint, Defendant the NEW YORK STATE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT is a government entity created by and authorized under the laws of the State of New York to uphold the US Constitution, the laws of the State and City of New York, and to provide adjudicators who give impartial reviews of the cases assigned to them, was, and is, an employer within the meaning of the Constitution of the State of New York and a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

19. Defendant HON. JOHN T. BUCKLEY, ("BUCKLEY") sued herein both individually and in his official capacity at all times relevant to the instant complaint, was a citizen of the United States residing in the State of New York, and the Judge presiding over the NEW YORK STATE SUPREME COURT APPELLATE DIVISION, FIRST DEPARTMENT when a subpoena was issued by him to retrieve the records in the Matter of the Will of Julia Taschereau in June, 2006 for an Appeal by Plaintiff of former

Surrogate Court Judge Renee R. Roth's ("ROTH")  order which said that Julia

Taschereau "died intestate". BUCKLEY permitted the subpoena to be ripped up,

therefore preventing Plaintiff from exercising her Constitutional right to due process and

defense against her adversaries, the Defendants cited herein. He refused to sign another

subpoena and thus effectively prohibited Plaintiff from appealing ROTH's changing of

her mother's Will, suddenly, on July 19, 2006. Plaintiff also found a secret memo in the

file of the ashes case from Wasserman, listing him as a Respondent. Exhibit 3.

BUCKLEY was a policy maker responsible for creating and implementing policies

carried out in accordance with the U.S. Constitution and all federal, state, Surrogate

("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of

the State of New York.

20. Defendant HON. KARLA MOSKOWITZ ("MOSKOWITZ") sued herein both

individually and in her official capacity as a former NEW YORK STATE SUPREME

COURT JUDGE in the Commercial Division at 60 Center Street, N.Y.C. until December

31, 2008, and then assigned the position of Associate Judge to the NEW YORK STATE

SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT by former

Attorney General Eliot Spitzer, was at all times relevant to the instant complaint a citizen

of the United States residing in the State of New York. Judge MOSKOWITZ presided

over and  was assigned the case "Danger v Combier" that was simply uploaded to the

New York State Supreme Court computer by Gloria Smyth Godinger, and was never

served on Plaintiff. Nonetheless, depite having no personal or subject matter jurisdiction,

Judge MOSKOWITZ pursued the false claims of WASSERMAN sua sponte without

concern for the denial of due process rights of Plaintiff for more than one and one half

years. On January 2, 2007 Plaintiff recorded a conversation with NYPD Detective

A'Hearn during which he told Plaintiff that MOSKOWITZ was paying WASSERMAN

to harass Plaintiff. Copies of this tape were sent to the Attorney General's Office, the

District Attorney, the FBI, and all personnel at the New York State Supreme Court as

well as Appellate Division, First Department. MOSKOWITZ was a Judge responsible for

creating and implementing policies carried out in accordance with the U.S. Constitution

and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations,

policies, customs and usages of the State of New York.

21. Defendant ERIC REISS ("REISS") sued herein both individually and in his official

capacity as a NEW YORK STATE SUPREME COURT clerk in the Commercial

Division at 60 Center Street, N.Y.C. was at all times relevant to the instant complaint a

citizen of the United States residing in the State of New York. REISS was assigned to

work with MOSKOWITZ on the case "Danger v Combier" that never existed and over

which there was no personal or subject matter jurisdiction,. REISS was  responsible for

implementing policies carried out in accordance with the U.S. Constitution and all

federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations,

policies, customs and usages of the State of New York.

22. Defendant LAUREN HOLMES ("HOLMES") sued herein both individually and in

her official capacity at all times relevant to the instant complaint, was a citizen of the

United States residing in the State of New York, and the senior Attorney for the NEW

YORK STATE SUPREME COURT APPELLATE DIVISION, FIRST DEPARTMENT

when the Matter of the Will of Julia Taschereau in June, 2006 was brought for an appeal

after Judge Renee Roth changed the Will to make it disappear for four days. HOLMES

was and is under oath to pursue and obey the U.S. Constitution and all federal, state,

Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs

and usages of the State of New York, yet designated WASSERMAN as a "Respondent"

when she knew that he was not a party in the Will Proceeding of Julia Taschereau.

HOLMES also denied Plaintiff's request for a jury at trial in Surrogate's Court in 1997

and in August 2009.

