UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | | |
|---|---|---|
| ELIZABETH COMBIER, | : | **REPORT AND** |
| | | **RECOMMENDATION** |
| Plaintiff, | : | **TO THE HONORABLE** |
| | | <u>**RICHARD J. HOLWELL**</u> |
| -against- | : | |
| | | 09 Civ. 5314 (RJH)(FM) |
| THE STATE OF NEW YORK, <u>et al.</u>, | : | |
| | | |
| Defendants. | : | |

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED:    8/25/10           │
└─────────────────────────────────┘
```

----------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

        <u>Pro se</u> plaintiff Elizabeth Combier ("Combier") brings this action against employees and judges of the New York State Unified Court System, attorneys who previously represented her, and other private individuals involved over the past twelve years in litigation surrounding the probate of her late mother's estate. The defendants employed or represented by the State of New York ("State Defendants"), as well as defendants Julia Danger ("Danger"), Mark Landsman ("Landsman"), Ethel Griffin ("Griffin"), Peter Schram ("Schram"), Fred Anderson ("Anderson"), GuideOne Insurance ("GuideOne"), Eli Uncyk ("Uncyk"), Jeff Kofsky ("Kofsky"), Kenneth T. Wasserman ("Wasserman"), Francesca Sabadie ("Sabadie"), and the Presbytery of New York City ("Presbytery") have moved to dismiss Combier's Second Amended Complaint ("SAC"). (<u>See</u> Docket Nos. 41, 43, 45, 47, 56, 57, 95). In addition, Combier has moved for a default judgment and sanctions against defendant Lawrence Mark ("Mark"), for my recusal, and to vacate Your Honor's denial of her motion seeking reconsideration of your

decision denying my recusal.[1]  (See Docket Nos. 77, 79, 81).  For the reasons set forth below, I recommend that all of the defendants' motions to dismiss be granted and that the federal claims brought by Combier be dismissed with prejudice.  I further recommend that the Court decline to exercise supplemental jurisdiction over Combier's state law claims, and that it deny Combier's motions.

I.    Background

    A.    Procedural History

            On June 8, 2009, Combier commenced this suit by filing a complaint against five defendants and paying the filing fee.  (See Docket No. 1).  On July 30, 2009, she filed an amended complaint naming eighteen additional defendants.  (See Docket No. 7).  Your Honor subsequently referred the case to me for general pretrial supervision and to report and recommend with respect to all dispositive motions.  (See Docket Nos. 11, 16).

---

[1]        Combier first filed a motion seeking my recusal when Your Honor referred the case to me.  (See Docket No. 17).  On October 2, 2009, Your Honor denied this motion because there were no grounds for my recusal.  (Docket No. 20).  Subsequently, on October 19, 2009, Combier filed a motion for reconsideration, (Docket No. 24), and, on October 26, 2009, a separate motion for recusal addressed to me (Docket No. 31).  On April 28, 2010, Your Honor denied Combier's motion for reconsideration.  (Docket No. 78).  On May 7, 2010, Combier filed a motion to vacate Your Honor's decision regarding the reconsideration motion on the theory that she never had made such a motion, but had only submitted a letter-application to me.  (Docket No. 79).  In fact, Combier had filed a document entitled "Notice of Motion to Reconsider Denial of Referral to Frank Maas."  (Docket No. 24).  Suffice it to say, there is no basis for my recusal.  Accordingly, any motions seeking that relief, including her second motion for recusal, (Docket No. 31), should be denied.

On October 28, 2009, I held an initial pretrial conference, during which I directed Combier to serve and file her SAC by November 13, 2009.  (See Docket No. 30).  I also afforded the defendants until December 11, 2009, to serve and file any motions to dismiss the SAC.

On November 24, 2009, Combier filed her SAC, naming a total of twenty-six defendants.  (Docket No. 33).  After various extensions, all defendants except Mark moved to dismiss Combier's SAC by January 27, 2010.  On February 17, 2010, Combier filed her opposition to these motions.  (Docket No. 76).  The motions were fully submitted as of March 5, 2010, when the defendants filed their reply papers.

On March 23, 2010, Combier filed a motion for default judgment against Mark, (see Docket No. 77), despite the fact that I previously had indicated in a memorandum endorsement that I would deal with her application seeking a default judgment after considering the motions to dismiss.  (See Docket No. 75).  On April 15, 2010, Your Honor received an affidavit in opposition to Combier's motion for a default judgment from Mark, which I since have had docketed.  (See Aff. of Lawrence Mark, sworn to Apr. 13, 2010 ("Mark Aff.") (Docket No. 94)).[2]  On May 28, 2010, Combier filed a further motion asking that Your Honor grant her motion for a default judgment against Mark and sanction him.  (Docket No. 81).

---

[2]     Mr. Mark maintains in his affidavit that he never found the legal papers related to this case allegedly left at his home.  (Id. ¶ 5).

3

B.      SAC

The allegations in the SAC all arise out of the death of Combier's mother,

Julia Taschereau ("Taschereau"), on March 15, 1998.  Following her mother's death,

Combier became involved in two litigations with Danger, who is her twin sister.  The first

was a probate proceeding in Surrogate's Court initiated by Combier; the second was a suit

brought by Danger contesting Combier's use of the assets of a trust created by

Taschereau's father.  The defendants in this action other than Danger are:  attorneys,

judges, court employees, and others who have been involved in one or both of the state

proceedings; the Presbytery; Anderson, who is the pastor of Combier's church; and the

church's insurer, GuideOne.  For purposes of the following summary, I have assumed the

truth of the allegations contained in the SAC.  I have nevertheless noted in the margin

several instances in which those allegations appear to be contradicted or further explained

by documents annexed to the SAC or Combier's other submissions.

1.      Julia Danger

As noted, Danger is Combier's twin sister.  (SAC ¶ 3).  Danger has lived in

Paris, France, since 1972 and is mentally unstable.  (Id. ¶ 5).  Danger had a terrible

relationship with her mother, Taschereau.  After moving to Paris in 1972, Danger

returned to New York each summer to abuse her mother emotionally and physically.  (Id.

¶¶ 46, 118).  On these trips, Danger also would take money from her mother.  (Id. ¶ 46).

In July 1997, Danger stole valuable letters from Taschereau's apartment.

(Id. ¶ 50).  During the same visit, Danger pushed Taschereau to the floor, causing her to

4

spend time in the hospital.  (Id. ¶¶ 50-51).  Several months later, on November 21, 1997, Taschereau signed a new will.  That will named Combier as the sole beneficiary of Taschereau's estate.  (Id. ¶¶ 52-53).

> 2.    Madison Avenue Presbyterian Church

Taschereau became a member of the Madison Avenue Presbyterian Church ("MAPC" or the "Church") in 1948 and began volunteering there on a full-time basis in 1958.  (Id. ¶ 40).[3]  Combier's children also attended the MAPC nursery school from 1986 to 1997.  (Id. ¶ 43).

In 1992, MAPC hired Anderson as its new pastor to manage its financial affairs.  (Id. ¶ 44).  Subsequently, in 1994, Taschereau discovered "the improper use of Church funds for real estate deals and . . . union-busting and racial discrimination by Anderson from the porters and other staff."  (Id. ¶ 45).  Taschereau told Combier about her discovery and that Anderson and associate pastor Charles Amstein ("Amstein") had threatened her to "keep quiet."  (Id.).  In 1996, Scott Vanos, a Church employee, was fired for "speaking out about the racism and discrimination going on at MAPC, and because he was the shop steward for Local B&J."  (Id. ¶ 48).  Anderson and MAPC mistakenly assumed that Taschereau had left her apartment or money to MAPC; in fact, as noted above, Taschereau left her entire estate to Combier.  (Id. ¶¶ 41, 53).

---

[3]     There are two paragraphs labeled "40" in the SAC.  This citation is to the latter.

5

i.      Removal from the Membership Rolls

On March 31, 1998, the day after the memorial service following Taschereau's death, MAPC removed Combier and Danger from the membership rolls of the Church.  (Id. ¶ 63).  In April, Amstein wrote Combier a letter in which he explained that he had taken that action in an effort to have Combier and Danger reconcile.  (Id.).  In May, Amstein wrote another letter which explained that Combier would be reinstated if she reconciled with Danger.  (Id.).  The real reason for removing Combier from the membership rolls, however, was a request from GuideOne, the Church's insurer.  (Id. ¶ 65).  By then, Combier had become embroiled in a dispute with Amstein concerning Taschereau's ashes.  (Id. ¶ 66).  As a "source" explained to Combier, GuideOne owed a duty to all Church members but was "not interested in insuring [Combier] for any claim she might have for damages."  (Id. ¶ 65).  The Church consequently "had to create a character assassination of [Combier] in order to divert attention away from the land and construction deals that the MAPC membership [knew] nothing about."  (Id.).

