and thus no immunity given to the defendants must be admitted when not denied in the responsive pleading.

Nor can this matter be transferred to a state court where there would be no jurisdiction over Julia Danger, a key to the association-in-fact enterprise. Danger provided the defendants with an interested party for both the Will proceedings and the case Danger v Combier, although she lives in Paris France and never has made any request for an appraisal of the property held inside the garage attached to the home of Defendant Lawrence Mark in Croton, New York. For convenience she used the Scarsdale address of Fransesca Sabadie, a friend of Wasserman whose address was necessary to perpetrate the scheme to rob Plaintiff of her mother's property.

Similarly, Plaintiff appealed the decision of Webber to have a trial without a jury starting in August 2009. The Appellate Division First Department denied Plaintiff's request for a stay of the bench trial so that Plaintiff could seek a trial by jury, on August 3, 2009. Proof positive of the Defendants' conspiring together to cover up the lack of verified Objections and the lack of jurisdiction in any court at the State level in the matter *Danger v Combier* can be seen in Defendants' absurd claim that the "only official" transcript of the April 1, 2009 conference before Defendant Webber is the one stamped "August 13, 2009" as well as in the transcripts themselves. Close examination of both transcripts (Plaintiff went over each word in both transcripts) shows that the only difference between Plaintiff's version and that stamped "August 13, 2009 (Connell, p. 5 and Ex. B) is: *the first page*. Thanks to Ms. Connell for sending both versions in her Motion For Dismissal/Summary Judgment, this court can see that the title for Kenneth Wasserman has been changed from "Attorney For the Respondent" to "*Attorney For the Petitioner*";

36

Defendant Troy Webber ("Webber") has her title changed from "Judge" to "*Presiding Official Surrogate*"; Mr. Schram, Esq. is not listed as making an appearance in the courtroom on April 1 2009 in the "official" transcript although he speaks on the record in the hearing; and Elizabeth Combier's title has been changed from "Proponent Pro Se" to "*Respondent, pro se*". These changes make no sense and give the court substantial proof of Defendants' conspiracy to falsify documents to reach their unlawful goals.

The simple fact is that Wasserman never filed a verified petition for Ms. Danger in any court, so therefore he cannot call himself the Attorney for the 'Petitioner'. Elizabeth Combier is not a "*Respondent Pro Se*" in any court. No court recognized *Danger v Combier* or the unverified objections, at least until August 4, 2009, when the objections, suddenly verified, were given to Webber as justification for a trial without a jury. Hoowever in actual fact these objections were already invalidated by laches and by the deposition testimony of Defendant Danger herself, on August 3, 2000, wherein she denied the validity of her own Objections, and would not agree to Wasserman's urging her to testify to her mother's mental incapacity (Danger deposition, Aug. 3, 2000, SAC) . This proves that the Verified Objections submitted on August 4, 2009 to Surrogate Court at the first day of the bench trial were false, and Danger and Wasserman were lying to Webber at the trial.

That Connell, representing Attorney General Andrew Cuomo, would reduce the defense of an association-in-fact enterprise to the falsified title page of the transcript of the April 1, 2009 hearing in Surrogate's Court, shocks the conscience. Defendants Wasserman, Danger and Sabadie all threatened Plaintiff with contempt charges for posting the "unofficial" transcript on her website, although none of these defendants are recognized

by any court involved in the matter cited herein. Plaintiff's RICO complaint is based upon the fact that there was no jurisdiction to hear the Objections To Probate or <u>Danger v Combier</u>, and all defendants' knowing participation in depriving plaintiff of her civil rights: (1) not to be presided over by a judge without jurisdiction; (2) to have equal protection under the law; (3) to the due process of having her mother's Will probated. Plaintiff complained about the violations of her rights taken from her on April 1, 2009, by filing the lawsuit herein, so Connell's claim that Plaintiff did not object to Webber's threat to hold her in contempt is obviously not true. It is also alarming that Connell argues Plaintiff has no right to a trial by jury, and she believes it is not a violation of Plaintiff's rights to appear, as she was forced to do, before a judge that is she is suing, to be screamed at every day for a month and a half without the added ears of a jury. The disputed fact at the Surrogate Court bench trial of the assault on Julia Taschereau committed by Julia Danger on July 25, 1997 required a jury, but defendants Webber, Santamarina, Danger, Wasserman, Griffin, Schram, and the other State actors could not have a jury listen to the evidence of judicial misconduct that they all knew Plaintiff had to present. (bench trial, August 4-September 14, 2009). The Maas Report's acceptance of the sudden verification of the Objections To Probate as valid (pp. 20-21) and as a legal basis to proceed to a bench trial without a jury before Judge Troy Webber who is being sued compromises the impartiality of the court and denies Plaintiff her due process rights