23. Defendant DAN RAMOS ("RAMOS") sued herein both individually and in his

official capacity at all times relevant to the instant complaint, was a citizen of the United

States residing in the State of New York, and a clerk at NEW YORK STATE SUPREME

COURT APPELLATE DIVISION, FIRST DEPARTMENT when the case Combier v

Anderson was presented for appeal. RAMOS was under oath to pursue and obey the U.S.

Constitution and all federal, state, Surrogate ("SCPA") and city laws. RAMOS ripped up

a two-page memo secretly filed in the Appellate Court by WASSERMAN, who called

himself an "APPOINTMENT-RESPONDENT-PRO SE", and told Plaintiff on March 15,

2005 "You weren't supposed to see that". EXHIBIT 3

24. Defendant JONATHAN LANDSMAN ("LANDSMAN") sued herein both

individually and in his official capacity as the former Attorney for Plaintiff in Surrogate's

Court and in New York State Supreme with the case "Combier v Anderson" as well as

"Danger v Combier", never attempted to file Motions that addressed the frivolous Danger

v Combier, or the unverified Objections to Probate, but made Plaintiff pay him for

frivolous motion practice. In March 2004, during a visit to LANDSMAN's former office

at 60 East 42nd Street, Plaintiff was physically hurt by LANDSMAN when he dug his

nails into her shoulder. He is withholding Plaintiff's papers at the request of his co-

conspirator, former Surrogate Judge Renee R. Roth, who ordered Plaintiff to pay

LANDSMAN almost $8,000 to get her papers back. Plaintiff refused to pay for the years

of fraudulent law practice. Presently, LANDSMAN shares an office with ROTH at 260

Madison Avenue, 17th floor. Thus he violated his ethical mandate to obey all federal,

state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies,

customs and usages of the State of New York.

25. At all times relevant in this complaint, Defendant HON.JONATHAN LIPPMAN,

("LIPPMAN") sued herein both individually and in his official capacity at all times

relevant to the instant complaint, was a citizen of the United States residing in the State

of New York, and the former presiding Judge over the NEW YORK STATE SUPREME

COURT APPELLATE DIVISION, FIRST DEPARTMENT . As Presiding Judge, and

now Chief Judge For the State of New York, LIPPMAN was and is a policy maker

responsible for creating and implementing policies carried out in accordance with the

U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes,

ordinances, regulations, policies, customs and usages of the State of New York. Plaintiff

brought to his attention the withholding of her mother's ashes and the request for a trial

by jury in Surrogate's Court in 2007, but LIPPMAN denied Plaintiff her rights.

26. From the start of the action complained about herein until her retirement from public

service as Manhattan Surrogate Court Judge in December, 2008, Defendant RENEE R.

ROTH, ("ROTH"), sued herein both individually and in her official capacity at all times

relevant to the instant complaint, was and is a citizen of the United States residing in the

city of New York, and the Judge presiding over the MANHATTAN SURROGATE

COURT and presiding over the Matter of the Will of Julia Taschereau, Plaintiff's mother.

ROTH, as Surrogate Judge, was a policy maker responsible for creating and implementing policies carried out in accordance with the U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York, yet ignored her duties in order to declare that Defendant GRIFFIN was the Administrator of the Estate after Roth changed the Taschereau Will so that it did not exist on July 19, 2006. ROTH made her court not a court of record, with no tape recordings or transcripts made of any session held before her, except for Plaintiff, after her heart failure in 2006. Plaintiff asked for and received a court reporter, but was the only one who has a recording before ROTH.

27. At all times relevant in this complaint, Defendant HON. TROY WEBBER (hereinafter "WEBBER"), sued herein both individually and in her official capacity at all times relevant to the instant complaint and events of April 1, 2009, is the Interim Acting Manhattan Surrogate Judge appointed in January, 2009 by Governor Paterson and presiding over the proceeding on the Matter of the Will of Julia Taschereau, Plaintiff's mother and as such was a policy maker responsible for creating and implementing policies carried out at the Manhattan Surrogate Court in accordance with the U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York that protect people who are litigating Wills and Estates in Manhattan.

28. At all times relevant in this complaint, Defendant BARBARA LEVITAN (hereinafter "LEVITAN"), sued herein both individually and in her official capacity at all times relevant to the instant complaint and events of April 1, 2009, was the Senior Attorney for the law department at the Manhattan Surrogate Court responsible for the actions of the

Attorneys within that Department, and for creating and implementing policies carried out at the Manhattan Surrogate Court in accordance with the U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York that protect people who are litigating Wills and Estates in Manhattan.