Combier appealed her removal from the church rolls by filing a complaint with the Presbytery.  (Id. ¶ 64).  In July 1999, after a lengthy ecclesiastical trial, Combier regained her status as an active MAPC member.  (Id. ¶ 66).

ii.      Taschereau's Ashes

On March 22, 1998, Combier received Taschereau's ashes from the MAPC funeral director.  (Id. ¶ 62).  "Too upset to touch them," Combier asked Amstein to keep the ashes for her.  (Id.).  In August 1998, Wasserman – an attorney who allegedly

represents her sister Danger – called Amstein and told him not to give the ashes to Combier for fear that she would bury them without Danger.  (Id. ¶ 66).  Amstein then refused to provide the ashes to Combier, stating that he needed to talk to Danger first. (Id.).  On August 7, 1998, Amstein relinquished the ashes to Combier after withholding them for eight days.  (Id.).

In July 1999, Combier sued Amstein and Anderson in Supreme Court, New York County, for wrongfully withholding the ashes.  (Id.).[4]  The case went to trial in 2004.  (Id.).  The jury recommended an award of $300,000, but the presiding judge, who was biased against Combier, unexpectedly declared a mistrial.  (Id.).  A second jury returned a defense verdict, finding that MAPC, Anderson, and Amstein were "justified" in withholding the ashes.  (Id.).  This decision was upheld on appeal to the Appellate Division, First Department.[5]  (Id.).

On March 15, 2005, Combier saw a "secret memo from Wasserman in the file of the ashes case at the Appellate Division, First Department, and she took a picture of the caption before Ramos grabbed it out of her hand and ripped it into tiny little pieces."  (Id. ¶ 67).[6]  A copy of this photograph is annexed to the SAC as Exhibit 4.

---

[4]       See Combier v. Anderson, Index No. 115354/1999 (Sup. Ct. N.Y. County).

[5]       See Combier v. Anderson, 808 N.Y.S.2d 902 (1st Dep't 2006); see also Combier v. Anderson, 824 N.Y.S.2d 276 (1st Dep't 2006) (affirming trial judge's declaration of a mistrial).

[6]       Combier has utilized block capitalization throughout her SAC where she refers to the defendants.  I have omitted this block capitalization in all quotations from her SAC in this Report and Recommendation.

3.    Probate Contest

After Taschereau died, Combier filed the 1997 will in Surrogate's Court,

New York County, on March 17, 1998, seeking to have it admitted to probate.  (Id. ¶ 56).

The probate proceeding was assigned to the Honorable Renee R. Roth.  (Id. ¶ 26).  That

same day, Combier received a call from Wasserman, who told her that she would "regret

not sharing the apartment with [her] sister."[7]  (Id. ¶ 57).  After his initial phone call,

Wasserman began calling Combier three to four times a week to threaten her and curse at

her.  (Id. ¶ 58).  Thereafter, in 1999, Wasserman "verbally abused" Combier during a

deposition that lasted "more than twenty-five hours."  (Id. ¶ 67).

In June 1999, Wasserman contacted Santamarina, a Surrogate's Court

employee, and arranged to have the Taschereau probate proceeding remain with Judge

Roth.  (Id. ¶ 68).  Annexed as Exhibit 9 to the SAC is a personal note from Santamarina

to Wasserman indicating that the case "[m]ust be kept before RRR [Judge Roth]."  (Id.

¶ 68 & Ex. 9).

In February 2000, Wasserman "sent [Combier's] Attorney Uncyk and

Kofsky an unverified two-page document called 'Objections To Probate.'"  (Id. ¶ 69).

This document, however, never was filed with the Surrogate's Court.  (Id.).  From 2000 to

2004, Wasserman also deposed the witnesses to the signing of the will, but never filed

_____

[7]        Wasserman contends that he represents Danger in both the probate proceeding
and the trust litigation.  (See Mem. of L. in Supp. of Mot. to Dismiss by Def. Kenneth
Wasserman (Docket No. 44), at 3).  The SAC alleges, however, upon "information and belief"
that Danger is not his client.  (SAC ¶ 5).

those depositions with the Surrogate's Court.  (Id. ¶ 72).  Combier contends that "[s]ince 2005 there has been a conspiracy established involving the Defendants with the sole purpose of denying the probate of the 1997 Will of Julia Taschereau."  (Id. ¶ 94).

On July 21, 2006, Judge Roth issued an order "stating that [Taschereau] died 'intestate' and therefore all the property left by Julia Taschereau would now be under the control of the Public Administrator, Ethel Griffin."[8]  (Id. ¶ 73).  Following her receipt of this order, Combier went into heart failure and was admitted to Lenox Hill Hospital, where she remained for three days.  (Id. ¶ 74).  Combier was released from the hospital on July 24, 2006, and in August filed a police complaint against Wasserman in which she accused him of aggravated harassment.  (Id.).

After Combier fired Landsman, the attorney representing her in the probate case, Judge Roth directed that she pay him $7,600 to resolve his retaining lien.[9]  (Id.

---

[8]         Ex. 2 to the SAC contains a letter to Combier from Peter S. Schram, Esq., Counsel to the Public Administrator of New York County, dated July 19, 2006, which indicates that the Public Administrator had been appointed "temporary administrator of [Taschereau's] estate pursuant to [a] May 10, 2006 decision of the Surrogate's Court (Roth, S.)."  As Judge Roth noted in a decision dated the same day ("July 19 Decision"), after Combier failed to account satisfactorily for the Taschereau estate assets, and a successor fiduciary failed to qualify, Judge Roth directed on June 21, 2006, that "letters of temporary administration be issued to the Public Administrator."  (See July 19 Decision at 5-6) (annexed as Ex. 7 to the Pl.'s Opp'n to Mots. to Dismiss and to Mots. for Summ. J. (Docket No. 76) ("Combier Opp'n")).  It appears that the letters of temporary administration issued by the Clerk of the Surrogate's Court pursuant to this directive erroneously stated that Taschereau had "died intestate."

[9]         Judge Roth noted in the July 19 Decision that Combier contended that she had fired Landsman, who was her fourth attorney, for cause.  (See July 19 Decision at 3-4).  As the Judge explained, "[u]nder ordinary circumstances," she would have held a hearing to determine whether this was so.  (Id. at 12).  At such a hearing, Combier would likely have had to waive her attorney-client privilege.  (Id.).  "To avoid compromising [Combier's] position in the probate
(continued...)

9

¶¶ 24, 71).  Judge Roth also prevented Combier from having a court reporter present at any proceedings before her.  (Id. ¶ 26).  "On October 26, 2007, and November 5, 2007, [Judge Roth] . . . imprisoned [Combier] in the same Courtroom in order to intimidate, harass, and threaten [her] into giving up seeking the Probate of the 1997 Will of Julia Taschereau."  (Id. ¶ 104).  Additionally, Roth told Combier "that if she did not come to her courtroom for a deposition on the Danger v Combier case, she [Roth] would not Probate the 1997 Will of Taschereau."  (Id.) (alteration in original).

    The will contest proceeding subsequently was transferred to the docket of Troy Webber, the Acting Surrogate.  (Id. ¶ 78).  In March 2009, Judge Webber ordered that a status conference be held on April 1, 2009.  (Id.).  Combier requested that a court reporter attend the status conference, and an individual from Judge Webber's staff told Combier that this request had been approved.  (Id.)  On April 1, 2009, when Combier arrived for the conference, a court officer screamed at her to "get into the courtroom right now," and then shut the door behind Combier, preventing her from leaving.  (Id.)  Judge Webber would allow only a physician to accompany Combier into the courtroom, not the two colleagues who came with her.  (Id.).  For ninety minutes, Judge Webber "refused to listen to a word that [Combier] said."  (Id.)  She also informed Combier that she could not have a jury trial because she had not requested one earlier.  (Id.)  In fact, Combier

---

⁹(...continued)
contest and to give her access to her files," Judge Roth directed that Combier "post a bond in the amount of $7,567, the portion of [Landsman's] asserted fee that he claim[ed was] related to Surrogate's Court matters."  (Id.).