**POINT V: THIS COURT HAS CREATED PROCEDURAL ERRORS THAT ARE FATAL TO A FAIR HEARING FOR PLAINTIFF AND FURTHER THE DENIAL OF DUE PROCESS THAT SHE CITED IN HER COMPLAINT**

Shockingly, Judge Maas ordered Plaintiff to answer with objections the first work day after Labor Day weekend and the day before the Jewish Holiday. Similarly, Judge Maas told Plaintiff to submit her Reply to Defendants' Motions To Dismiss on February 12, 2010, a day that the Court was closed. He states in his Report that Plaintiff's Second Amended Complaint was due on November 13 when indeed, this date was changed to November 24 and Plaintiff filed on time.

Judge Maas gives excusable error to all the violations of law cited by Plaintiff. He clearly violates Plaintiff's due process rights. He states that Plaintiff's claim that Moskowitz was paying Wasserman to harass her in the frivolous matter Danger v Combier is sanctionable, is simply outrageous. And, he returned the tape to Plaintiff saying that he would not accept any evidence that was not written.

Maas further dismisses the fact that he denied Plaintiff her right under Federal Rules to obtain a Default Judgment against Mark, who was served in a timely fashion yet didn't respond until months later. Maas wrote that he was too busy to have a pre-motion conference to hear arguments on the default judgment, yet Plaintiff hired a service company for $300.00 and filed the certificates of service. Mark and Danger still have never been listed on the docket sheet as making an appearance, despite the fact that Danger wrote Judge Holwell a letter saying she would appear pro se, and this letter was secretly kept in Holwell's chambers until today. Indeed, in July, Holwell quietly docketed Danger's papers (written by Wasserman).

Maas emails Danger his Report, yet has been advising the parties that this is not a case that can have emailed documents.

The complaint that Plaintiff filed had thirteen exhibits, and twelve of these showed a predicate act that relates to the RICO enterprise Plaintiff alleges ran the show: Ex 2: The July 19, 2006 order of Judge Renee Roth saying that The Public Administrator could take over control of the Estate of Julia Taschereau because Taschereau died "intestate"; Ex 3: The subpoena that Plaintiff obtained at the Appellate Division, First Department, to move the records from the Surrogate Court records room to the Appellate Court to appeal the ruling that Plaintiff had to get an attorney, and pay Jonathan Landsman almost $7,000; 3A: the Appellate decision would not re-issue the subpoena after it was ripped up, then changed the caption twice in their denial of Plaintiff's appeal to get the records; Ex 4: the memo from Wasserman discovered in the folder of the ashes case at the First Department, immediately ripped up by Dan Ramos march 15, 2005; Ex 5: the unverified Objections to Probate, and the 2009 Verification; Ex 6: police complaint against Wasserman; Ex 7: Trust agreement signed by Julia Danger and Combier; Ex 8: Will of Julia Taschereau Nov. 21, 1997; Ex 9: secret note from Santamarina to Wasserman, June 1999; Ex 10: Decision in Danger v Combier; Ex 10A: stipulation signed by Jeff Kofsky giving Plaintiff's rights in Danger v Combier away; Ex 11: complaint against Webber, Levitan; Ex 12: Transcript of April 1, 2009 at Surrogate's Court; Ex 13: RICO statement.

The Supreme Court issued its opinion on June 8, 2009 upholding the District Court's refusal to instructthe jury that an association-in-fact enterprise must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages. Judge Alito wrote: "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *Turkette,* an association-in-fact enterprise is 'a group of persons associated together for a common

purpose of engaging in a course of conduct.' 452 U.S., at 583." See Boyle v. U.S., 2009 WL 1576571 (U.S.)

The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiff, with the intent of impairing, obstructing, preventing and discouraging Plaintiff from writing, publishing, investigating and conducting judicial activism as a qualified Private Attorney General.

Pleading and proving the specialized direct cause of injury requirement under the RICO Act is just one of many important challenges confronting plaintiffs who want to take advantage of the powerful impact a RICO claim almost always has on a defendant.

RICO's provision for civil actions reads that --

[a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c). [Emphasis added.]

Unlike proximate cause in a tort case, which exists whenever a plaintiff's injury is a reasonably foreseeable consequence of the defendant's tortuous conduct, RICO's "by reason of" language makes proximate cause a matter of law. Consequently, unless properly pled, a plaintiff will find himself on the short end of a motion to dismiss and/or motion for summary judgment based on lack of causation.