29. At all times relevant to this Complaint, Defendant MARY SANTAMARINA (hereinafter "Santamarina"), sued here in her individual and official capacity, was at all times and upon information and belief a citizen of the United States of America residing in the State and city of New York. She works at the Manhattan Surrogate Court as the alleged law secretary of Defendant WEBBER, and as such is responsible for implementing the policies carried out by the Surrogate Court and those that are aligned with the federal, state and local laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

30. At all times relevant to this Complaint, Defendant KENNETH WASSERMAN (hereinafter "WASSERMAN"), sued here in his individual and official capacity, was at all times and upon information and belief a citizen of the United States of America residing at 368 Prospect Street, South Orange, New Jersey and working as a licensed Attorney in New York City with an office inside the Empire State building, Suite 4810. Wasserman falsely alleges that he has been employed by Defendant DANGER, yet has never submitted a verification to any court, and has made himself a RESPONDENT in the proceedings in Surrogate Court and in State Court without justification. He is not a relative of Plaintiff, and has no interest in the Will of Julia Taschereau. EXHIBIT 4.

31. At all times relevant to this Complaint, Defendant JULIA DANGER (hereinafter "DANGER"), sued here in her individual capacity, was at all times and upon information and belief a citizen of the United States and France, with property in Paris, France. She is sued for her eleven years of false allegations and breach of contract of the Samuel Strauss Settlement and Accounting Agreement signed by both her and Plaintiff, her sister, in 1999. She testified that her Objections To Probate were false in 2000, yet Verified the same claims in Surrogates Court on August 4, 2009..EXHIBIT 5

32. At all times relevant in this complaint, Defendant ETHEL GRIFFIN (hereinafter "GRIFFIN"), sued herein both individually and in her official capacity at all times relevant to the instant complaint was and is the Public Administrator and her office is in the same building as the Surrogate Court, 31 Chambers Street, New York City. GRIFFIN is in alleged control of the property in the Estate of Julia Taschereau, but this position was given to her due to fraud. GRIFFIN was a policy maker responsible for creating and implementing policies carried out by her in accordance with the U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

33. At all times relevant in this complaint, Defendant PETER S. SCHRAM, P.C. (hereinafter "SCHRAM"), sued herein both individually and in his official capacity at all times relevant to the instant complaint, is located at 350 Broadway, Suite 515 in New York City; SCHRAM was and is the Attorney who represents Public Administrator GRIFFIN and her office, currently and fraudulently in alleged control of the property in the Estate of Julia Taschereau. SCHRAM was responsible for implementing policies carried out by him in accordance with the U.S. Constitution and all federal, state,

Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York. EXHIBIT 2

34. Defendant DR. FRED ANDERSON (hereinafter "ANDERSON"), sued herein both individually and in his official capacity at all times relevant to the instant complaint, is Pastor in charge of the large endowment of Madison Avenue Presbyterian Church, located at 921 Madison Avenue in New York City. ANDERSON lives in the church manse at 1165 Fifth Avenue, #12-A, N.Y. N.Y. 10029 and is allegedly the person accountable to the Presbytery of New York City and the Presbyterian Church USA for the itemizing of taxes, spending of contributions and invasions into the endowment. Plaintiff alleges that ANDERSON is misusing the funds donated to the "921 FUND" at MAPC, and a member of the Session told her in June 2009 about this information.

35. Defendant FRANCESCA SABADIE ("SABADIE") is an Attorney who lives at 1 Walforth Avenue in Scarsdale, with her husband and Robert Dwyer, as well as elusive Defendant JULIA DANGER. SABADIE is sued individually as a co-conspiator and ally of both DANGER and WASSERMAN.

36.. Defendant LAWRENCE MARK ("MARK") lives at 2110 Quaker Ridge Road, Croton on Hudson, NY 10520, and is in control of the property taken from the apartment of Julia Taschereau in June 1998. Upon information and belief, MARK has stored the estate property in his garage, and has made no attempt to preserve the property nor has he paid taxes on the property he holds.

37. Defendant ELI UNCYK ("UNCYK") is sued herein individually and in his professional capacity as an Attorney licensed to practice law with an office at 555 Fifth Avenue, 18th Floor, NY NY 10017 and thus must obey the U.S. Constitution and all

federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York, as well as the rules and statutes of professional responsibility. UNCYK played along with the scheme to deny probate of the Taschereau Will, and called Plaintiff on several occasions to threaten her that she had better cave in to the Court and settle with her sister.