had requested a jury in 2007, but her motion was denied by the Appellate Division.[10]
(Id.).

        After the conference before Judge Webber, Combier rejoined her

colleagues, who had waited outside the courtroom for her.  (Id. ¶ 84).  Her colleagues

noticed that the court officer had "a CPR machine."  (Id.).  This suggested to Combier

that the defendants "intended on doing harm to her, possibly to the extent of her having

heart problems while imprisoned in Webber's Courtroom."  (Id.).

        The proceeding on April 1, 2009, was tape recorded.  (Id. Ex. 12 at 3).

Combier was able to get both a transcript and an audio recording of the conference.  (Id.

¶ 79).  Judge Webber warned Combier, however, that she would be held in contempt if

she "posted the tape of the hearing on her website or in the media."  (Id.).

        After Combier named Judge Webber as a defendant in this lawsuit, she

retaliated by scheduling the trial of the probate case to commence on August 4, 2009.[11]

(Id. ¶ 80).  The trial continued until September 14, 2009, during which time "Webber,

---

[10]    During the conference, Combier contended that her attorney in the probate proceeding had requested a jury trial in his papers.  (See SAC Ex. 12 at 60-61).  Santamarina, a Surrogate's Court employee who was present at the conference, explained that a party seeking a jury trial in Surrogate's Court has to file a jury demand and pay a fee.  (Id. at 63); see also N.Y. Surrogate's Court Procedure Act ("SCPA") § 502(2)-(3).  She noted that there was no record in the Court's database that Combier had paid such a fee.  (SAC Ex. 12 at 64).  Accordingly, Judge Webber advised Combier either to produce the document in which she had demanded a jury and proof that the fee was paid or file a motion explaining why a jury trial nevertheless was warranted.  (Id. at 64-67).  There is no indication that Combier pursued either of these suggested courses of action.

[11]    Combier evidently moved in the Appellate Division for a stay of the trial.  Her motion was denied on August 18, 2009.  See SAC Ex. 11 (Appellate Division Order dated Aug. 18, 2009, denying stay of trial).

Santamarina, Wasserman and Danger [continuously] made fun of her, insulted her, and violated her rights to a fair and unbiased hearing." (Id.).  It appears that a decision in the probate case has yet to be issued.  (See Combier Opp'n ¶ 55) (noting that Judge Webber had not ruled as of Feb. 15, 2010).

4.       Items at the Home of Lawrence Mark

Between April and June 1998, Wasserman and Danger removed all the valuables in Taschereau's apartment to the home of Lawrence and Martha Mark.  (Id. ¶ 60).  Since then, Mark has stored the property in his garage and has made no effort to preserve the property.  (Id. ¶ 36).   The items in the garage, which may have a value in excess of $500,000, have never been appraised.  (Id. ¶ 76).  Schram, the attorney for the Public Administrator, discussed the property with Wasserman; together, without consulting Combier, they determined the property was not worth anything.  (Id.).

5.       Danger Lawsuit

Danger and Combier were remaindermen under a trust established in 1953 by Taschereau's father.  (Id. ¶ 47).  In June 1999, after Taschereau's death, Danger and Combier signed a final accounting and agreed to the termination of the trust, with the balance of the principal and income to be distributed to them in equal shares.  (Id.).  (Their agreement is annexed to the SAC as Exhibit 7.)

In December 1999, Wasserman "secretly filed" a case, captioned Danger v. Combier, in which he alleged that Combier had fraudulently taken money from the trust and owed Danger $25,001, plus $2 million in punitive damages.  (Id. ¶ 71).  State Supreme

Court Justice Beatrice Shainswit initially dismissed that action, but, upon reconsideration urged by Wasserman, changed her ruling and transferred the case to Civil Court. (Id.). Six months later, Justice Shainswit retrieved the case and transferred it to Surrogate's Court to be consolidated with the probate matter. (Id.). Surrogate Judge Roth then retained the case from 2000 through 2006, forcing Combier to pay her attorneys (first Uncyk and Kofsky, and then Landsman) "to pursue her interests." (Id.). Combier "demanded that her attorneys end the case, but they refused." (Id.).

Between 2003 and 2005, Santamarina, a Surrogate's Court employee, and Wasserman both called Combier's home repeatedly "to yell and scream at her that she would win the Will contest, but not the 'Danger case' and . . . 'better' give her sister $375,000+ or else." (Id.).

In July 2006, Judge Roth determined that she had no jurisdiction to hear the Danger v. Combier case and returned it to Supreme Court, New York County, where it was reassigned to Justice Karla Moskowitz. (Id.; July 19 Decision at 6-7). From September 2006 through December 2007, Justice Moskowitz "threatened [Combier] with contempt, a trial, and a judgment against her." (SAC ¶ 71). The Justice also "pursued the false claims of Wasserman sua sponte without concern for the denial of [Combier's] due process rights." (Id. ¶ 20). In 2007, Combier "recorded a conversation with NYPD Detective

13

A'Hearn during which he told [Combier] that Moskowitz was paying Wasserman to harass Plaintiff." (Id.).[12]

In December 2007, Justice Moskowitz dismissed the Danger case with prejudice. (Id. ¶ 71 & Ex. 10). Justice Moskowitz's ruling in Combier's favor subsequently was affirmed by the Appellate Division, First Department. (Id. ¶ 71).[13]

## II.   Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must dismiss a complaint that fails to state a claim upon which relief can be granted. In deciding a motion under Rule 12(b)(6), the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

---

[12]     Combier has provided the Court with a copy of this recording. (See Combier Opp'n Ex. 2). The tape recording indicates that Combier placed a phone call to the detective to follow up on her complaint that Wasserman had harassed her. The detective explained that he had investigated her complaint by telephoning Wasserman and Justice Moskowitz, and that Justice Moskowitz had confirmed that Wasserman was working for the court. The detective went on to clarify that statement, noting that Justice Moskowitz's clerk had indicated that Wasserman was an "officer of the court," who was acting within the bounds of Justice Moskowitz's orders related to a case (which presumably was Danger v. Combier). (Id.). The only person who suggested during the conversation that Wasserman was "being paid" by Justice Moskowtiz was Combier. Detective A'Hearn never said anything about such a payment. (Id.).

[13]     See Danger v. Combier, 885 N.Y.S.2d 594 (1st Dep't 2009).

(2007)).  While this does not require detailed factual allegations, it does require "more than an unadorned, the-defendant-unlawfully- harmed-me accusation" or "naked assertion[s] devoid of further "factual enhancement." Id.  Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from "conceivable to plausible" requires a court to "draw on its judicial experience and common sense." Id. at 1950-51. Moreover,  the Court is "not bound to accept as true" legal conclusions couched as factual allegations.  Twombly, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." Associated Fin. Corp. v. Kleckner, No. 09 Civ. 3895 (JGK), 2010 WL 3024746, at *1 (S.D.N.Y. Aug. 3, 2010) (citing Chambers v. Time Warner, Inc., 292 F.3d 147, 153 (2d Cir. 2002)).  In this case, because the plaintiff is proceeding pro se, the Court may also rely on the plaintiff's opposition papers in assessing the legal sufficiency of her claims.  See Crum v. Dodrill, 562 F. Supp. 2d 366, 373 n.13 (N.D.N.Y. 2008) (citing Gadson v. Goord, No. 96 Civ. 7544 (SS), 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997)).  Her pro se status further compels the Court to "read [her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

III.    Federal Claims

Liberally construed, Combier's SAC asserts the following federal claims against all of the defendants:  (1) a claim under 42 U.S.C. § 1983 ("Section 1983") for the deprivation of her rights under the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution; (2) a claim under Section 1983 for malicious prosecution and false imprisonment; (3) a claim of conspiracy under 42 U.S.C. § 1985 ("Section 1985"); (4) a claim under 42 U.S.C. § 1986 ("Section 1986") for failing to prevent the Section 1985 conspiracy; (5) a claim under the civil damages provisions of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961-1968; (6) whistleblower retaliation; and (7) violations of federal criminal laws.  As set forth below, each of these federal claims must be dismissed.

A.    Federal Claims Against State Defendants

The State Defendants have moved to dismiss the SAC on multiple grounds, contending, among other things, that the suit is barred by the Eleventh Amendment, that the State Defendants are protected by judicial and quasi-judicial immunity, and that the SAC fails to state a claim upon which relief may be granted against any of the State Defendants.