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992), the United States Supreme Court expressly held that section 1964(c)'s language limiting civil claims to plaintiffs injured "by reason of a violation of section 1962" required civil plaintiffs to prove that their damages were "proximately caused" by the RICO violation. Thus, the plaintiff must plead and prove direct injury – meaning that no other causes could intervene between the defendant's RICO violation and the plaintiff's injury. As pointed out by RICO Act commentator, Jeff Grell, in *Holmes*, ". . . the Supreme Court encouraged lower courts to use 'proximate cause' as a sword to attack the abusive practice of bringing RICO claims whenever mail or wire fraud arguably occurs."

Guide One Insurance Company stepped into the association-in-fact enterprise when Wasserman started working with them after the death of Julia Taschereau. Peggy Mundy in their litigation department in Indianna told Plaintiff that Wasserman helped them with

the church interests. This basically meant that as Plaintiff was writing about MAPC and their money laundering by excessively charging for repairs in the church, Wasserman was hired to stop Plaintiff from doing this. The Presbytery knows all about this scheme, and yet does nothing to stop it. The FBI and DA know about it as well. Plaintiff became a whistleblower, so the Guide One executives decided that they would stop her by filing an order to show cause as to why there should not be prior restraint on her website. Guide One is not listed with the New York State Department of State as a company doing business in the State of New York, and the Executives did not want any publicity, so they asked the Judge from the ashes case to take this new issue. The case was dismissed. Dr. Anderson told the Session not to speak with Plaintiff, ever, and proceeded to once again remove her from receiving any mail. Anderson told the Session and the Trustees that Ken Wasserman had said that Plaintiff was stealing from her mother's Trust to the tune of "six figures" and that she, Plaintiff was in a bitter battle with her twin sister, and he had to get Plaintiff out. He and Charles Amstein started making up a fairytale that Plaintiff and her sister Danger hated each other, and were bitter enemies. The purpose of this story was to have Julia Danger win the Will contest, by making Plaintiff into a monster. The RICO enterprise worked for them to keep Plaintiff's character defamed as often as possible. This character assassination worked at the second trial of the ashes, when the second jury decided that the church was guilty of keeping the ashes of her mother for eight days, but they were justified in doing it.. This verdict was reached by Wasserman and Danger lying on the stand about Plaintiff's abusive personality.

The exhibits prove that Plaintiff's allegations about the predicate acts are true, and she has met her burden in overcoming the hurdle to dismiss requested only by Monica

Connell. All the other defendants understood Plaintiff's complaint, and did not suggest a

Rule 8 dismissal.

Kofsky and Uncyk's motion for 12(b)(6) must fail for several reasons:

1. first and foremost, the Court stated, on October 28, 2009:

"I don't want to convert these motions into motions for summary judgment....I don't
want to get into extraneous facts that require consideration of this as a motion for
summary judgment". (Transcript, P.20, lines 3-11)

2. secondly, their motion to dismiss is a summary judgment and there is no separate
   statement listing the undisputed facts according to Federal Rules of Civil
   Procedure Rule 56 as applied in this District.

Defendants' Uncyk and Kofsky's motion for summary judgment basically claims that the

complaint has not described these defendants as having any role in any of the proceedings

referred to in plaintiff's complaint. However, in paragraph #71, along with defendants'

own exhibits, plaintiff writes "Plaintiff demanded that her attorneys end the case, but they

refused." (Complaint, p. 26). Uncyk and Kofsky were and still are well aware that

because of their refusal to attempt to end cases with no jurisdiction they are 42 USC 1985

and RICO co-conspirators in two cases without jurisdiction: (1) The matter of the Probate

proceedings; (2) *Danger v Combier*. Continuing the Estate case, which deprived plaintiff

of justice, money in fees, and estate property, when there was no jurisdiction, because

there was no verified petition, met the minds of defendants Roth, Wasserman and

Danger: [1] deprive plaintiff of a judge with jurisdiction, [2] deprive plaintiff of equal

protection of estate law, and [3] deprive plaintiff of the due process probating the will.

Continuing <u>Danger v Combier</u> deprived plaintiff of justice and money in fees to

defendants Uncyk and Kofsky. There was no jurisdiction because the trustee was not a

defendant and conversion of monies from a trust requires the trustee to be a defendant.

Further, there was no jurisdiction because plaintiff executed a release in favor of both trustee and Combier, and because defendant Combier never controlled the trust or determined how its assets were to be distributed. (complaint, EX.7)

Because these defendants never attempted to stop a lawsuit they knew was without jurisdiction, Uncyk and Kofsky met the minds of defendants Shainswit, Wasserman and Danger: [1] to deprive plaintiff of a judge with jurisdiction, [2] to deprive plaintiff of equal protection of law.