38. Defendant JEFF KOFSKY ("KOFSKY") is sued herein individually and in his professional capacity as an Attorney licensed to practice law with an office in the lawfirm of Uncyk, Borenkind, and Nadler at 555 Fifth Avenue, 18th Floor, NY NY 10017 and thus must obey the U.S. Constitution and all federal, state, Surrogate ("SCPA") and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York, as well as the rules and statutes of professional responsibility.

39. GUIDE ONE INSURANCE Company is an entity that insures churches, and is located at 1111 Ashworth Road, West Des Moines, Iowa 50265-3538. GUIDE ONE has funded the storytelling of WASSERMAN and has a duty of care to insure Plaintiff as a member of MAPC, yet directed the Session and ANDERSON to throw her off the membership roll ten days after her mother's death.

40. At all times relevant to this Complaint, Defendant DOROTHY HENDERSON (hereinafter "HENDERSON"), sued here in her individual and official capacity, was at all times and upon information and belief a citizen of the United States of America residing in the State and city of New York, and was the Senior Attorney to former Judge ROTH until 2009, when she became the law clerk to New York State Supreme Court Judge Nicholas Figueroa at 60 Centre Street, Room 655, New York City. While at New York Surrogate's Court she was responsible for implementing the policies carried out by

17

the Surrogate Court and those that are aligned with the federal, state and local laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

41. The PRESBYTERY OF NEW YORK CITY is located at 475 Riverside Drive, Suite 1600, in New York City, and is responsible for overseeing the submission of minutes for all the Presbyterian Churches in New York City including those for Session meetings of MAPC, filing tax receipts, and general management of rules and guidelines for the Presbyterian Church USA based in Louisville Kentucky.


## **FACTUAL BACKGROUND**


40. Julia Taschereau, ("Taschereau") Plaintiff's mother, was the daughter of Samuel Strauss and Irene Rosenfield. She married Plaintiff's dad, P. Hodges Combier, Assistant Attorney General for the State of New York, in 1948 and joined Madison Avenue Presbyterian Church in New York City. She worked as a volunteer at MAPC fulltime from about 1958, and worked a concert at the Church on the afternoon of her sudden death in her sleep on March 15, 1998.

41. Upon information and belief, ANDERSON and The Session of MAPC, the governing body of MAPC, assumed that Julia Taschereau's Will left her apartment and/or money to MAPC.

42. Julia Taschereau had twin daughters, Julia Combier DANGER and Elizabeth Combier. Julia DANGER moved to Paris France in 1972, while Elizabeth Combier lived in New York City except for five years (1978-83) in Egypt, Israel and Jordan.

43. Plaintiff married and had four daughters, and saw her mother often at MAPC due to the nursery school in the church house, where Plaintiff's children attended 1986-1997.

44. In 1992 MAPC Session hired a new Pastor, Dr. Fred ANDERSON, to manage the financial affairs of the Church.

45. Julia Taschereau had an office on the 7th floor of the church building, down the hall from ANDERSON. She found out, in 1994, about the improper use of Church funds for real estate deals and about the union-busting and racial discrimination by ANDERSON from the porters and other staff. She told Plaintiff, and also told Plaintiff that she was being threatened by Fred Anderson and Associate Pastor Charles Amstein to "keep quiet."

46. DANGER had a terrible relationship with her mother Taschereau and beat her continuously. She came to New York every summer to physically and emotionally abuse her mother for money. In 1996 she joined forces with ANDERSON to make sure that Plaintiff was not getting in the way of a large bequest from Julia Taschereau to the MAPC endowment and the pockets of DANGER upon the death of Taschereau.

47. Taschereau was Co-Trustee with Banker's Trust Company of the Samuel Strauss Trust established by her father in 1953 in which Plaintiff and Danger were the remaindermen. The Trust ended with the death of Julia Taschereau, and in June-July 1999 both Julia DANGER and Plaintiff signed a Final Accounting, agreeing to closing the Trust and taking the money in equal shares. EXHIBIT 7

48. In 1996, an employee of MAPC, Scott Vanos, was fired by ANDERSON, because he was speaking out about the racism and discrimination going on at MAPC, and because he was the shop steward for Local B&J. ANDERSON wanted the Union out of the Church.

Plaintiff assisted the porters and Union workers at the Church obtain their benefits after they were summarily fired without cause, and she also got a job for Scott as the doorman of her building, infuriating ANDERSON, who decided to get rid of Plaintiff as soon as Jul;ia Taschereau "died or was incapacitated" (deposition testimony by ANDERSON) .