1.    Eleventh Amendment

Under the Eleventh Amendment, a state and its agencies generally are immune from suit in federal court.  See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54-56 (1996); Papasan v. Allain, 478 U.S. 265, 276 (1986).  There are two exceptions to this general rule which apply when there has been an explicit and unequivocal waiver of

immunity by a state or a similarly clear abrogation of the immunity by Congress.  See

Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984); Hallett v. N.Y. State

Dep't of Corr. Servs., 109 F. Supp. 2d 190, 197 (S.D.N.Y. 2000); Burrell v. City Univ. of

N.Y., 995 F. Supp. 398, 411-12 (S.D.N.Y. 1998).

New York has not waived its sovereign immunity generally or with respect to

its courts.  See, e.g., Mamot v. Bd. of Regents, 367 F. App'x 191, 192 (2d Cir. 2010) (citing

Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977)).[14]

Congress similarly has not abrogated the states' Eleventh Amendment immunity in the

course of creating federal civil remedies under the Reconstruction Era civil rights statutes,

Quern v. Jordan, 440 U.S. 332, 342 (1979), or RICO, see, e.g., Lape v. Pennsylvania, 157

F. App'x 491, 497 n.5 (3d Cir. 2005); Robinson v. California Board of Prison Terms, 997

F. Supp. 1303, 1307 (C.D. Cal. 1998); see also Molina v. State of N.Y., 956 F. Supp. 257,

260 (E.D.N.Y. 1995) (court will not infer that RICO statute abrogates Eleventh

Amendment protection).

Moreover, Eleventh Amendment immunity extends to state officials if the

relief to be granted "would bind the state or where the state is the real party in interest."

Russell v. Dunston, 896 F.2d 664, 667 (2d Cir. 1990) (citing Pennhurst, 456 U.S. at 101).

When an official is sued in his official capacity, rather than his personal capacity, the state

is treated as the real party in interest.  See O'Connor v. Pierson, 568 F.3d 64, 71 (2d Cir.

---

[14]     In this Report and Recommendation, I have cited certain cases which appear only
in the Federal Appendix or computerized legal research databases.  Copies of those cases have
been mailed to Combier.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

2009) (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985)).  A plaintiff therefore may not recover damages in federal court from a state official acting in his official capacity. <u>See, e.g.</u>, <u>Spencer v. Doe</u>, 139 F.3d 107, 111 (2d Cir. 1998) (citing <u>Graham</u>, 473 U.S. at 169).

Accordingly, Combier's claims against the State of New York and the Appellate Division, First Department, must be dismissed, as must her claims against Buckley, Moskowitz, Spitzer, Reiss, Holmes, Ramos, Lippman, Roth, Webber, Levitan, Santamarina, and Henderson in their official capacities.

2.      <u>Judicial Immunity</u>

i.      <u>Judges</u>

Throughout the course of the events described in the SAC, defendants Lippman, Buckley, Moskowitz, Roth, and Webber were New York State judges.  They consequently have absolute judicial immunity for their acts.  Judicial immunity protects a judge from suit even when there are "allegations of bad faith or malice."  <u>Mireles v. Waco</u>, 502 U.S. 9, 11 (1991).  The only two exceptions to judicial immunity arise when:  (a) a judge takes a nonjudicial action or (b) a judge's actions, "though judicial in nature, [are] taken in the complete absence of all jurisdiction."  <u>Id.</u> at 11-12.

Combier's only allegation regarding Judge Lippman, who was then the presiding Justice of the Appellate Division, First Department, is that she "brought to his attention the withholding of her mother's ashes and the request for a trial by jury in Surrogate's Court in 2007, but Lippman denied [Combier] her rights."  (SAC ¶ 25).  Since

her grievances concerning then-Justice Lippman relate directly to decisions rendered with respect to appeals concerning her various lawsuits, these claims are barred because he has absolute judicial immunity.

Combier's allegations against Justice Buckley (named as Judge Buckley) are as follows:

> [Buckley was] the Judge presiding over the New York State Supreme Court Appellate Division, First Department when a subpoena was issued by him to retrieve the records in the Matter of the Will of Julia Taschereau in June, 2006 for an Appeal by Plaintiff of former Surrogate Court Judge [Roth's] order which said that Julia Taschereau "died intestate". Buckley permitted the subpoena to be ripped up, therefore preventing [Combier] from exercising her [c]onstitutional right to due process and defense against her adversaries, the Defendants cited herein. He refused to sign another subpoena and thus effectively prohibited [Combier] from appealing Roth's changing of her mother's Will, suddenly, on July 19, 2006.

(SAC ¶ 19). A copy of a "so-ordered" subpoena evidently signed by Justice Buckley is annexed to the SAC as Exhibit 3. Even if the Justice refused to sign a second subpoena, however, issuing or refusing to issue a so-ordered subpoena clearly is a judicial function. See N.Y. C.P.L.R. § 2302 (distinguishing subpoenas issued by a clerk or counsel from those issued by a judge). Moreover, the First Department clearly has jurisdiction over appeals from the Surrogate's Court in New York County. See SCPA § 2701. Justice Buckley consequently clearly acted in a matter within his jurisdiction. Thus, no exception to his judicial immunity applies, and Combier's claims against Justice Buckley must be dismissed.

Similarly, although Combier makes numerous allegations about former Surrogate Judge Roth, each of the matters about which she complains relates to judicial proceedings before Judge Roth relating to either the probate of the Taschereau will or the Danger v. Combier case, which was consolidated for a period of time with the probate proceeding.  For example, Combier alleges that Judge Roth issued an order stating that Taschereau died intestate, forced Combier to sit for a deposition, ordered Combier to pay her former attorney, and directed that she would not allow the proceedings before her to be recorded.  Whether or not these rulings were correct, each unquestionably arose in the context of a judicial proceeding.  Judge Roth therefore clearly took these actions in a judicial capacity, with respect to cases over which she had jurisdiction, and therefore is entitled to judicial immunity.[15]

---

[15]      Combier alleges frequently in her SAC and opposition papers that the Surrogate's Court lacked jurisdiction over the probate proceeding because Danger failed to verify her "Objections to Probate" until 2009.  (See SAC ¶¶ 30, 69, 86; Combier Opp'n ¶¶ 11-12, 17, 20-23).  It is undisputed that the objections first were verified in August 2009.  The New York courts have generally held, however, that belatedly verified pleadings should be accepted and that a defective verification does not deprive a court of subject matter jurisdiction.  See, e.g., Hablin Realty Corp. v. McCain, 478 N.Y.S.2d 224, 225 (1st Dep't 1984) ("irregularity in verification . . . is not an appropriate basis upon which to refuse to enter judgment"); In re Johnson's Estate, 388 N.Y.S.2d 252, 254 (Sur. Ct. 1976) (denying motion to dismiss on jurisdictional grounds though petition was not properly verified); see also In re Dairymen's League Co-op. Ass'n, 109 N.Y.S.2d 867, 868-69 (Sup. Ct. Albany County 1952) (accepting corrected verification nunc pro tunc).

In any event, the jurisdiction of the Surrogate's Court first was invoked by Combier, who sought to have the Taschereau will admitted to probate.  Section 201(3) of the SCPA states that the court "shall continue to exercise full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents, and . . . determine all questions, legal and equitable, arising between any or all of the parties to any action or proceeding, or between any party and any other person having any claim

(continued...)

Judge Webber evidently became an acting Surrogate's Court judge after

Judge Roth retired.  Combier's SAC contains numerous assertions regarding Judge Webber

based on her actions in the probate proceeding, including a claim that Judge Webber

retaliated against her for filing this lawsuit by scheduling the probate case for trial in

August 2009.  Since all of these allegations relate to actions taken by Judge Webber in a

judicial capacity in connection with a matter over which the Surrogate's Court had

jurisdiction, Judge Webber also is protected by absolute judicial immunity.

Combier's allegations against Justice Moskowitz include claims that she

acted in the <u>Danger v. Combier</u> case without jurisdiction, violated Combier's rights in

connection with that case, and threatened Combier with contempt.  (<u>See</u> SAC ¶¶ 20, 71).

Once again, because these allegations all relate to a judicial matter over which Justice

Moskowitz was presiding, there is no question that she undertook the actions complained of

---

[15](...continued)
or interest therein, over whom jurisdiction has been obtained as to any and all matters necessary
to be determined in order to make full, equitable and complete disposition of the matter by such
order or decree as justice requires."  Clearly, the probate of the will, as well as the consideration
of any objections thereto, were matters within the subject matter jurisdiction of the Surrogate's
Court, regardless of any technical issues such as verification.  <u>See</u> <u>In re Cohen</u>, 529 N.Y.S.2d
958, 960 (Sur. Ct. 1988) ("The jurisdiction of Surrogate's Court is very broad and is limited only
by the fact that the proceedings must involve in some matter and to some extent the estate of a
decedent.").