Most astonishing, Uncyk and Kofsky do not remember that they wrote and sent a stipulation to Wasserman saying that Plaintiff would not defend herself against any claim that Banker's Trust should be named in the case Danger v Combier. This stipulation remained unknown to Plaintiff until several years later, and Plaintiff would never have agreed with giving up her rights in this manner (Complaint, Ex. 10A).

Judge Maas does not mention any of these predicate acts committed under color of state law without jurisdiction in any court.

No defendants' motion has a separate statement of the undisputed facts, therefore Plaintiff cannot sufficiently answer with the opposition, except that none of the defendants denied the fact that neither the Objections or Danger v Combier ever had jurisdiction in any court. Thus, the failure to deny Rule controls, and none of the defendants have met their burden for summary judgment.

In Harris v City of New York, 186 F. 3d 243 (2d Cir, 1999) the Court discussed the high burden of proof necessary on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and held: Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle. (citations omitted). On a motion to dismiss under 12(b)(6), the Court must accept

as true the factual allegations in the complaint, and draw all favorable inferences in favor of the Plaintiff. The district Court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"

It is well settled that the courts in New York follow the Supreme Court determination in Conley v Gibson, 335 U.S. 41, 78 S.Ct99, 2 L. Ed 2d 80 (1985): dismissal could only be granted when it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim...Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principal that the purpose of pleading is to facilitate a proper decision on the merits"."

Applying the standard, the particularity alleged in plaintiffs' complaint demonstrates that the defendants have been provided with more than fair and ample notice of the plaintiff's claim. The allegations are based on actual facts (in the Exhibits) and personal knowledge of the Plaintiff. The allegations are specific, and do not constitute conjecture or surmise and are not conclusory. See also Chamber v Time Warner, Inc., 282 F. 3d 147 (2d Cir, 2002).

With respect to the claim for the intentional infliction of emotional distress, the tort has four elements: (a) extreme and outrageous conduct; (b) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (c) a causal connection between the conduct and injury; and (d) severe emotional distress. Howell v New York Post, 81 N.Y. 2d 115, 596 N.Y.S. 2d 250 (1993). The courts have found liability where the  conduct has been so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community." Fisher v Maloney 43 N.Y. 2d 553, 402 N.Y.S. 2d 991 (1978).

The proof of the emotional trauma and fact that Plaintiff has suffered at the hands of defendants is the heart failure on July 22, 2006 less than one hour after opening the envelope from Peter Schram, esq., which told Plaintiff that her mother's Will never existed (complaint, Ex. 2). Sheetz, in his moving papers calls this a "clerical" error; Webber on April 1, 2009 said this did not happen. Plaintiff says that this was a willful move on Judge Roth's part to get quickly rid of Plaintiff who was remaining on her calendar for far too long. The order is a statement of fact that the Surrogate Court has a familiar relationship with the Public Administrator that should be investigated. Roth, or Passenant, even changed the caption. Then, approximately four days later, the caption was changed back, and the Will was back. But now, according to Mr. Schram, who Plaintiff called the day after she returned from the hospital, he had a copy of the Will in front of him (July 25, 2006). Plaintiff asked him how he could take control of the property on Croton if the Will actually existed, and Schram told her, "Roth told us to". I told him I was taping him, and he told me that he would not be in contact with me again except in writing, and he would be in contact with Wasserman. In the transcript dated April 1, 2009, there is an entry by Schram that implies he has sent many letters back and forth to Wasserman. Plaintiff has never received copies.

To the general public, the harassment by telephone (see the CD, Ex. 2, enclosed in this motion) that is now posted on Plaintiff's website is extreme and outrageous. Of course, the word "extreme" is subjective, but certainly the almost death of Plaintiff at the hands of an association-in-fact enterprise whose focus is to steal her mother's property sitting in

a garage n Croton for eleven years, paints an ugly picture that looks extreme to most people who have heard about this story.

The prism that people see the world through is very determinative of the manner in which they see what has happened in this matter herein described.

Plaintiff has previously described the facts in the complaint which prove that no court over the past eleven years have assumed jurisdiction over either the Objections To Probate nor the case Danger v Combier . Therefore, defendants have no absolute, quasi- , qualified, or Eleventh Amendment Immunity and can be prosecuted for the actions they have taken to harm Plaintiff as described in her complaint. The State Defendants are also sued in their individual capacity, thus lack Eleventh Amendment Immunity.