49. In 1996, to protect herself from the attacks of DANGER and the hostility of ANDERSON, Taschereau gave Plaintiff Power of Attorney so that she could tell DANGER that she did not have any money to give her, and also tell the church that they were not going to get the huge donations of the past.

50. In July, 1997, DANGER stole very valuable letters from Taschereau's apartment, and threw her to the floor in the kitchen the day before she flew to California for a vacation July 25, 1997.

51. Taschereau spent a few days in the hospital, but with the help of a walker, was back at her volunteer job within two weeks, performing her duties as before the "accident".

52. Taschereau, now afraid of being further abused by DANGER, decided she must write a Will.

53. On November 21, 1997 the Will of Julia Taschereau was signed in front of three attesting witnesses and an Attorney.  Taschereau made Plaintiff the Executrix and Beneficiary of her estate, which consisted only of her apartment and the contents.

54. Plaintiff told her mother often that she did not want the apartment, but Taschereau went ahead anyway to secure the "rights to survivorship" for Plaintiff without telling Plaintiff. EXHIBIT 8

55. Suddenly, after working at a concert at MAPC all day, Taschereau died in her sleep on March 15, 1998. Plaintiff heard about this from the live-in caregiver in her mother's

apartment, and she went to the apartment as soon as her children went to school. About one hour after arriving there, Plaintiff called Charles Amstein, MAPC Associate Pastor, who told her that he would take care of "everything". He called the funeral director of the church to cremate the body. Upon information and belief, when he returned to the Church, he called GUIDE ONE INSURANCE COMPANY and WASSERMAN to pursue the "interests of the Church".

56. On March 17, 1998 Plaintiff filed the 1997 Will in the Surrogate's Court, with a request for probate.

57. On March 17, 1998 Plaintiff received her first telephone call from a man named Mr. Kenneth Wasserman ("WASSERMAN"), who told Plaintiff that he was DANGER'S lawyer. He told Plaintiff "You are going to be sorry, you will regret not sharing the apartment with your sister"; Plaintiff kept asking him, "Who are you?"

58. Wasserman started calling Plaintiff up 3-4 times/week, screaming threats and curses, such as "We are going to get you for this"; "We will bury you"; "We know what you did," and other such words.

59. In April, 1998, DANGER was barred from the apartment building by the Coop Board due to her drunken and disorderly conduct, but Plaintiff allowed her to enter with WASSERMAN in order to sort through the stuff in the apartment..

60. From April to June 1998 DANGER and WASSERMAN removed all the valuable property from Taschereau's apartment and gave it to be stored in the home of Lawrence and Martha Mark, in Croton. Nothing of value was left inside the apartment. In August 1997 Danger had removed priceless letters from the apartment of Taschereau that belong to the estate. Plaintiff's mother begged Plaintiff for help in getting these letters back from

her sister, Danger. After the death of their mother, at her deposition in 2000, Danger brought Xerox copies of the missing letters and said on the record that the originals were in Paris, but she did not know how she had gotten hold of them.

61. In June 1998, Plaintiff went to the apartment and found WASSERMAN with a cart filled with the property from inside the apartment. She demanded that he tell her where he was going with this property, and he told her that it was none of her business, and verbally attacked her with menacing comments such as "Try to stop me", "we'll take care of you, you'll see", and other such comments. WASSERMAN told ANDERSON and Amstein that Plaintiff had stolen money "up to six figures" from the Taschereau bank account to pay her own credit cards. Amstein emailed this news to ANDERSON in June, 1998, and from this point on, Plaintiff's name was brought up at all Session meetings at MAPC, and at the Presbytery. Plaintiff had become a thief in the eyes of her Church.

62. On March 22, 1998 Plaintiff received Taschereau's ashes from the MAPC funeral director. Too upset to touch them, Plaintiff called Associate Pastor Charles Amstein ("Chuck") and asked him to hold them for a few days.

63. Plaintiff did not know that on March 31, the day after Taschereau's memorial service at MAPC the Session of MAPC would vote her off of the membership roll of the church after almost 40 years of membership. Amstein wrote her a letter in April telling her that he had to get Plaintiff and her sister together by throwing both off of the active membership list. This letter was followed by another on May 12, 1998, from Charles Amstein to Plaintiff, telling her that if she reconciled with her sister Julia DANGER, then she would be placed back on the membership roll.

64. In June, 1998 Plaintiff filed a complaint with the Presbytery of NYC at 475 Riverside Drive. The day Plaintiff filed her complaint the clerk told her that Fred ANDERSON had violated all of the rules of the PRESBYTERY by never giving any minutes of any meetings, or financial information, to the Presbytery.