To the extent that Combier is challenging the exercise of personal jurisdiction
over Danger and her by the Surrogate's Court, her contentions are equally baseless.  Section 203
of the SCPA outlines the ways in which the court may obtain jurisdiction over a party, which
include the "appearance of an adult competent party in person or by attorney or by pleading."
SCPA § 203.  Both Combier and Danger appeared in both the probate proceeding and the
<u>Danger</u> lawsuit either in person, through an attorney, or both.  The Surrogate's Court
consequently had jurisdiction over them.

in her judicial capacity.  Combier also clearly is wrong to the extent that she alleges that Justice Moskowitz had no jurisdiction over the case.  Combier apparently bases her jurisdictional claim on the theory that the case before Justice Moskowitz "never existed." (See SAC ¶ 21).  This conclusory assertion, however, is belied by the facts.  The case not only existed, but was resolved in Combier's favor.  See Danger v. Combier, 885 N.Y.S.2d at 594 (affirming Judge Moskowitz's dismissal of Danger's complaint).

        To the extent that Combier alleges a lack of subject matter jurisdiction based upon the transfer of the Danger v. Combier case from Supreme Court to Surrogate's Court and back her claim is baseless.  The "[New York] Supreme Court is a court of original, unlimited and unqualified jurisdiction and is competent to entertain all causes of actions unless its jurisdiction has been specifically proscribed."  Fry v. Vill. of Tarrytown, 89 N.Y.2d 714, 718 (1997) (internal quotation marks and citations omitted).  Accordingly, in the absence of any showing that the exercise of its plenary jurisdiction was proscribed, Justice Moskowitz and the Supreme Court in which she then sat had subject matter jurisdiction over the dispute between Danger and Combier concerning the trust assets.

        It also is clear that the court had personal jurisdiction over the parties. Although Danger lives in France, she brought her suit in state court and therefore consented to its exercise of personal jurisdiction over her.  Similarly, although Combier alleges that she was "never served," (SAC ¶ 20), she unquestionably appeared in the Danger suit.  (See SAC Ex. 10) (granting Combier's motion in the Danger case).  The State Supreme Court consequently had personal jurisdiction over Combier.

Thus, none of Combier's allegations are sufficient to overcome Justice Moskowitz's judicial immunity.

Finally, Combier alleges, based upon her conversation with a police detective, that Judge Moskowitz paid Wasserman to harass her. (See SAC ¶ 20). Since such an improper payment plainly would fall outside what might ordinarily be considered a judicial task, I will consider below in Section II(A)(3) whether this allegation gives rise to a claim upon which relief can be granted.

ii.   Judicial Employees

Judges obviously do not work without assistants. For this reason, judicial immunity may also protect defendants who are court employees. As the Second Circuit has explained, such "quasi-judicial immunity" applies to those "who perform functions closely associated with the judicial process." Oliva v. Heller, 839 F.2d 37, 39 (2d Cir. 1988) (extending judicial immunity to federal judge's law clerk); accord Gollomp v. Spitzer, 568 F.3d 355, 365 (2d Cir. 2009) (extending immunity to state court judge's law secretary); see also Young v. Selsky, 41 F.3d 47, 51 (2d Cir. 1994) ("Whether non-judicial officers merit quasi-judicial absolute immunity depends upon 'the functional comparability of their judgments to those of the judge.'") (quoting Imbler v. Pachtman, 424 U.S. 409, 423 n.20 (1976)). Thus, when state court employees act in a judicial, rather than a ministerial, capacity, they are protected by judicial immunity. See Oliva, 839 F.2d at 40. Even administrative actions taken at the direction of a judicial officer may be protected by the immunity. See Rodriguez v. Weprin, 116 F.3d 62, 66-67 (2d Cir. 1997) (extending

23

immunity to Appellate Division and Pro Se clerks for their actions in managing the court calendar).

Combier alleges that defendant Lauren Holmes was the senior attorney for the Appellate Division, First Department.  (SAC ¶ 22).  Holmes allegedly denied Combier's requests for a jury trial in Surrogate's Court in 1997 and 2009 and designated Wasserman as a respondent in the probate matter.  (Id.).   Clearly, the denial of a party's request for a jury trial is a judicial, not ministerial, function.  Thus, to the extent that Holmes took such an action, it must have been taken in a judicial capacity.

It is unclear what Combier means when she says that Holmes designated Wasserman as a respondent in the probate case.  If Holmes did so, it presumably was in connection with some interlocutory skirmish such as Combier's motion to stay the trial of the will contest, (see supra n.11), since the Surrogate's Court has yet to issue its final decision as to whether the will proffered by Combier will be admitted to probate.  In any event, the Court need not resolve whether the designation of Wasserman as a respondent is a quasi-judicial action because even if it constituted a ministerial act and was improperly taken, under even the most liberal interpretation of the SAC, Holmes would not thereby have committed a violation of federal law.

Eric Reiss apparently is a court clerk in Supreme Court, New York County. (SAC ¶ 21, Mem. of L. in Supp. of State Defs.' Mot. to Dismiss (Docket No. 42) ("State Defs.' Mem."), at 15).  Combier alleges that Reiss was "assigned to work with Moskowitz on the case 'Danger v Combier' that never existed and over which there was no personal or

subject matter jurisdiction."  (SAC ¶ 21).  Although this hardly amounts to an allegation

that Reiss himself was involved in any wrongdoing, to the extent it does, Reiss's actions in

working with Justice Moskowitz on a case are protected by judicial immunity.  The SAC

therefore must be dismissed as against Reiss.

Combier alleges that defendant Santamarina was Judge Webber's law

secretary.  (Id. ¶ 29).  (In its motion to dismiss, the State refers to her as a "court attorney."

(State Defs.' Mem. at 14)).  Combier alleges that Santamarina helped Wasserman keep the

Taschereau probate proceeding before Judge Roth.  (SAC ¶ 68).  Assigning a case to a

judge's docket is substantially the same as managing the court's calendar, a task that clearly

involves the exercise of judicial discretion.  See Rodriguez, 116 F.3d at 66 ("A court's

inherent power to control its docket is part of its function of resolving disputes between

parties."); see also Rule 16, S.D.N.Y. Rules for Division of Business Among Dist. Judges

(authorizing a judge to transfer a case to any other consenting district judge).  Thus,

Santamarina is immune from suit to the extent she helped ensure that the probate dispute

remained assigned to Judge Roth.

Combier alleges that Santamarina also assisted Wasserman in "fixing" the

objections to probate he filed in 2000.  (Id. ¶ 70).  Although it is unclear precisely what this

means, Combier apparently is referring to Wasserman's alleged failure to file a timely

verification of the objections to probate that he asserted on Danger's behalf.  (See id. ¶¶ 30,

69, 86).  In her opposition papers, Combier explains that "[t]he reason the two-page paper

[containing the objections] was 'accepted' was that Wasserman was working with . . .

Santamarina to establish a Will contest without the verified petition as required by the S.C.P.A." (Combier Opp'n ¶ 23). However, as noted earlier, the failure to file a timely verification is of no legal consequence. (See supra n.15). Moreover, to the extent that Santamarina assisted Wasserman by accepting a document that the state court allegedly was not required to accept, or by allowing him to file a belated verification, Santamarina was performing functions closely associated with the judicial process and therefore is entitled to immunity.

Combier further alleges that Santamarina called her at home to harass her. (Id. ¶ 71). Assuming this occurred and was outside the context of a settlement discussion, it arguably might not constitute the rendering of assistance to a judge in a judicial capacity – even if the judge directed her to make the calls. Santamarina therefore is not entitled to the dismissal of this aspect of Combier's claim on the basis of quasi-judicial immunity.