The doctrine holds that lower United States federal courts other than the Supreme Court should not sit in direct review of state court decisions unless Congress has specifically authorized such relief. In short, a federal court must not become a court of appeals for a state court decision. The state court plaintiff has to find a state court remedy. Plaintiff has no decision in a lower court that she is disputing, and the Rooker-Feldman does not apply to this case.

The Constitutional issues of freedom of speech and religion, equal representation before the law, and lack of jurisdiction as well as obstruction of justice for more than nine years compel this court to hear this case and not abstain.

Section 1962(d): Conspiracy: To state a claim under š  1962(d), a plaintiff must plead that the defendant agreed to join the conspiracy, agreed to commit predicate acts, and knew

that those acts were part of a pattern of racketeering activity. The agreement to commit

predicate acts, standing alone, is not enough. (See EXHIBIT 1, the Caputo decision in the

"Cash For Kids" case).

The State law claims are intertwined with the federal claims in this matter, and cannot be

separated. Thus this Court must not dismiss Plaintiff's state law claims and causes for

action.

## POINT V
## LEAVE TO REPLEAD SHOULD BE FREELY GIVEN.\

Plaintiff seeks leave to replead. In this vein, the Court's attention is respectfully referred

to Cortec Industries Inc., v Sum Holding L.P., 949 F. 2d 42 (2d Cir. 1991) where the

court held:

"We begin with a statement of the rule. It is the general practice upon granting a motion

to dismiss to allow leave to replead. See, e.g. Ronzani v. Sanofi S.A., 899 F.2d 195, 198

(2d Cir. 1990 and other authority). Although leave to replead is within the discretion of

the District Court, refusal to grant it without any justifying reason is an abuse of

discretion (authority)."

## CONCLUSION

State defendants purposefully and recklessly  used extortion, mail and wire fraud,

malicious prosecution and color of law without subject matter or personal jurisdiction,

thus creating a cause of action for all RICO acts cited with the specificity in plaintiff's

pleading as required by the RICO statute. It is respectfully submitted that by virtue of all

of the above, the Report and Recommendations of Magistrate Judge Frank Maas be

denied in full, and this matter move forward so that finally Plaintiff may receive the relief she seeks.

Dated: September 19, 2010

New York City

Elizabeth Combier
Plaintiff Pro Se
315 East 65th Street
New York, NY 10065
212-794-8902

49

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RAUL CLARK, BRUCE CLARK, and
IRAIDA CLARK,

      Plaintiffs,

        v.

MICHAEL T. CONAHAN, et al.,

      Defendants,

CIVIL ACTION NO. 3:09-CV-2535

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are the Motions to Dismiss of Defendants Mark A. Ciavarella, Jr. (Doc. 24), Michael T. Conahan (Doc. 28), Sandra Brulo (Doc. 59), Robert K. Mericle and Mericle Construction, Inc. (Doc. 68), PA Child Care, LLC ("PACC") (Doc. 70), Robert J. Powell and Vision Holdings, LLC (Doc. 72), and Barbara Conahan and Cindy Ciavarella (Doc. 78). For the various reasons discussed more fully below the motions of Mr. Conahan, Mr. Ciavarella, Ms. Brulo, Mr. Mericle, Mericle Construction, PACC, Powell, and Vision will be granted in part and denied in part, and the motion of Mrs. Conahan and Mrs. Ciavarella will be granted.

## BACKGROUND

### I.    GENERAL FACTS

The facts alleged in the Complaint are as follows. Defendants Ciavarella and Conahan both served as judges for the Pennsylvania Court of Common Pleas for Luzerne County. (Compl. ¶ 42.) Conahan served as president judge from January 2002 to June 2007, and Ciavarella served as president judge from June 2007 to January 2009. (Compl. ¶¶ 43, 46.) Defendant Ciavarella oversaw juvenile matters in his role as judge between 2000 and

conspiracy. Plaintiffs have alleged that Conahan, Ciavarella, Powell, PACC, Mericle, Miracle Construction, Mrs. Conahan, Mrs. Ciavarella, and Vision are "persons" within the meaning of 18 U.S.C. § 1961(3). (Compl. ¶ 251.) Plaintiffs also allege that these Defendants formed an enterprise within the meaning of § 1961(4).

RICO defines "person" as including "any individual, partnership, corporation, association, or other legal entity." Clearly, the group of individuals and legal entities alleged to have committed RICO violations are, in fact, "persons" as defined by § 1961(3). "Enterprise" includes a "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). However, associations-in-fact have been read liberally to include an enterprise consisting of individuals and corporate entities associating with one another. *See United States v. Console*, 13 F.3d 641, 652 (3d Cir. 1993). Here, Plaintiffs have alleged a sufficiently distinct enterprise from the "persons" who form that enterprise. Specifically, the "enterprise" here is an association-in-fact enterprise comprised of the aforementioned individuals and other legal entities.