65. In July 1998 Plaintiff's "trial" began in front of an ecclesiastical panel at the PRESBYTERY, the Permanent Judicial Commission, on whether or not Plaintiff could get her membership back. Plaintiff was told by a source on Session that the reason for her removal from the membership was because GUIDE ONE INSURANCE COMPANY had a duty of care for all members, and they were not interested in insuring Plaintiff for any claim she might have for damages. GUIDE ONE INSURANCE COMPANY has no duty-to-defend MAPC for withholding the ashes, so they had to create a character assassination of Plaintiff in order to divert attention away from the land and construction deals that the MAPC membership knows nothing about.

66. The ecclesiastic trial lasted 1 year. In July, 1999, Plaintiff regained her status as an active member of MAPC, and at the end of the month she sued ANDERSON and AMSTEIN in New York State Supreme Court for withholding her mother's ashes from her for eight days July 30-August 7, 1998, an actionable tort in New York State. In August 1998 WASSERMAN had told Amstein not to give Plaintiff her mother's ashes, that Plaintiff would bury Taschereau's ashes without DANGER because Plaintiff "hated" DANGER and because Plaintiff was an abusive, revengeful person. Amstein told Plaintiff that he would give her ½ of the ashes, if he did not hear from DANGER. He gave them back to Plaintiff on August 7, 1998, with a note on top of the box that he had to keep the ashes until DANGER told him to give them to Plaintiff. The case went to trial

23

in March, 2004, with LANDSMAN as the Attorney for Plaintiff. The presiding Judge, Lottie Wilkins, threatened Plaintiff while she was on the stand, telling her that she "better not say anything about a church". The jury recommended an award of $300,000, and suddenly Wilkins declared a mistrial, and ordered Plaintiff and the Church Attorney back into her courtroom in "one hour, with a new jury". The Church got a postponement for two weeks so that they could fly in Julia DANGER, who cried on the stand saying that Plaintiff was such a horrible person that she was going to bury the ashes without her, and took their mother's money for her own use (the Wasserman fairy tale). The second jury came back with a verdict that the Church , ANDERSON, and Amstein were liable for withholding Plaintiff's mother's ashes from her, but they were "justified" in doing so. Plaintiff appealed to the FIRST DEPARTMENT APPELLATE DIVISION, but was denied a new trial because, the Dept. wrote, withholding the ashes for a brief eight days was "justified under the circumstances". This decision became the standard for the Surrogate Court in the matter of the ashes. Plaintiff was permanently defamed.

67. On March 15, 2005, Plaintiff saw a secret memo from WASSERMAN in the file of the ashes case at the APPELLATE DIVISION, FIRST DEPARTMENT, and she took a picture of the caption before RAMOS grabbed it out of her hand and ripped it into tiny little pieces, saying "You were not supposed to see that". EXHIBIT 4.

Meanwhile, WASSERMAN told Plaintiff's lawyer that he was going to file Objections To Probate of the 1997 Will, and demanded a deposition of Plaintiff in 1999. Plaintiff agreed, and then was placed into a deplorable situation of being verbally abused in 1999-2000 for more than twenty-five hours by WASSERMAN. Plaintiff's lawyer asked to be removed from the case, and Plaintiff hired UNCYK and KOFSKY as her new attorneys.

68. In June, 1999 WASSERMAN contacted SANTAMARINA at the Surrogate Court, and arranged to keep the Matter of the Estate of Julia Taschereau with Judge Rene Roth. In November 2005 Plaintiff found the personal note written by SANTAMARINA to WASSERMAN. EXHIBIT 9

69. On February 15, 2000 WASSERMAN sent Plaintiff's Attorney UNCYK and KOFSKY an unverified two-page document called "Objections To Probate". These papers were never filed in the Surrogate's Court. This paper – "Objections To Probate" remained an unverified document that is not a petition, in defiance of SCPA §202, 207, 303, until the first day of the bench trial in Surrogate Court, August 4, 2009, the day that Julia DANGER submitted her Verification, so the trial could go forward without a jury. In this document, WASSERMAN writes he is the "Attorney For Julia Danger", and he claims truth in baseless and unproven allegations of lack of testamentary capacity on the part of Taschereau, and undue influence over her by Plaintiff. WASSERMAN also never filed any of the 1404 depositions of the attesting witnesses to the signing of the 1997 Will by Julia Taschereau, and these 1404s were filed on September 14, 2009, the last day of the bench trial on the Probate of the Taschereau Will before WEBBER.