3.    Failure to State a Claim

Even if certain court employees are not entitled to quasi-judicial immunity for some of their acts, Combier still has failed to state a legally sufficient claim against them. First, Combier alleges that she was told during a recorded telephone conversation with an NYPD detective that Justice Moskowitz had paid Wasserman to harass her. (See SAC ¶ 20). Even if this allegation is accepted as true, Combier has not established a violation of federal law. While the facts alleged might violate state law, they do not establish a legally-sufficient federal claim. See, e.g., Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000) ("rudeness and name-calling does not rise to the level of a constitutional violation");

26

Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (verbal harassment is not a deprivation of rights under Section 1983); Ramos v. Artuz, No. 00 Civ. 0149 (LTS) (HBP), 2003 WL 342347, at *11 (S.D.N.Y. Feb 14, 2003) (Report & Rec. of Pitman, M.J.) (allegations of verbal abuse or harassment fail to state any federal claim); Savage v. Snow, 575 F. Supp. 828, 837 (S.D.N.Y. 1983) ("Neither harassment nor slander rises to the level of a constitutional claim.").

   Moreover, the materials provided to the Court by Combier establish that the claim that Justice Moskowitz paid Wasserman to harass Combier is implausible.  Exhibit 2 to Combier's opposition papers is the recording of the telephone conversation with the police detective that Combier alleges establishes that Justice Moskowitz paid Wasserman. (See Combier Opp'n ¶ 17 & Ex. 2).  However, as noted earlier, (see supra n.12), the gist of that conversation was that the detective had investigated Combier's allegation that Wasserman was harassing her by contacting both Wasserman and the state court.  Based on his interviews, the detective concluded that criminal charges were not warranted because, insofar as Wasserman was contacting Combier, he was acting in connection with a pending case and as an officer of the court.  The only person who suggested during the conversation that Wasserman was being paid by Justice Moskowitz was Combier; the detective said no such thing.  The claim that Justice Moskowitz paid Wasserman to harass her is therefore totally implausible.  See Iqbal, 129 S. Ct. at 1951 (court is not bound to accept implausible allegations).  Indeed, the claim probably rises to the level of being sanctionable.  See Fed. R. Civ. P. 11.

Combier also alleges that Santamarina called her at home (perhaps with Wasserman) to "yell and scream at her" that she "better" give Danger "375,000+ or else." (Id. ¶ 71). This may, of course, have been part of an aggressive (and perhaps misguided) effort to settle the disputes between Combier and Danger. In any event, even if Santamarina's actions cannot be considered "judicial," and therefore preclude her from relying on judicial immunity, as noted earlier verbal harassment does not state a claim under federal or constitutional law. See, e.g., Ramos, 2003 WL 342347, at *11.

Combier's SAC also fails to state a claim for relief with respect to the remaining State Defendants. For example, the SAC names Eliot Spitzer as a defendant, but the only allegation with respect to the former Governor and Attorney General is that Justice Moskowitz allegedly was "assigned the position of Associate Judge [sic] to the New York State Supreme Court, Appellate Division, First Department by former Attorney General Eliot Spitzer." (SAC ¶ 20). The SAC is devoid of any suggestion that Spitzer was in any way personally involved in any of the events giving rise to Combier's alleged claims. Since a defendant cannot be held liable on a respondeat superior theory under Section 1983, Combier's claims against Spitzer must be dismissed. See Iqbal, 129 S. Ct. at 1948; Monnell v. N.Y. City Dep't of Social Servs., 436 U.S. 658, 691 (1978).

Similarly, Barbara Levitan is named as a defendant in the SAC, but the only substantive allegation with respect to her is that she "was the Senior Attorney for the law department at the Manhattan Surrogate Court responsible for the actions of the Attorneys within that Department, and for creating and implementing policies carried out at the

28

Manhattan Surrogate Court in accordance with the U.S. Constitution and all federal, state, Surrogate ('SCPA') and city laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York that protect people who are litigating Wills and Estates in Manhattan." (SAC ¶ 28). This appears to be a job description, not an allegation of wrongdoing. Once again, Combier is seeking to hold a defendant liable not because of any personal involvement, but on the basis of her supervisory authority. Since this is impermissible, Levitan is entitled to dismissal of the claims against her in the SAC. See Iqbal, 129 S. Ct. at 1948; Monell, 436 U.S. at 691.

Combier alleges that Dorothy Henderson was the senior attorney to Judge Roth until 2009. (SAC ¶ 40). According to Combier, when she brought copies of the New York Civil Practice Laws and Rules and the New York Surrogate's Court Procedure Act to Surrogate's Court, both Henderson and Santamarina laughed at Combier and "insisted that as [Combier] was not an Attorney, she was stupid and could not cite the law with any understanding." (Id. ¶ 107). Neither laughter nor insults, even on the part of a city or state official, rises to the level of a federal or constitutional wrong. See, e.g., Savage, 575 F. Supp. at 837 (verbal harassment does not constitute constitutional claim). The SAC therefore must be dismissed as against Henderson.

Combier alleges that defendant Dan Ramos, a clerk at the Appellate Division, "ripped up a two-page memo secretly filed in the Appellate Court by Wasserman, who called himself an 'Appointment-Respondent-Pro Se', and told [Combier] on March 15, 2005 'You weren't supposed to see that.'" (SAC ¶ 23). Assuming that Ramos destroyed a

memo from Wasserman, that action alone does not give rise to a plausible civil rights claim under federal law.  Indeed, Combier has not alleged what the secret memo was, nor has she shown that ripping it up deprived her of any federal right.  Moreover, this isolated incident involving Ramos took place outside of the three-year limitations period applicable to her Section 1983 claims, see, e.g., Cloverleaf Realty of New York, Inc. v. Town of Wawayanda, 572 F.3d 93, 94 (2d Cir. 2009) (citing Owens v. Okure, 488 U.S. 235, 251 (1989)), as well as the four-year limitations period applicable to her RICO claims, see Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156 (1987).  Accordingly, the SAC must also be dismissed against Ramos for failure to state a claim.

      B.     Federal Claims Against Private Defendants

      Combier also alleges federal claims against several private individuals.  These claims, too, must be dismissed for failure to state a claim for relief.

      1.     Constitutional Claims

      Combier alleges that all of the defendants have conspired to deprive her of various constitutional rights, including her rights to due process, equal protection, freedom of speech, and trial by jury.  (See, e.g., SAC ¶¶ 1-2, 6, 11, 92, 94, 135).  Section 1983 is the proper vehicle for a plaintiff to seek redress of such constitutional wrongs.  To state a claim under Section 1983, Combier must allege "[a] that the challenged conduct was attributable at least in part to a person acting under color of state law, and [b] that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993),

overruled in part on other grounds by Leatherman, 507 U.S. at 163; accord Pitchell v.

Callan, 13 F.3d 545, 547 (2d Cir. 1994) (citing Parratt v. Taylor, 451 U.S. 527, 535

(1981)).

        Private individuals, of course, do not ordinarily act under color of state law.

Therefore, to allege a Section 1983 violation by a private defendant in this case, Combier

"must allege facts demonstrating that the private [person] acted in concert with the state

actor to commit an unconstitutional act."  Ciambriello v. County of Nassau, 292 F.3d 307,

324 (2d Cir. 2002) (quoting Spear v. Town of W. Hartford, 954 F.2d 63, 68 (2d Cir. 1992)).

In pleading that a private individual acted in concert with a state actor, "conclusory

allegations of conspiracy" are insufficient.  See Leon v. Murphy, 988 F.2d 303, 311 (2d

Cir. 1993); Spear, 954 F.2d at 68.  Rather, Combier must allege, with sufficient factual

detail, how the private individuals conspired with the state actors.  As a matter of law,

rulings made during the course of the state court proceedings are not a sufficient basis for

the Court to find unlawful joint action among the judges, judicial employees, and private

individuals involved.  See Dennis v. Sparks, 449 U.S. 24, 28 (1980) ("[M]erely resorting to

the courts and being on the winning side of a lawsuit does not make a party a co-

conspirator or a joint actor with the judge."); Gangemi v. Johnson, No. 98 Civ. 8470 (SHS),

1999 WL 777861, at *4 (S.D.N.Y. Sep 30, 1999) (same).

        Combier's SAC is peppered with conclusory allegations that the defendants

conspired to deprive her of constitutional rights.  (See, e.g., SAC ¶¶ 2 ("Defendants, with

flagrant disregard for [Combier's] Constitutionally protected rights, wantonly, recklessly,

maliciously, knowingly and purposefully, acting . . .  in conspiracy with each other under color of state law, have deprived [Combier] of her protected rights of freedom of speech, assembly, religion, and enjoyment of liberty and property"), 94 (conspiracy among defendants to deny probate of will), 129 ("[E]ach of [the defendants] conspired to deprive [Combier] of her First, Fifth, Seventh and Fourteenth Amendment rights, and jointly caused such deprivation of rights by acting in concert to unlawfully . . . silence [Combier].").  Such allegations are insufficient to allege plausibly that any of the private defendants acted in concert with state actors to deprive Combier of her constitutional rights.  See Leon, 988 F.2d at 311 ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.").