In *United States v. Turkette*, 452 U.S. 576 (1981), the Supreme Court set forth three factors for establishing such a RICO enterprise: (1) 'an ongoing organization, formal or informal," (2) that "the various associated function as a continuing unit," and (3) that the enterprise exists "separate and apart from the pattern of activity in which it engages." *See Pappa v. Unum Life Ins. Co. Of America*, No. 3:07-CV-0708, 2008 WL 744820, at *10 (citations omitted). While Defendants are correct Plaintiffs will ultimately need to establish each of these factors, at this early juncture it is sufficient to merely to allege the existence of an association-in-fact enterprise. *Pappa v. Unum Life Ins. Co. Of America*, 2008 WL 744820, at *11(citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 789 (3d Cir.1984)). While Defendants' arguments that the enterprise did not exist apart from

the racketeering activity may have merit, Plaintiffs need not satisfy these requirements at this stage. Because Plaintiffs sufficiently allege that an association-in-fact enterprise existed, they have satisfied the pleading requirements of this element at this stage.

### b.    Participation in the Enterprise

A plaintiff must also establish that the defendants were associated with and participated in the "operation or management" of the enterprise to bring a cause of action pursuant to civil RICO. *Reves v. Ernest & Young*, 507 U.S. 170, 184 (1993). In order for a Defendant "to conduct or participate" in the affairs of a RICO enterprise, a defendant must, in some capacity, direct the affairs of the enterprise. *Id.* at 178-79. A defendant will not be liable simply because he provides services that benefit the enterprise; instead, there "must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." *University of Maryland at Baltimore,* 996 F.2d 1534, 1539 (3d Cir. 1993). That does not necessarily mean that a defendant must have a managerial position in the enterprise, but only that he or she "knowingly further[s] the illegal aims of the enterprise by carrying out the directives of those in control." *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998).

Here, Mrs. Ciavarella, Mrs. Conahan, and PACC argue that Plaintiffs have not sufficiently alleged participation in the enterprise. Turning first to Mrs. Conahan and Mrs. Ciavarella, the Complaint does not contain any allegations that Mrs. Ciavarella and Mrs. Conahan did anything to participate in the enterprise. As discussed above, Plaintiff's allege that they were owners and operators of Pinnacle, but that the entity was controlled by their husbands to engage in wire and mail fraud. Without more, the Complaint is devoid of any allegations that Mrs. Ciavarella or Mrs. Conahan were personally involved in taking any

action that would constitute knowingly advancing the illegal aims of the alleged association-in-fact.

Although *respondeat superior* liability may be applied under RICO where it is not otherwise prohibited by the statute, *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1358 (3d Cir. 1987),[7] PACC argues that it should not be held liable for Powell's actions because he was acting outside of the scope of his employment as an agent for PACC. Conduct is within the scope of employment if a) it is the kind that the employee is employed to perform, b) it occurs substantially within the authorized time and space limits, and c) it is actuated, at least in part, by a purpose to serve the master. *CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008). However, all of these inquiries are factual questions that are not properly determined at the motion to dismiss stage. Without a developed factual record, it is impossible to know the scope and contours of Powell's relationship with PACC. While his activities here might well be outside that scope, it is too early for this Court to make that determination and the motion to dismiss will be denied.

### 3.   Conspiracy under § 1962(d)

Plaintiffs allege that all Defendants participated in a conspiracy to violation § 1962(d). As stated above, Plaintiffs sufficiently allege that all Defendants, except Mrs. Conahan and Mrs. Ciavarella, participated in a conspiracy which included conduct in violation of § 1962(c). Therefore, the motions to dismiss of Mrs. Conahan and Mrs. Ciavarella will be granted, and the remaining motions will be denied.

---

[7]    This Court recognized that *Petro-Tech* ultimately held that *respondeat superior* liability under § 1962(c) was foreclosed "insofar as it would make the enterprise liable for RICO violations which victimized it." *Id.* at 1359. However, this case is readily distinguishable from *Petro-Tech*; in that case, plaintiff was trying to hold the defendant corporation liable as a participant in the RICO activity while at the same time alleging the corporation was the RICO enterprise being corrupted. In this case, PACC is not the enterprise for purposes of the RICO violation but is instead only alleged to be a "person" who participated in the association-in-fact.