70. Thus in June 1999, WASSERMAN obtained the partnership of Defendant SANTAMARINA in fixing the as yet unfiled objections to probate he was making up.

71. Soon after, in December 1999, WASSERMAN secretly filed a case "Danger v Combier" saying that Elizabeth Combier had somehow fraudulently taken money from the Trust and Combier had to give $25001 back to Danger, with $2 million in damages. He did not put Bankers Trust in the case, therefore he created a "Derivative Trust case" that cannot exist. New York State Supreme Court Judge Beatrice Shainswit dismissed the

case immediately, then took back her decision on re-argument of WASSERMAN, and sent it to Civil Court on a 325(d). Six months later, she grabbed it back, saying she had made an error, and sent the case to Surrogate's Court where it did not belong. From 2000-2006 Judge ROTH kept the matter "Danger v Combier" in the court and forced Plaintiff to pay her attorneys, first UNCYK/KOFSKY and then LANDSMAN, to pursue her interests. Plaintiff demanded that her attorneys end the case, but they refused. In 2005 Plaintiff fired LANDSMAN, and ROTH then ordered her to pay him $7600+ to get her records back. Plaintiff refused to pay him for his fraud. From 2003 to 2005 SANTAMARINA and WASSERMAN called Plaintiff at home to yell and scream at her that she would win the Will contest, but not the "Danger case" and she 'better' give her sister $375,000+ or else". Plaintiff knew as of 2005 that the case Danger v Combier did not have any validity in fact or law, and taped these harassing telephone calls. In July 2006 Judge ROTH ordered the matter Danger v Combier to New York State Supreme Court as the Surrogate's Court had no jurisdiction to hear it. The case was put into the computer and on the docket of MOSKOWITZ. From September 2006 to December 2007 when Plaintiff's Motion To Dismiss was granted with prejudice, MOSKOWITZ threatened Plaintiff with contempt, a trial, and a judgment against her, because she did not appear in court with WASSERMAN, who kept asking for sanctions for Plaintiff. After the matter was dismissed with prejudice, WASSERMAN Filed an appeal to the Appellate Division, and Plaintiff submitted papers which got the case permanently dismissed on October 1, 2009. Nine years too late. EXHIBIT 10

72.  From 2000-2004 the depositions of the witnesses to the signing of the Will dated Nov. 21, 1997 were taken but never filed in Surrogate's Court. The Deposition of the

Attorney was taken as well, and all the originals remained hidden in the office of WASSERMAN, so that Plaintiff could not file a Petition for Summary Judgment or note of issue.

All the witnesses to the signing of the Will validated that Taschereau was aware of the terms in the Will, wanted to sign it, and she was competent to know what she was signing.

73. On July 21, 2006, Plaintiff received an order from then Surrogate Judge ROTH and signed by Jane Passenant stating that Plaintiff's mother died "intestate" and therefore all the property left by Julia Taschereau would now be under the control of the Public Administrator, Ethel Griffin. (See EXHIBIT 2)

74. Plaintiff went into heart failure. She was three days in Lenox Hill Hospital on a heart monitor and was released on July 24, 2006. In August Plaintiff filed a police complaint against the harassment of Wasserman. This experience left permanent emotional and physical scars on Plaintiff.

75. Upon leaving the hospital and returning home, Plaintiff also called Mr. Peter Schram, the Attorney for Ethel Griffin, and he told her that he had a copy of the Will, he read the terms, and said that he could now take over because "the Judge [Roth] told him to".

76. Plaintiff has color photos taken in 2005 of the property stolen from her mother's apartment in 1998 by Wasserman and placed in a garage in Croton. Mr. Schram and the Public Administrator have done nothing to preserve this property for Plaintiff. The property may have the value of $500,000+, but has not been assessed. WASSERMAN and SCHRAM discuss the property together without Plaintiff, as SCHRAM told Plaintiff,

and they have decided that the property is not worth anything. WASSERMAN wrote
Plaintiff that there is no need to do an assessment.

77. In or about April 2006 Plaintiff received a call from a man who said his name was
"Bill Jorgenson", from the Attorney General's office.  Jorgenson told Plaintiff never to
come to the Attorney General's office again with any matter related to the Supreme Court
action.