Combier's specific allegations regarding the private defendants are no less conclusory.  For example, Combier alleges that "Webber, Santamarina, Wasserman and Danger made fun of her, insulted her, and violated her rights to a fair and unbiased hearing," (id. ¶ 80), and that their conduct "created a hostile environment in the Court so that [Combier] would suffer harmful consequences starting in March 1998 and continuing without interruption until the present, June 2009, and therefore created a continuing violation as well as a pattern and practice of abuse."  (Id. ¶ 98).  Although Combier has in this instance named a group of individuals, her allegations fail to establish how they allegedly worked together to violate Combier's right to a "fair and unbiased hearing" or to

create a "hostile environment in the Court."  These conclusory allegations therefore fail to state a claim.

The SAC also alleges that Wasserman, a private individual, worked with Santamarina, a Surrogate's Court employee, to arrange to have the probate of Taschereau's will kept before Judge Roth.  (Id. ¶ 68).  Combier further alleges that Santamarina assisted Wasserman in "fixing" the objections to probate he filed in 2000.  (Id. ¶ 70).  Combier also alleges that Holmes designated Wasserman as a respondent in the probate matter.  (Id. ¶ 22).  Finally she alleges that Ramos, a court clerk, assisted Wasserman by ripping up a secret memo in the Appellate Division's files before Combier could read it.  (Id. ¶ 23). These allegations also are insufficient to establish impermissible joint action.  As noted earlier, the actions taken by Santamarina and Holmes were discretionary judicial actions, albeit ones which apparently were in Wasserman's and Danger's favor.  As a matter of law, the mere fact that a court took action in favor of a party in a litigation before it is insufficient to establish joint action or a conspiracy with that party.  See Dennis, 449 U.S. at 28.  Furthermore, even if Ramos conspired with Wasserman, their actions fall outside the three-year statute of limitations applicable in New York to Section 1983 claims.  See Cloverleaf Realty, 572 F.3d at 94.

Finally, the only other private defendant named in the SAC is Francesca Sabadie.  The sole allegations regarding Sabadie state that she "is an Attorney who lives at 1 Walforth Avenue in Scarsdale, with her husband and Robert Dwyer, as well as [Danger]. Sabadie is sued individually as a co-conspirator and ally of both Danger and Wasserman."

(SAC ¶ 35).  A conspiracy among these private individuals, even if established, obviously would not give rise to a federal claim.  See Dwares, 985 F.2d at 98 (complaint must allege that action took place at least partially under color of state law).

        2.    <u>Sections 1985 and 1986</u>

Combier also alleges the existence of a conspiracy in violation of Section 1985.  (SAC at 43-44) (Fifth Cause of Action).  To state a claim for relief under Section 1985, Combier must allege a deprivation of her rights on account of her membership in a particular class of individuals.  See United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 849-50 (1983).  Specifically, Combier must allege "[a] a conspiracy; [b] for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; [and c] an act in furtherance of the conspiracy; [d] whereby a person is either injured in his person or property or deprived of any right of a citizen if the United States."  Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087-88 (2d Cir. 1993) (quoting United Bhd., 463 U.S. at 828-29).

In Griffin v. Breckenridge, 403 U.S. 88 (1971), the Supreme Court considered the legal sufficiency of a Section 1985(3) claim brought by black citizens of Mississippi against white citizens who allegedly had assaulted them on the public highways of the State to prevent them from enjoying their equal rights.  In the course of holding that the statute reaches such private race-based conspiracies, provided that they are motivated by an "invidiously discriminatory animus," the Court stated (in language which is partly

34

dictum) that the animus underlying the defendants' conspiratorial acts must be based on the

plaintiffs' race "or perhaps otherwise class-based." Id. at 102.  Subsequently, in United

Brotherhood of Carpenters, the Court observed that "it is a close question whether

§ 1985(3) was intended to reach any class-based animus other than animus against Negroes

and those who championed their cause, most notably Republicans." United Bhd. of

Carpenters, 463 U.S. at 836.

       With respect to her claim under Section 1985, Combier alleges that the

Defendants have "denied [Combier] equal protection under the law, based on [her] being a

reporter and whistleblower."  (SAC ¶ 130).  Thus, Combier does not allege that she was

denied equal protection based on either her race or her membership in a suspect class.  She

therefore fails to state a legally-sufficient Section 1985 claim.

       Combier also alleges a claim pursuant to Section 1986.  (See SAC at 39-41)

("Third Cause of Action").  That statute provides a damages remedy against persons who

have knowledge of a proposed conspiracy in violation of Section 1985 and the ability to

thwart it, but fail to do so.  Mian, 7 F.3d at 1088.  Accordingly, "without a violation of

Section 1985, there can be no violation of Section 1986." Koch v. Mirza, 869 F. Supp.

1031, 1039 (W.D.N.Y. 1994); accord Baptiste v. N.Y.C. Transit Auth., No. 02 Civ. 6377

(NRB), 2004 WL 626198, at *7 (S.D.N.Y. Mar. 29, 2004).  Here, Combier has failed to

plead a legally-sufficient Section 1985(3) violation.  Therefore, as a matter of law, Combier

also fails to state a Section 1986 claim.

3.    RICO Claims

Combier further alleges in the SAC that all of the defendants participated in a scheme in violation of the RICO statute.  (SAC ¶ 11-13).

Section 1962 of RICO bans four distinct activities:  "[a] the use of income derived from a 'pattern of racketeering activity' to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; [b] the acquisition or maintenance of any interest in an enterprise 'through' a pattern of racketeering activity; [c] conducting or participating in the conduct of an enterprise through a pattern of racketeering activity; and [d] conspiring to violate any of these provisions."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 482-83 (1985).  Although the four prohibited activities vary, each requires that a plaintiff plead a "pattern of racketeering activity."  See 18 U.S.C. § 1962(a)-(d).  "Under RICO, a pattern of racketeering activity consists of at least two acts of racketeering activity (often referred to as the 'predicate acts') within a ten year period."  Conte v. Newsday, Inc., __ F. Supp. 2d __, 2010 WL 1257887, at *3 (E.D.N.Y. Mar. 25, 2010) (citation and internal quotation marks omitted).  The possible predicate acts are listed in 18 U.S.C. § 1961.

A plaintiff also must show that the a pattern of racketeering activity resulted in a direct injury to the "business or property" of the plaintiff.  18 U.S.C. § 1964(c); see also Sedima, 473 U.S. at 496.  This does not include personal injuries, whether physical or emotional.  See Williams v. Dow Chem. Co., 255 F. Supp. 2d 219, 225 (S.D.N.Y. 2003) (collecting cases).  Moreover, the injury to business or property must be quantifiable.  See

McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 227 (2d Cir. 2008) ("A plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege actual, quantifiable injury.") (emphasis omitted).

Combier alleges that the defendants have committed the predicate acts of mail fraud under 18 U.S.C. § 1341 and witness intimidation under 18 U.S.C. § 1512. (SAC ¶ 12-13). Even if the SAC alleged these predicate acts adequately, itself a dubious proposition, Combier must plead an injury to her property or business. Here, neither of the injuries she alleges makes out a prima facie case. First, Combier alleges that she went into heart failure and spent time in the hospital after Judge Roth declared that Taschereau had died intestate. (Id. ¶14). This is an injury to Combier's person – not to her property or business. See Williams, 255 F. Supp. 2d at 225. Moreover, this is not an injury that is readily quantifiable.

Second, Combier alleges that she has been injured by by the twelve-year delay in the probate of her mother's estate. (SAC ¶¶ 94, 131). This, however, cannot constitute a direct injury to Combier's property, since the estate res has yet to be declared her property. See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235-39 (2d Cir. 1999) (discussing RICO requirement of "direct injury"). For the same reason, this injury also is not quantifiable.

Accordingly, Combier has failed to allege adequately a civil RICO claim against any of the defendants.