### C.   Punitive Damages

Defendants Mericle, Mericle Construction, Powell, and Vision also argue that Plaintiffs have failed to allege a factual basis for their § 1983 punitive damages claims.  It is clear that in certain circumstances punitive damages may be awarded for violations of civil rights. *Cochetti v. Desmond*, 572 F.2d 102, 105 (3d Cir. 1978).  The test for determining whether punitive damages should be awarded for civil rights violations is whether Defendants acted with actual knowledge that they were violating a federally protected right or with reckless disregard for whether they were doing so. *Cochetti*, 572 F.2d at 106.  While Defendants again dispute whether the conspiracy was intended to violate Plaintiffs' rights, as stated above Plaintiffs sufficiently allege that Defendants Mericle and Powell, and, therefore Mericle Construction and Vision, were involved in the conspiracy to intentionally violate Plaintiffs' rights in furtherance of making PACC and WPACC profitable ventures for the conspirators. Defendants' request to dismiss claims for punitive damages will be denied.

### VII.   STATE LAW CLAIMS AGAINST ALL DEFENDANTS

#### A.   Count VI: False Imprisonment

In Count VI of the Complaint, Plaintiffs allege that all Defendants conspired to falsely imprison Raul and that Mr. and Mrs. Clark have suffered injury as a result of Raul's false imprisonment. It is unclear from the face of the Complaint whether this is a cause of action under civil conspiracy or simply a cause of action for false imprisonment. However because Plaintiffs have disclaimed a cause of action under civil conspiracy, this Court will treat this as a cause of action solely for false imprisonment. (*See* Doc. 89 at 29 n.4.)

First and foremost, Mr. and Mrs. Clark cannot recover under a theory of false imprisonment because they do not allege that they were ever detained. A claim of false imprisonment under Pennsylvania law requires: "(1) the detention of another person, and (2)

the unlawfulness of such detention." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa.

1994). An actor is liable for false imprisonment if "(1) he acts intending to confine the other

or a third person within boundaries fixed by the actor and (2) his act directly or indirectly

results in such a confinement of the other, and (3) the other is conscious of the confinement

or is harmed by it." *Crivellaro v. Pa. Power and Light Co.*, 24 Pa.D.&C.3d 590, 595 (Pa.

Com. Pl. 1982).

Defendants argue that the false imprisonment claims are barred by the statute of

limitations.  The statute of limitations for claims of false imprisonment in Pennsylvania is two

(2) years. 42 Pa. Cons. Stat. Ann. § 5524(1). Generally, the statute of limitations begins to

run "when the plaintiff knew or should have known of the injury upon which its action is

based." *Sameric Corp. of Del., Inc.  v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998).

Because Plaintiffs allege that they were aware of their detentions, the statute of limitations

on each claim would ordinarily have started running on the date each was released. *See*

*Martin v. Red Lion Police Dept.*, 146 Fed. Appx. 558, 561 (3d Cir. 2005) (statute of

limitations began upon release from hospital or at least when aware of nature of treatment

therein).

Plaintiffs argue that the statute of limitations should be equitably tolled until January

2009, when the U.S. Attorney filed a criminal information outlining the Defendants' alleged

conspiracy. First, they argue that the "discovery rule" should toll the statute of limitations.

"The purpose of the discovery rule has been to exclude from the running of the statute of

limitations that period of time during which a party who has not suffered an immediately

ascertainable injury is reasonably unaware he has been injured, so that he has essentially

the same rights as those who have suffered such an injury." *Fine v. Checcio*, 870 A.2d 850,

858 (Pa. 2005) (citation omitted).  While it may be true that Raul did not know of the

*conspiracy* until that date, the discovery rule acts to toll the statute of limitations until the *injury* is known. In this case, the alleged injuries arise from the imprisonment, which Plaintiffs allege were known from the time of incarceration. Therefore, the discovery rule is inapplicable here.

Plaintiffs also argue that the statute of limitations should be equitably tolled because of Defendants' intentional fraud or concealment of the facts relating to Raul's causes of action. "A party relying on this doctrine will be entitled to a tolling of the Statute of Limitations by proving that there has been either intentional or unintentional deception by the Defendant, and the statute will be tolled until the Plaintiffs would, through the exercise of reasonable diligence, have discovered the fraudulent concealment." *Piccolini v. Simon's Wrecking*, 686 F. Supp. 1063, 1074 (M.D. Pa. 1988) (internal citations omitted). "The Plaintiff, however, must prove such fraud or concealment by clear, precise, and convincing evidence." *Id.* (citing *Ritter v. Theodore Pendergrass*, 514 A.2d 930, 935 n. 8 (1986)). Plaintiffs sufficiently allege that Defendants intentionally acted to conceal their conspiracy from Plaintiffs and others. Concealment of the conspiracy may have prevented Plaintiffs from bringing the present cause of action. Ultimately, Plaintiffs will be required to prove the alleged fraud or concealment in order to equitably toll the statute of limitations. But, considering only the allegations in the complaint, the Court holds that equitable tolling might be appropriate here and will deny Defendants' motion to dismiss.