78.. In March, 2009, Plaintiff received a Notice that the new, Interim Acting Surrogate
Court Judge Troy Webber requested a status conference with a law Department Attorney
on April 1, 2009, 10:30 AM. On or about March 25 2009 Plaintiff filed a Request For a
Court Reporter at the Pre-Trial Hearing scheduled in front of Judge Troy WEBBER on
April 1, 2009.  The Surrogate Court is a court of record and this request could not be seen
as frivolous. Plaintiff has filed the same request since 2006 when she had heart failure
and found out that WASSERMAN was paid by the Court to harass her. Plaintiff was told
in WEBBER's Chambers by her Assistants that the request had been granted.
 She went to the court for the Conference, with two colleagues. Upon arrival on the fifth
floor of the Surrogate Court, a Court Officer, "Randy Dash" (badge 4689) screamed at
Plaintiff to "get into the courtroom right now". He then pushed Plaintiff into the court,
closed the door on the two colleagues, and imprisoned her inside. EXHIBIT 11.
WEBBER said that she could not leave, and that she could not have her colleagues enter,
unless they were doctors for her heart condition. For the next hour and a half, WEBBER
refused to listen to a word that Plaintiff said, that she had given WASSERMAN all the
discovery he had asked for and she had never been given anything. WEBBER told
Plaintiff and SCHRAM and WASSERMAN that she was scheduling a trial. Plaintiff

asked for a jury trial. WEBBER told her to write a motion. Plaintiff told her that she had

already asked for a trial, but WASSERMAN denied this, and said that he had not asked

for a trial in his note of issue. Plaintiff had filed for a trial by jury in 2007, but this was

denied by the APPELATE COURT. WEBBER told Plaintiff that if she posted the tape of

the hearing on her website or in the media, that WEBBER would hold her in contempt.

79. On April 10, 2009, Plaintiff and her colleagues, one of whom is a recording engineer,

came to Surrogate Court to get a copy of the tape from the April 1, 2009 hearing. Plaintiff

not only got a copy from the court, but Mark Sabel in Personnel allowed her to make an

audiotape of the tape, so that she has the copy of the April 1 2009 hearing in two formats.

Plaintiff made a transcript, and on June 8, 2009 sued WEBBER, SANTAMARINA,

WASSERMAN, and DANGER in District Court for false imprisonment, and violations

of her First Amendment rights. EXHIBIT 12.

80. WEBBER was served and informed on June 9, 2009. She retaliated against Plaintiff

by ordering a trial to start on August 4, 2009 without a jury. Plaintiff was on trial from

August 4, 2009 until September 14, 2009, and every day WEBBER, SANTAMARINA,

WASSERMAN and DANGER made fun of her, insulted her, and violated her rights to a

fair and unbiased hearing.

81. WASSERMAN contacted Lenox Hill Hospital about the injuries Julia Taschereau

suffered on July 25, 1997, and the records from the emergency room visit were "lost" by

Lenox Hill. These records were "found" after the trial by Plaintiff insisting that Lenox

Hill must have these records, which have in them that Julia Danger harmed her mother

Julia Taschereau. This material fact should have been presented to a jury, and Plaintiff

alleges that this trial violated her Seventh Amendment right to a trial by jury. The sole

reason for WEBBER to have a trial before her while she is being sued, is to retaliate against Plaintiff for her whistleblowing the civil RICO that she has now published.

82. Plaintiff has been subjected to threats by the Surrogate as undeniable proof of the partnership of the Defendants in defaming Plaintiff, filing frivolous lawsuits, alleging malicious lies, and deliberately attempting to harm Plaintiff so that they, Defendants, can keep the stolen property still kept in Croton and under the control of the Public Administrator and Defendant MARK.

83. WASSERMAN has made himself a Respondent and for all intents and purposes, acts as he were Julia DANGER. None of his papers have the signature of DANGER. Judiciary Law §487 forbids this type of legal malpractice.

84. On April 1, 2009 Plaintiff left the courtroom in great emotional and physical distress. Fortunately, both her colleague were outside the door, waiting for two hours to join her. They both noticed the Court officer with the woman who had taped the hearing, and in his hand was a CPR machine. Plaintiff realized that Defendants intended on doing harm to her, possibly to the extent of having heart problems while imprisoned in WEBBER's Courtroom.

## CONCLUSION

85. Defendants' purpose over the past eleven years was to crush Plaintiff, defame her, and deny Plaintiff her lawful and protected rights to freedom of speech, freedom of religion, to obtain her mother's ashes, to property given to her in the Will of her mother, and other civil rights and protections pursuant to both State and Federal statutes. Plaintiff wrote about these actions in an article published in 2005, *"Without A Prayer For Relief"* .