37

4.    Whistleblower Retaliation

Combier further alleges "whistleblower retaliation," (see SAC at 39), but this, in and of itself, is insufficient to make out a claim under federal law.  There are several federal statutes prohibiting retaliation against whistleblowers, each of which is applicable to specific sorts of individuals or misconduct.  See, e.g., 5 U.S.C. § 1221 (protecting federal employees from certain types of retaliation); 12 U.S.C. § 1441a(q) (protecting persons who report misconduct by the FDIC or the Thrift Depositor Protection Oversight Board); 18 U.S.C. § 1513(e) (Sarbanes Oxley provision protecting whistleblowers who report corporate fraud); 31 U.S.C. § 3730(h) (False Claims Act whistleblower provision); 33 U.S.C. § 1367 (protecting employees who report violations of Clean Water Act).  Combier does not specify any federal whistleblower protection for which she allegedly is eligible, nor is there any obviously applicable statute.  Accordingly, insofar as Combier relies on federal law, her whistleblower retaliation claim must be dismissed.  See Loren v. Levy, No. 00 Civ. 7687 (DC), 2003 WL 1702004, at *10 (S.D.N.Y. Mar. 31, 2003) (dismissing claims because "[n]o federal whistleblower statute is applicable").

5.    Federal Criminal Law

Finally, Combier alleges many violations of Title 18 of the United States Code, (see SAC at 39 ("Third Cause of Action"), 41 ("Fourth Cause of Action"), but lacks standing to seek relief under federal criminal law.  See Ippolito v. Meisel, 958 F. Supp. 155, 161 (S.D.N.Y. 1997).  The SAC consequently must be dismissed to the extent Combier relies on federal criminal law as a basis for relief.

38

IV.    State Law Claims

Combier also alleges various state law claims against the defendants, including intentional and negligent infliction of emotional distress, defamation, false imprisonment, misrepresentation, and violations arising under the New York State Constitution, the State's civil rights laws, and its judicial codes of conduct.  (See SAC at 36 ("Intentional and Negligent Infliction of Emotional Distress, Verbal Harassment, and False Imprisonment With Unjustified Threats of Future Harm"), 41 ("New York State Civil Rights Law §§70, 76-a, 79-h"), 44 ("Malicious Prosecution")).

A federal court may exercise supplemental jurisdiction over state law claims when a federal claim vests the court with subject matter jurisdiction and the state and federal claims "derive from a common nucleus of operative fact."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).  A federal court also has the discretion to retain pendent state claims after dismissing a plaintiff's federal claims on the merits prior to trial, but it must consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Id. at 350 n.7; see also Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y., 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

Combier has not shown that there is any reason for the Court to depart from the usual rule in this case. To date, there has been no pretrial discovery. Indeed, apart from a pretrial conference, the only events that have taken place are the filing of numerous motions. As shown above, each of Combier's federal claims is subject to dismissal. Accordingly, her state law claims against the defendants should be dismissed in the exercise of this Court's discretion.

V.    Motions for Default Judgment and Sanctions

As mentioned previously, Combier has moved for both a default judgment and sanctions against Mark. (Docket Nos. 77, 81). Although Combier's papers indicate that proper service was timely effected on Mark, (see Docket No. 77, Ex. 5), his affidavit disputes this fact, contending that he was never served with process. (Mark Aff. ¶¶ 2, 5-6).

Regardless of whether service was properly effected on Mark, the Court need not consider Combier's motion for a default judgment because it has no jurisdiction to consider the merits of Combier's claims against Mark or to enter a default judgment against him on these claims.

The only allegations in the SAC directed at Mark relate to his current possession of property belonging to the estate of Taschereau. It is undisputed that on April 1, 2009, the Surrogate's Court ordered that this property remain in Mark's possession until further notice. (See SAC Ex. 12 at 80-81).

The "probate exception" to federal subject matter jurisdiction "reserves to state probate courts the probate or annulment of a will and the administration of a

decedent's estate; it also precludes federal courts from endeavoring to dispose of property

that is in the custody of a state probate court." <u>Marshall v. Marshall</u>, 547 U.S. 293, 311-12

(2006).  Thus, this Court may not "take over the administration of estate assets pending in

probate courts[.]"  <u>Lefkowitz v. Bank of N.Y.</u>, 528 F.3d 102, 107 (2d Cir. 2007).  Any

decision this Court could make about the propriety of Mark's actions with respect to the

estate property would interfere with the Surrogate's Court administration of the Taschereau

estate assets.  Accordingly, this Court is without jurisdiction to consider Combier's claims

against Mark or to enter a default judgment against him.

       Turning to the motion for sanctions, Combier alleges that Mark should be

sanctioned for his "failure to obey this Court's pre-trial conference memos, for Defaulting

on providing an Answer to the Complaint, and for his committing Larceny and Perjury."

(Docket No. 81) (Notice of Motion at 1-2).  Whether to award sanctions is a matter

addressed to the Court's broad discretion.  <u>See, e.g.</u>, <u>Kyoei Fire & Marine Ins. Co. v. M/V</u>

<u>Mar. Antalya</u>, 248 F.R.D. 126, 143 (S.D.N.Y. 2007).  Here, it would make no sense to

sanction Mark for actions over which this Court has no jurisdiction.  To the extent that

Combier also seeks sanctions for Mark's failure to respond to the complaint, the Court

should exercise its discretion to deny such relief.

VI.    <u>Leave to Replead</u>

       In her opposition papers, Combier correctly observes that leave to replead is

generally freely given.  (<u>See</u> Combier Opp'n ¶ 86 (citing <u>Cotec Indus., Inc. v. Sum Holding</u>

<u>L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991))); <u>see also</u> Fed. R. Civ. P. 15(a)(2) ("The court should

41

freely give leave when justice so requires.").  Although Combier has amended her complaint twice, (see Docket Nos. 1, 7), she has not been given any opportunity to replead after the defendants' motions were filed and prior to the issuance of this Report and Recommendation.  Nonetheless, to allow Combier to replead would be an exercise in futility.  As noted above, most of her claims are precluded by absolute or qualified judicial immunity.  Other claims are precluded by the Eleventh Amendment or the statute of limitations.  There also is no reason to believe that any of the high-ranking defendants who she names had any personal involvement in the state court cases giving rise to her claims. Combier similarly has alleged no facts to support her conclusory allegations of conspiracy. See Cotec Indus., 949 F.2d at 48 ("[W]here a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Her RICO claim is also a non-starter.[16]

The Court should therefore exercise its discretion by denying Combier's request for leave to file a third amended complaint.

---

[16]      Moreover, even if Combier could cure some of these defects through further pleading, this Court would likely still lack jurisdiction to consider her federal claims under either (a) the probate exception to federal jurisdiction; (b) the Younger abstention doctrine, which requires federal courts to abstain from exercising jurisdiction over claims that could have been presented in ongoing state proceedings; or (c) the Rooker-Feldman doctrine, which bars federal jurisdiction over claims that seek reversal or modification of state court orders.  See D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Younger v. Harris, 401 U.S. 37 (1971); Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923).  Because Combier's claims relate to either the ongoing probate proceeding or one of several now-closed state court proceedings, this Court is ill-suited for consideration of her claims.

VII.    Conclusion

        For the foregoing reasons, I recommend that the defendants' motions to dismiss, (Docket Nos. 41, 43, 45, 47, 56, 57, 95), be granted, and that the federal and constitutional claims in the SAC be dismissed with prejudice.  I further recommend that Combier's motions for a default judgment, (Docket No. 77), for sanctions, (Docket No. 81), for recusal, (Docket No. 31), and to vacate Your Honor's earlier order, (Docket No. 79), be denied.  Finally, I recommend that the Court decline to exercise supplemental jurisdiction over Combier's state law claims and that the case be closed.

VIII.   Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the clerk of the Court, and send copies to the chambers of the Honorable Richard J. Holwell, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge

Holwell.  The failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C.   § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72(b).

       SO ORDERED.

Dated:     New York, New York
           August 25, 2010

                                      FRANK MAAS
                         United States Magistrate Judge

Copies to:

Honorable Richard J. Holwell
United States District Judge

Elizabeth Combier [by mail]
315 East 65th Street
New York, NY 10065

Monica A. Connell, Esq.
Assistant Attorney General
Fax:  (212) 416-6009

Kenneth T. Wasserman, Esq.
Fax:  (212) 244-0980

Jeffery H. Sheetz, Esq.
Greenfield, Stein & Senior, LLP
Fax:  (212) 818-1264

Eli Uncyk, Esq.
Uncyk, Borenkind & Nadler, LLP
Fax:  (212) 768-4469

Julia Danger [by mail and e-mail]
47 Avenue Matheiria Morau
75019 Paris, France

Carl Schaerf, Esq.
Scnader Harrison
Fax:  (212) 972-8798

Francesca Sabadie [by mail]
One Walworth Avenue
Scarsdale, NY 10583