Defendants also argue that Plaintiffs have failed to state a claim upon which relief can be granted. Defendants argue that Plaintiffs have failed to sufficiently allege that Raul's detention lacked probable cause. When detention is in the form of an arrest, to show the unlawfulness of that detention, Plaintiff must show "that the process used for the arrest was void on its face or that the issuing tribunal was without jurisdiction; it is not sufficient that the

charges were unjustified." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 984-85 (Pa. Super. 1997). In order to consider the claims of false imprisonment and false arrest collectively, however, the confinement must be "inextricably intertwined with the unlawful arrest." *Gagliardi v. Lynn*, 285 A.2d 109, 128 (1971). Plaintiffs do not allege that Raul's arrests were unlawful or that the arresting officials were part of the conspiracy, thus it cannot be said that the arrest and confinement were "inextricably intertwined." Therefore, Plaintiffs need not allege a lack of probable cause to state a claim for false imprisonment.

As such, Raul has clearly stated a claim for false imprisonment against PACC and Powell, who were responsible for his detention following his probation violations. Furthermore, false imprisonment claims "can lie against one who instigated an arrest or imprisonment through his influence on a third party." *Gilbert v. Feld*, 788 F. Supp. 854, 862 (E.D. Pa. 1992). However, the only party that instigated the false imprisonment of Raul was Ciavarella when he issued an order confining Raul to PACC. As noted above, that type of in-court activity is shielded by absolute judicial immunity; therefore, Raul does not have a cause of action against Ciavarella for false imprisonment. The remaining defendants have not been alleged to be directly involved in the imprisonment of Raul or instigating the imprisonment of Raul; the Complaint fails to state a claim against these Defendants, although they may be liable for civil conspiracy, as discussed below.

Thus, the motion to dismiss the false imprisonment claim will be granted as to Mrs. and Mrs. Clark, denied as to Raul for PACC and Powell, and granted as to Raul for the remaining Defendants.

### B.   Count VII: IIED

_____"To prove a claim of intentional infliction of emotional distress, the following elements must be established: (1) the conduct must be extreme and dangerous; (2) it must be

intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. 1997).  Extreme and outrageous conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possibly bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997). Generally, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'outrageous'!" *Id.* Furthermore, "in order to state a claim under which relief can be granted for the tort of intentional infliction of emotional distress, the plaintiffs must allege physical injury." *Hart v. O'Malley*, 647 A.2d 542, 554 (Pa. Super. 1994); *see also Mann v. Brenner*, No: 1:06-cv-1715, 2008 WL 4491950, at *7 (M.D. Pa. Sept. 30, 2008).

In the instant case, Mr. and Mrs. Clark have not alleged that they suffered any type of physical injury. Raul has only alleged that he suffered "great emotional distress." Plaintiff argues that this is a sufficient allegation of physical injury to survive a motion to dismiss. Although allegations of emotional distress can be sufficient to support a claim for infliction of emotional distress, Plaintiffs' bare allegations on this matter are not sufficient to state a cause of action intentional infliction of emotional distress. *Compare Behm v. Luzerne County Children and Youth Policy Makers*, 172 F. Supp.2d 575, 588 (M.D. Pa. 2001) (dismissing intentional infliction of emotional distress claim for failure to allege physical injury), *with Frank v. Smith*, No. 3:09-cv-596, 2009 WL 5214978, at *4 (M.D. Pa. Dec. 29, 2009) (holding that allegation of "severe emotional distress, causing [plaintiff] to obtain both medical and psychiatric advice, medication, obtain ongoing counseling, subjecting her to therapy and deep depression" sufficient to defeat motion to dismiss). Here, Plaintiffs have not sufficiently alleged physical injury to make out a claim for intentional infliction of emotional distress, and

this count of the Complaint will be dismissed.

## **CONCLUSION**

For the various reasons discussed above the motions of Mr. Conahan, Mr. Ciavarella, Ms. Brulo, Mr. Mericle, Mericle Construction, PACC, Powell, and Vision will be granted in part and denied in part, and the motion of Mrs. Conahan and Mrs. Ciavarella will be granted.

August 25, 2010
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge